UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NICOLE VAN DORN, as Surviving Spouse and Personal
Representative for the Estate of Lt. J WESLEY VAN
DORN, USN, deceased;

AMY SNYDER, as Surviving Spouse and Personal
Representative for the Estate of Lt. SEAN
CHRISTOPHER SNYDER, USN, deceased;

CHEYENNE COLLINS, as Surviving Spouse and
Personal Representative for the estate of Petty Officer 3rd
Class BRIAN ANDREW COLLINS, USN, deceased; and

Petty Officer 2nd Class DYLAN MORGAN BOONE,
USN,

Plaintiffs,

- against -

SIKORSKY AIRCRAFT CORPORATION; SIKORSKY
SUPPORT SERVICES, INC. dba SIKORSKY
AEROSPACE SERVICES; HELICOPTER SUPPORT,
INC.; DERCO AEROSPACE, INC.; UNITED
TECHNOLOGIES CORPORATION;  LOCKHEED
MARTIN CORPORATION;

GENERAL ELECTRIC COMPANY; GE AVIATION,
LLC;

E.I. DU PONT DE NEMOURS & CO.; THE DOW
CHEMICAL COMPANY; and

L-3 COMMUNICATIONS CORPORATION,

Defendants.

**Docket No.**

**<u>COMPLAINT</u>**

**JURY TRIAL
DEMANDED**

**December 28, 2015**

Plaintiffs by and through their attorneys, KREINDLER & KREINDLER LLP,

respectfully allege:

## PLAINTIFFS

1.     On January 8, 2014, Lt. J WESLEY VAN DORN, USN, deceased (hereinafter "VAN DORN") was on active duty in the United States Navy and the pilot on board a Sikorsky MH-53E Sea Dragon helicopter, Bureau Number (BUNO) 163070, call sign Vulcan 543 (hereinafter "subject aircraft"), which crashed off the coast of Virginia Beach, Virginia.  VAN DORN was killed as a result of the crash of the subject aircraft.

2.     Plaintiff NICOLE VAN DORN is the duly appointed personal representative for the Estate of Lt. J Wesley Van Dorn, and she brings this action in her individual capacity as the surviving spouse of VAN DORN, in her representative capacity for the Estate of Lt. J Wesley Van Dorn, and for the decedent's two natural infant children, surviving parents, siblings, and next of kin.  NICOLE VAN DORN was appointed personal representative for the Estate of Lt. J Wesley Van Dorn in Virginia Beach, Virginia, on December 17, 2015.

3.     At the time of his death, VAN DORN was a citizen of Virginia.

4.     On January 8, 2014, Lt. SEAN CHRISTOPHER SNYDER, USN, deceased (hereinafter "SNYDER") was on active duty in the United States Navy and was the co-pilot on board the subject aircraft.  SNYDER was killed as a result of the crash of the subject aircraft.

5.     Plaintiff AMY SNYDER is the duly appointed personal representative for the Estate of Sean Christopher Snyder, and she brings this action in her individual capacity as the surviving spouse of SNYDER, in her representative capacity for the Estate of Lt. Sean Christopher Snyder, and for the decedent's four natural infant children, surviving parents, siblings, and next of kin.  AMY SNYDER was appointed as personal representative for the Estate of Lt. Sean Christopher Snyder in Virginia Beach, Virginia, on December 17, 2015.

2

6.   At the time of his death, SNYDER was a citizen of Virginia.

7.   On January 8, 2014, Petty Officer 3rd Class BRIAN ANDREW COLLINS, USN, deceased (hereinafter "COLLINS") was on active duty in the United States Navy and was an aircrewman on board the subject aircraft.  COLLINS was killed as a result of the crash of the subject aircraft.

8.   Plaintiff CHEYENNE COLLINS is the duly appointed personal representative for the Estate of Petty Officer 3rd Class Brian Andrew Collins, and she brings this action in her individual capacity as the surviving spouse of COLLINS, in her representative capacity for the Estate of Petty Officer 3rd Class Brian Andrew Collins, and for the decedent's surviving parents, siblings, and next of kin.  CHEYENNE COLLINS was appointed as personal representative for the Estate of Petty Officer 3rd Class Brian Andrew Collins in Norfolk, Virginia, on December 16, 2015.

9.   At the time of his death, COLLINS was a citizen of Virginia.

10.  On January 8, 2014, Plaintiff Petty Officer 2nd Class DYLAN MORGAN BOONE, USN, (hereinafter "BOONE") was on active duty in the United States Navy and was an aircrewman on board the subject aircraft.  BOONE was seriously and permanently injured as a result of the crash of the subject aircraft.

11.  BOONE is a citizen of Colorado.

## DEFENDANTS

12.  At all relevant times herein, Defendant SIKORSKY AIRCRAFT CORPORATION (hereinafter "SIKORSKY") was and is a Delaware corporation with its principal place of business in Stratford, Connecticut.

3

13. At all relevant times herein, Defendant SIKORSKY SUPPORT SERVICES, INC. (dba Sikorsky Aerospace Services) (hereinafter "SIKORSKY AEROSPACE")  was and is a Delaware corporation with its principal place of business in Stratford, Connecticut. SIKORSKY AEROSPACE is a wholly-owned subsidiary of SIKORSKY.

14. At all relevant times herein, Defendant HELICOPTER SUPPORT, INC. (hereinafter "HSI") was and is a Connecticut corporation with its principal place of business in Trumbull, Connecticut.  HSI is a wholly-owned subsidiary of SIKORSKY.

15. At all relevant times herein, Defendant DERCO AEROSPACE, INC. (hereinafter "DERCO") was and is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin, and, at all relevant times herein was and is continually and systematically doing business in the state of Connecticut.  DERCO is a wholly-owned subsidiary of SIKORSKY.

16. At all relevant times herein, Defendant UNITED TECHNOLOGIES CORPORATION (hereinafter "UTC"), was and is a Delaware corporation with its principal place of business in Farmington, Connecticut, and owned all Sikorsky entities.

17. At all relevant times herein, Defendant LOCKHEED MARTIN CORPORATION (hereinafter "LOCKHEED") was and is a Maryland corporation with its principal place of business in Bethesda, Maryland, and, at all relevant times herein was and is continually and systematically doing business in the state of Connecticut, and owned all Sikorsky entities.

18. LOCKHEED acquired SIKORSKY, SIKORSKY AEROSPACE, HSI, and DERCO from UTC in 2015.  SIKORSKY, SIKORSKY AEROSPACE, HSI, DERCO, UTC, and LOCKHEED will hereinafter be referred to as "SIKORSKY DEFENDANTS."

19. At all times herein mentioned, SIKORSKY DEFENDANTS, and each of them, and their aggregates, associates, and partners, and each of them, were the agents, servants, employers, assignees, permissive users, successors in interest, or joint venturers of each other, and were acting within the time, purpose, or scope of such agency or employment or permission, and all acts or omissions alleged herein of each such Defendant were authorized, adopted, approved, or ratified by each of the other Defendants.

20. At all times relevant herein, SIKORSKY DEFENDANTS were and are in the business of designing, manufacturing, testing, inspecting, assembling, instructing, maintaining, training, writing manuals regarding, advertising, marketing, warranting, selling, leasing, distributing, and placing into the stream of commerce the MH-53E line of aircraft, including the subject aircraft and its component parts, subject engines, wires and wiring insulation, fuel lines/fuel transfer tubes, fasteners, and ties

21. At all relevant times herein, Defendant GENERAL ELECTRIC COMPANY (hereinafter "GE") was and is a New York corporation with its principal place of business in Fairfield, Connecticut.

22. At all relevant times herein, Defendant GE AVIATION, LLC (hereinafter "GE AVIATION") was and is a Delaware corporation with its principal place of business in Cincinnati, Ohio, and was and is engaging in continuous and systematic contacts with the State of Connecticut.

23. At all relevant times, GE AVIATION, LLC was and is a wholly-owned subsidiary of GE.   GE AVIATION and GE will hereinafter be referred to as "GE DEFENDANTS."

24.  At all times herein mentioned, GE DEFENDANTS, and each of them, and their aggregates, associates, and partners, and each of them, were the agents, servants, employers, assignees, permissive users, successors in interest or joint venturers of each other, and were acting within the time, purpose, or scope of such agency or employment or permission, and all acts or omissions alleged herein of each such Defendant were authorized, adopted, approved, or ratified by each of the other Defendants.

25.  At all times relevant herein, GE DEFENDANTS were and are in the business of designing, manufacturing, testing, inspecting, assembling, instructing, maintaining, training, writing manuals regarding, advertising, marketing, warranting, selling, leasing, distributing and placing into the stream of commerce the MH-53E line of aircraft, including the subject aircraft and its component parts, subject engines, wires and wiring insulation, fuel lines/fuel transfer tubes, fasteners, and ties

26.  At all relevant times herein, Defendant E.I. DU PONT DE NEMOURS & COMPANY (hereinafter "DU PONT") was and is a Delaware corporation with its principal place of business in Wilmington, Delaware, and was and is engaging in continuous and systematic contacts with the State of Connecticut.

27.  At all relevant times herein, Defendant DOW CHEMICAL COMPANY (hereinafter "DOW") was and is a Delaware corporation, with its principal place of business in Midland, Michigan, and was and is engaging in continuous and systematic contacts with the State of Connecticut.

28.  As of the filing of this complaint, DU PONT and DOW are engaged in a corporate merger.  DU PONT and DOW will hereinafter be referred to as "DUPONT-DOW."

29. At all times herein mentioned, DUPONT-DOW, and each of them, and their aggregates, associates, and partners, and each of them, were the agents, servants, employers, assignees, permissive users, successors in interest or joint venturers of each other, and were acting within the time, purpose, or scope of such agency or employment or permission, and all acts or omissions alleged herein of each such Defendant were authorized, adopted, approved, or ratified by each of the other Defendants.

30. At all times relevant herein, DUPONT-DOW were and are in the business of designing, manufacturing, testing, inspecting, assembling, instructing, maintaining, training, writing manuals regarding, advertising, marketing, warranting, selling, leasing, distributing and placing into the stream of commerce the MH-53E line of aircraft, including the subject aircraft and its component parts, subject engines, wires and wiring insulation, fuel lines/fuel transfer tubes, fasteners, and ties.

31. At all relevant times herein, L-3 Communications Corporation (hereinafter "L-3") was and is a Delaware Corporation with its principal place of business in New York, and was and is engaging in continuous and systematic contacts with the State of Connecticut.

32. At all times relevant herein, L-3 was and is in the business of designing, manufacturing, testing, inspecting, assembling, instructing, maintaining, training, writing manuals regarding, advertising, marketing, warranting, selling, leasing, distributing and placing into the stream of commerce the MH-53E line of aircraft, including the subject aircraft and its component parts, subject engines, wires and wiring insulation, fuel lines/fuel transfer tubes, fasteners, and ties.

## JURISDICTION AND VENUE

33.   Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332.   The adverse parties are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.   Jurisdiction is also based on maritime jurisdiction under 28 U.S.C. § 1333 because the injuries alleged herein occurred on navigable waters off the coast of Virginia.

34.   Venue is proper in Connecticut, as many of the negligent and culpable acts giving rise to PLAINTIFFS' claim, including, but not limited to, the design, manufacture, distribution, and maintenance of the subject aircraft and its component parts, subject engines, wires and wiring insulation, fuel lines/fuel transfer tubes, fasteners, and ties took place in Connecticut.

## GENERAL ALLEGATIONS

35.   SIKORSKY DEFENDANTS, GE DEFENDANTS, DUPONT-DOW, and L-3 will hereinafter be referred to as DEFENDANTS.

36.   The Sikorsky MH-53E Sea Dragon helicopter and  its component parts, subject engines, wires and wiring insulation, fuel lines/fuel transfer tubes, fasteners, and ties are designed, manufactured, tested, inspected, assembled, maintained, marketed, warranted, sold, leased, and/or distributed by DEFENDANTS.

37.   The U.S. Navy's MH-53E fleet first became operational in 1986.   The fleet conducts mine sweeping operations and logistical support, among other services.

38.   Helicopter Mine Countermeasures Squadron Fourteen also known as Helmineron Fourteen (hereinafter "HM-14"), is an airborne mine countermeasures squadron in the U.S. Navy.   HM-14 is based in Norfolk, Virginia.   HM-14 operates approximately twelve MH-53E aircraft.

39. On November 26, 1990, HM-14 took delivery of the subject aircraft, a Sikorsky MH-53E Sea Dragon, Bureau Number (BUNO) 163070, call sign Vulcan 543.

40. On January 8, 2014, the subject aircraft was operated by HM-14 for a training flight (hereinafter "the subject flight") involving ocean minesweeping and aircraft ramp operator training.

41. VAN DORN was the pilot for the subject flight and SNYDER was the co-pilot. BOONE, COLLINS, and a third Naval serviceman who is not a party to this suit, were aircrewman. The subject flight took place off the coast of Virginia Beach, Virginia.

42. The subject aircraft took off from Naval Station Norfolk at approximately 8:11 AM. The subject aircraft began training operations off the coast of Virginia Beach, Virginia at approximately 8:40 AM. The training involved towing a minesweeping device through the water at approximately 100 feet of altitude.

43. At approximately 10:25 AM, an explosion occurred near the port wall aft of the gunner's window, i.e. on the left side of the aircraft to the rear of the gunner's window.

44. According to post-accident accounts, the explosion resembled a "flamethrower" and a "fireball," which came from the flight refuel filter and smokerack.

45. Fire and black smoke that smelled like fuel rapidly filled the aircraft. The crewmen tried unsuccessfully to extinguish the fire.

46. Blinded by the thick smoke, VAN DORN and SNYDER had no visual reference to the horizon and could not reference their flight instruments. As a result, the pilots lost spatial awareness and the aircraft violently struck the water and began to sink.

47. BOONE, who was severely and permanently injured in the crash, was able to swim to the surface of the water. VAN DORN was visible on the surface thirty to forty

yards away from BOONE and was yelling for help.  COLLINS was also on the surface of the water, floating unconscious and face down.

48.  A Navy aircraft pulled COLLINS and VAN DORN out of the water at approximately 11:15 AM and, because of the severity of their injuries, immediately flew them to Sentara Norfolk General Hospital.

49.  BOONE and the third crewman were rescued by another Navy aircraft at approximately 11:35 AM.

50.  On arrival at Sentara Norfolk General Hospital, COLLINS could not be revived and was pronounced dead at 11:41 AM.

51.  VAN DORN sustained massive internal injuries, an amputated left hand and right foot, hypothermia, and other severe injuries.  VAN DORN was pronounced dead from cardiac arrest at 4:35 PM.

52.  BOONE suffered severe and permanent injuries and ultimately survived.  The third crewman also survived.

53.  SNYDER was unable to escape the subject aircraft.  Navy divers recovered SNYDER's remains from the subject aircraft's cockpit on January 14, 2014.

54.  At the time of the subject flight, the subject aircraft and its component parts, subject engines, wires and wiring insulation, fuel lines/fuel transfer tubes, fasteners, and ties had recently undergone the first of three life extension maintenance and overhaul phases.  As part of these phases, Kapton wiring in the subject aircraft was to be replaced.  At the time of the subject flight, not all of the Kapton wiring had been removed from the subject aircraft.

55.  The Kapton wiring was designed, manufactured, tested, inspected, assembled, maintained, marketed, warranted, sold, leased, and/or distributed by DEFENDANTS.

56. Kapton wiring is defective and unsafe due to its susceptibility to corrosion, degradation, deterioration, wear, alteration upon contact with water, carbonization upon exposure to heat, and disintegration. These defects rendered the wiring in the subject aircraft prone to arcing events, arc tracking, flashover, deflagration, and other unplanned conduction and energizing events.

57. The life extension maintenance and overhaul phases, as well as maintenance, inspection, updates, overhauls, and repairs of the subject aircraft and its component parts, subject engines, wires and wiring insulation, fuel lines/fuel transfer tubes, fasteners, and ties were carried out by DEFENDANTS.

58. Wiring in the aircraft, including but not limited to the Kapton wiring, was designed, manufactured, tested, inspected, assembled, maintained, marketed, warranted, sold, leased, and/or distributed by DEFENDANTS.

59. Portions of the wiring in the aircraft, including but not limited to the Kapton wiring, were bundled together by DEFENDANTS using nylon zip ties.

60. An engineering investigation, conducted in furtherance of the Manual of the Judge Advocate General (JAGMAN) final report of the crash, revealed two "through-wall" holes in the subject aircraft's fuel transfer pressure tube.

61. The fuel transfer pressure tube is an aluminum component of the aircraft's fuel transfer system located inside the aircraft. It transfers fuel from storage tanks inside the aircraft's sponsons to a location selected by the crew.

62. The first hole was on the front side of the fuel transfer tube and measured .134 inches long and .011 inches wide. The report concluded this rupture was likely caused by a

nylon zip tie used to bundle the electric wiring in the aircraft, which rubbed against and chafed the fuel transfer tube.

63.    The JAGMAN report concluded a nylon zip tie likely caused the breach for two reasons.  First, rounded contours at each edge of the breach chafe area were consistent with the contours of a large or medium-sized nylon zip tie.  Second, no foreign metal transfer was found in the chafe damage area.

64.    Safe operation, repair, and maintenance of the MH-53E requires a minimum of two inches between wiring and any flammable liquid, fuel, or oxygen line.  In addition, wires in the vicinity of fuel transfer tubes must be closely clamped and rigidly supported to prevent contact with ignitable sources.  Finally, zip ties should be appropriately fastened to remove any sharp edges that might increase the risk of chafing of adjacent aircraft components.

65.    The second hole in the fuel transfer tube was oval shaped and measured .225 by .110 inches.  The second hole was located approximately .25 inches below the first hole, near the front side of the fuel transfer tube.  The perimeter around the second hole displayed shallow chafe damage into the parent material of the tube.  Stereoscopic examination of the second hole revealed it was likely caused by electrical arcing/shorting in an area of chafing damage, which was produced by an active conductor tack welding directly to the surface of the fuel transfer tube.  Stereoscopic examination also revealed a dispersal of carbon around the perimeter of the hole, consistent with a fuel vapor cloud perimeter.

66.    The JAGMAN report concluded that wire bundle chafing caused a breach in the insulation of an actively conductive wire near the fuel transfer tube, causing electrical arcing to the fuel transfer tube's chafed surface and resulting in the ignition of fuel or fuel vapor.

67.   The resulting explosion caused the onboard fire that directly led to the subject crash, the deaths of VAN DORN, SNYDER, and COLLINS, and the serious and permanent injuries suffered by BOONE.

**FIRST CLAIM FOR WRONGFUL DEATH
AND SURVIVAL DAMAGES ARISING OUT OF THE
WRONGFUL DEATHS OF LT. J WESLEY VAN DORN, LT. SEAN CHRISTOPHER
SNYDER, AND PETTY OFFICER THIRD CLASS BRIAN ANDREW COLLINS.**

68.   PLAINTIFFS hereby incorporate by reference paragraphs 1 through 67 above.

69.   On January 8, 2014, DEFENDANTS owed PLAINTIFFS a duty to exercise reasonable care in the study, analyses, design, manufacture, assembly, inspection, testing, distribution, sale, servicing, maintenance, overhaul, and/or repair of the subject aircraft and its component parts, including the subject engines, electrical wires, wire insulation, fuel lines/fuel transfer tubes, fasteners, and ties related thereto and the duty to use reasonable care in the development, production and distribution of instructions for the safe use of the subject aircraft, including, but not limited to, operation, training, and maintenance manuals in accordance with the airworthiness requirements, standards of performance in the industry, and standards promulgated by the United States Government, and to do so in a reasonable and prudent manner so as not to allow the subject aircraft and its component parts and systems, including electrical wires, wire insulation, fuel lines/fuel transfer tubes, fasteners, and ties related thereto to be unairworthy, and/or otherwise unsafe so as to pose an unreasonable risk of injury and death to U.S. Navy and U.S. Marine Corps personnel, including PLAINTIFFS.

70.   Upon information and belief, at all relevant times stated herein, the subject crash, injuries, death, and resultant damages were proximately caused by the negligence of DEFENDANTS, by and through their officers, agents, employees, servants and others under

their employ and control, in that DEFENDANTS breached their aforesaid duties, carelessly failed to properly design, study, analyze, manufacture, assemble, inspect, service, overhaul, repair, alter, modify, test, certify, and maintain the subject aircraft and its component parts, including the subject engines, wires and wiring insulation, fuel lines/fuel transfer tubes, and ties related thereto, and failed to adequately detect, correct and warn or caution about dangerous and unsafe conditions causing the subject aircraft, electrical wires, wire insulation, and fuel lines/fuel transfer tubes to be unairworthy and/or otherwise unsafe on and prior to January 8, 2014, and caused or contributed to the crash of the subject aircraft.

71. Specifically, DEFENDANTS were negligent, by act or omission, and breached their duty of care owed to PLAINTIFFS, in one or more of the following respects, by:

a. Failing to employ the proper safe distance and other safeguards between: (1) the fuel lines/fuel transfer tubes running from the subject aircraft's fuel tanks to the engines; and (2) wire bundles used to transmit electrical currents to aircraft components and systems;

b. Failing to properly secure zip ties that were supposed to safely bundle and stow electrical wires and failing to keep the zip ties from fuel lines/fuel transfer tubes and other aircraft components containing ignitable substances;

c. Failing to prevent chafing of the fuel lines/fuel transfer tubes and electrical wires by the zip ties, causing damage and deterioration of the fuel lines/fuel transfer tubes, and electrical wires; and failing to prevent electrical current, heat, and electrical arcing to ignitable fuels and/or fuel vapors from the compromised and damaged fuel lines/fuel transfer tubes and electrical wires, causing an explosion, fire, and blinding smoke.

14

d.   Failing to adequately warn users, operators, and maintainers of the subject aircraft of the chafing risks posed by the use of nylon zip ties and/or improperly secured nylon zip ties.

e.   Failing to adequately warn users, operators, and maintainers of the subject aircraft of the risks posed by close proximity between electric wires and fuel lines/fuel transfer tubes.

f.   Manufacturing, distributing, failing to remove, and installing Kapton wiring in the subject aircraft, which was defective and unsafe due to its susceptibility to corrosion, degradation, deterioration, wear, alteration upon contact with water, carbonization upon exposure to heat, and disintegration, and which defects rendered the wiring in the aircraft prone to arcing events, arc tracking, flashover, deflagration, and other unplanned conduction and energizing events.

g.   Manufacturing, distributing, and installing fuel lines/fuel transfer tubes that were defective and unsafe due to their susceptibility to corrosion, degradation, deterioration, wear, and alteration

72.   On January 8, 2014, the subject aircraft and its component parts, including the subject engines, electrical wires, wire insulation, fuel lines/fuel transfer tubes, fasteners, and ties related thereto were unreasonably dangerous and unsafe by reason of DEFENDANTS' defective design, manufacture, assembly, testing, inspection, service, distribution, and sale of the subject aircraft and its component parts, inadequate and unsafe instructions, manuals, cautions, and warnings.

73. At all times material hereto and prior to January 8, 2014, DEFENDANTS had an ongoing and continuing duty to warn and were required by contract, specification, standard and/or otherwise, to make certain that any defects in the component and replacement parts for the aircraft, including, but not limited to, the subject aircraft's engines, electrical wires, wire insulation, fuel lines/fuel transfer tubes, fasteners, and ties, were corrected prior to causing injury or death.

74. Upon information and belief, DEFENDANTS breached their post-sale duty to adequately warn of and to correct the defective and dangerous conditions in the component and replacement parts for the subject aircraft, including, but not limited to, the subject aircraft's engines, electrical wires, wire insulation, fuel lines/fuel transfer tubes, fasteners, and ties.

75. As a proximate cause of the defective conditions of the component and replacement parts for the subject aircraft, including but not limited to the subject aircraft's engines, electrical wires, wire insulation, fuel lines/fuel transfer tubes, fasteners, and ties, inadequate and defective warnings, and the failure to warn of and/or correct these defects, as alleged herein, and as a direct result of the negligent acts and omissions of DEFENDANTS, the subject aircraft crashed and VAN DORN, SNYDER, and COLLINS suffered fatal injuries.

76. On January 8, 2014, the subject aircraft and its component parts, including the subject engines, electrical wires, wire insulation, fuel lines/fuel transfer tubes, fasteners, and ties related thereto were being operated and used for the purpose and in the manner for which they were designed, manufactured, assembled, tested, inspected, serviced, distributed, sold

and intended to be used, and in a manner foreseeable to defendants and for which adequate and safe instructions, manuals, cautions, and warnings were required to be issued.

77.  The defects in the design, manufacture, assembly, instructions, manuals and warnings, testing, inspection, service, distribution and sale of the subject aircraft and its component parts, including the subject engines, electrical wires, wire insulation, fuel lines/fuel transfer tubes, fasteners, and ties related thereto caused the subject aircraft to crash and caused VAN DORN, SNYDER, and COLLINS to suffer serious and fatal injuries.

78.  In addition, as shown by the sudden malfunction on board the subject aircraft, there were catastrophic defects in the subject aircraft and its component parts, including the subject engines, electrical wires, wire insulation, fuel lines/fuel transfer tubes, fasteners, and ties.  Said defects existed at the time the subject aircraft left DEFENDANTS' control and were not solely the result of causes other than a product defect existing at the time of DEFENDANTS' manufacture, distribution, maintenance, and repair of the subject aircraft and its engines, electrical wires, wire insulation, fuel lines/fuel transfer tubes, fasteners, and ties.

79.  Prior to January 8, 2014, defendants expressly and/or implicitly warranted and represented that the subject aircraft, the subject engines, and their component parts, including wires and wiring insulation, fuel lines/fuel transfer tubes, fasteners, and ties related thereto were airworthy, of merchantable quality, fit and safe for the purposes for which they were designed, manufactured, assembled, tested, serviced, distributed, sold, intended, used, and that the instructions, manuals, cautions, and warnings that had been issued were adequate and safe, and further that the subject aircraft and its component parts, including the subject

engines, and their component parts, including wires and wiring insulation, fuel lines/fuel transfer tubes, fasteners, and ties related thereto were free from defects.

80. DEFENDANTS breached said express and implied warranties in that on January 8, 2014, the subject aircraft and its component parts, including the subject engines, electrical wires, wire insulation, fuel lines/fuel transfer tubes, fasteners, and ties related thereto were not airworthy, of merchantable quality, fit and safe for the purposes for which they were designed, manufactured, assembled, tested, serviced, distributed, sold, intended, and used, and the instructions, manuals, and warnings which had been issued were not adequate and safe, but were defective and thereby caused the subject crash and caused VAN DORN, SNYDER, and COLLINS to suffer serious and fatal injuries.

81. As a proximate cause of DEFENDANTS' negligence, failure to warn, unreasonably dangerous and defective products, and breach of warranties, and the death of VAN DORN as aforesaid, the Estate of Lt. J Wesley Van Dorn, the decedent's wife, two natural infant children, and all surviving parents, siblings, and next of kin, and each of them, have sustained damages, including, but not limited to, the loss of earnings of the decedent, loss of services, loss of inheritance, loss of prospective accumulations, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, attention, advice, counsel, training, guidance, and education, and are entitled to be compensated therefor.

82. As a proximate cause of DEFENDANTS' negligence, failure to warn, unreasonably dangerous and defective products, Decedent VAN DORN sustained serious personal injuries and other medical conditions, which resulted in prolonged severe and

excruciating conscious pain, suffering and fear of impending death from the moment of the explosion and resulting smoke and fire up to the moment of decedent's wrongful death.

83. As a proximate cause of DEFENDANTS' negligence, failure to warn, unreasonably dangerous and defective products, and breach of warranties, and the death of SNYDER as aforesaid, the Estate of Lt. Sean Christopher Snyder, the decedent's wife, four natural infant children, and all surviving parents, siblings, and next of kin, and each of them, have sustained damages, including, but not limited to, the loss of earnings of the decedent, loss of services, loss of inheritance, loss of prospective accumulations, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, attention, advice, counsel, training, guidance, and education, and are entitled to be compensated therefor.

84. As a proximate cause of DEFENDANTS' negligence, failure to warn, unreasonably dangerous and defective products, and breach of warranties, SNYDER sustained serious personal injuries and other medical conditions, which resulted in prolonged severe and excruciating conscious pain, suffering and fear of impending death from the moment of the explosion and resulting smoke and fire up to the moment of decedent's wrongful death.

85. As a proximate cause of DEFENDANTS' negligence, failure to warn, unreasonably dangerous and defective products, breach of warranties, and the deaths of COLLINS as aforesaid, the Estate of Petty Officer 3rd Class Brian Andrew Collins, the decedent's wife, and all surviving parents, siblings, and next of kin, and each of them, have sustained damages, including, but not limited to, the loss of earnings of the decedent, loss of services, loss of inheritance, loss of prospective accumulations, mental anguish, emotional

pain and suffering, loss of society, companionship, comfort, protection, marital care, attention, advice, counsel, training, guidance, and education and are entitled to be compensated therefor.

86.  As a proximate cause of DEFENDANTS' negligence, failure to warn, unreasonably dangerous and defective products, and breach of warranties, Decedent COLLINS sustained serious personal injuries and other medical conditions, which resulted in prolonged severe and excruciating conscious pain, suffering and fear of impending death from the moment of the explosion and resulting smoke and fire up to the moment of decedent's wrongful death.

87.  VAN DORN, SNYDER, and COLLINS allege that DEFENDANTS should be punished by an award of exemplary damages over and above compensatory damages, sufficient to deter DEFENDANTS and others similarly situated from committing the acts and/or omissions detailed herein.

88.  By reason of the foregoing, PLAINTIFFS are entitled to recover all legally available damages including, but not limited to, damages for: sorrow, mental anguish and solace, pre-death pain and suffering, loss of income, services, protection, care, and assistance of the deceased, medical expenses, funeral expenses, and punitive damages, in amounts according to proof and within the jurisdiction of this court.

**SECOND CLAIM FOR DAMAGES FOR PERSONAL INJURIES OF PETTY OFFICER 2ND CLASS DYLAN MORGAN BOONE**

89.  Plaintiff BOONE hereby incorporates by reference paragraphs 1 through 88 above.

90.  As a proximate cause of DEFENDANTS' aforesaid negligence, failure to warn, unreasonably dangerous and defective products, and breach of warranties, BOONE has sustained serious and permanent personal injuries.

91.  As a result of said injuries, BOONE has lost earnings and earnings capacity. Plaintiff will pray leave of court to be compensated for both past and future claimed lost earnings and earnings capacity at the time of trial.

92.   BOONE has and will also continue to suffer severe and excruciating physical pain and suffering, distressing mental anguish, fear of impending death, and emotional distress as a result of said injuries.  In the treatment of the aforesaid injuries, BOONE was compelled to and did employ the services of physicians, surgeons, and other medical personnel, and incurred expenses relative to the care and treatment of said injuries.  BOONE is informed and believes and thereupon alleges that he will be compelled to seek further treatment in the future for care and treatment of said injuries and to incur further expenses for the same. BOONE will pray leave of court to receive compensation for both past and future claimed medical and related expenses at the time of trial.

93. BOONE alleges that DEFENDANTS should be punished by an award of exemplary damages over and above compensatory damages, sufficient to deter DEFENDANTS and others similarly situated from committing the acts and/or omissions detailed herein.

94. By reason of the foregoing, BOONE is entitled to recover the aforesaid damages and any and all other available damages under applicable law from defendants in amounts according to proof and within the jurisdiction of this court.

WHEREFORE, PLAINTIFFS respectfully request that judgment be entered on their behalf for compensatory damages against each of DEFENDANTS as set forth above, as well as punitive/exemplary damages over and above compensatory damages against each of DEFENDANTS, together with an award of pre and post judgment interest, costs, attorneys' fees, and such other relief as this Court may deem appropriate.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.

Dated:   December 28, 2015                    Respectfully submitted,

                                              KREINDLER & KREINDLER LLP

                                              By: _____
                                                  Andrew J Maloney (CT 15639)
                                                  Francis G. Fleming
                                                  750 Third Avenue
                                                  New York, New York 10017
                                                  Tel.: (212) 687-8181
                                                  Fax:  (212) 972-9432
                                                  Email: amaloney@kreindler.com
                                                  Email: ffleming@kreindler.com

                                              *Attorneys for Plaintiff*