# Exhibit B

**(UNPUBLISHED OPINIONS)**

2016 WL 915102
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Ludwig's Drug Store, Inc., Jermaine Pratt, Sean
Scarborough and Glen Defreitas, Plaintiffs,
v.
Forest City Enterprises, Inc., Brooklyn
Events Center, LLC d/b/a Barclays Center,
Compass Group USA, Inc. and Levy Premium
Foodservice Limited Partnership, Defendants.

13-CV-6045 (MKB)
|
Signed 03/04/2016

**MEMORANDUM & ORDER**

MARGO K. BRODIE, United States District Judge

*1 On March 12, 2014, Plaintiffs Ludwig's Drug Store, Inc. ("Ludwig's"), Jermaine Pratt, Sean Scarborough and Glen Defreitas filed a Second Amended Complaint [1] in the above-captioned action asserting claims against Defendants Forest City Enterprises, Inc. ("Forest"), Brooklyn Events Center, LLC, doing business as Barclays Center ("BEC"), Compass Group USA, Inc. ("Compass") and Levy Premium Foodservice Limited Partnership ("Levy"). The Second Amended Complaint ("SAC") alleges that Defendants discriminated against Plaintiffs on the basis of race in connection with a license agreement between BEC and Ludwig's and asserts claims pursuant to (1) the New York State Human Rights Law, N.Y. Exec. Law § 296(2)(a) ("NYSHRL"); (2) the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 ("NYCHRL"); (3) 42 U.S.C. § 1981; and (4) 42 U.S.C. § 1983; and (5) for breach of contract claim under New York State law. (SAC ¶¶ 14, 27, 53–76, Docket Entry No. 22.) Plaintiffs seek compensatory and punitive damages, attorney's fees, costs and injunctive relief. (Id. ¶¶ 57, 61, 67, 72, 76.)

[1] Ludwig's commenced this action on October 31, 2013 against Forest, BEC and Compass One, LLC ("Compass One"). (Compl., Docket Entry No. 1.) On December 5, 2013, Ludwig's, Pratt, Scarborough and Defreitas filed an Amended Complaint asserting claims against Forest,

BEC and Compass One. (Am. Compl., Docket Entry No. 10.)

On June 10, 2014, BEC and Forest moved to dismiss all claims asserted against them in the SAC for failure to state a claim, except for the breach of contract claim by Ludwig's against BEC. (Not. of Mot. to Dismiss on behalf of Defs. Forest & BEC ("Forest & BEC Mot."), Docket Entry No. 30; Mem. in Supp. of Forest & BEC Mot. ("Forest & BEC Mem."), Docket Entry No. 31.) By separate motion filed on June 10, 2014, Compass and Levy moved to dismiss all claims asserted against them in the SAC for failure to state a claim. (Not. of Mot. to Dismiss on behalf of Defs. Compass & Levy ("Compass & Levy Mot."), Docket Entry No. 34; Mem. in Supp. of Compass & Levy Mot. ("Compass & Levy Mem."), Docket Entry No. 36.)

On March 30, 2015, the Court heard oral arguments on Defendants' motions (the "March 30, 2015 Hearing") and, for the reasons stated on the record and explained below, the Court partially granted the motions to dismiss from the bench and reserved decision as to certain claims. (Mar. 31, 2015 Min. Entry.) During the March 30, 2015 Hearing, the Court dismissed: (1) the section 1983 claim against all Defendants; (2) all remaining claims — under section 1981, the NYSHRL and the NYCHRL, and for breach of contract — against Forest and Compass; and (3) the breach of contract claim against Levy. (Id.) The Court reserved decision as to the remaining claims against BEC and Levy — under section 1981, the NYSHRL and the NYCHRL — and Pratt's, Scarborough's and Defreitas' (collectively the "Individual Plaintiffs") breach of contract claims against BEC. (Id.)

*2 For the reasons set forth below, the Court grants BEC's motion to dismiss the SAC in part and grants Levy's motion to dismiss in its entirety. The Court dismisses Plaintiffs' section 1981, NYSHRL and NYCHRL claims against BEC and declines to exercise supplemental jurisdiction over Plaintiffs' state law breach of contract claims against BEC.

**I. Background**
On October 10, 2013, BEC, as licensor, and Ludwig's, as licensee, entered into the Barclays Center Suite License Agreement (the "Agreement"). (Agreement 1, annexed to SAC as Ex. A, Docket Entry No. 22-1; SAC ¶ 14.) Pursuant to the Agreement, Ludwig's obtained a license to use a suite at the Barclays Center arena located in Brooklyn, New York (the "Arena") in accordance with the Agreement's terms and conditions. Plaintiffs allege that the Individual Plaintiffs use

the suite during events held at the Arena and that Defendants have subjected the Individual Plaintiffs and their African-American guests to racial discrimination.

### a. Parties

Ludwig's, a New York corporation, is a "neighborhood pharmacy" located in Brooklyn, New York. [2] (SAC ¶¶ 5, 20.) Defreitas is Ludwig's "designated agent," (*id.* ¶ 6), and Pratt and Scarborough are both employees of Ludwig's, (*id.* ¶¶ 7–8). Defreitas, Pratt and Scarborough are all African-American. (*Id.* ¶¶ 23-24.) Forest, an Ohio corporation licensed to do business in New York, is the owner of the Arena. (*Id.* ¶ 9.) BEC, a Delaware corporation licensed to do business in New York, "manages" the Arena. (*Id.* ¶ 10.) Compass is a North Carolina limited liability company licensed to do business in New York. (*Id.* ¶ 11.) Levy is the wholly-owned subsidiary of Compass. (*Id.* ¶ 12.) Plaintiffs allege "on information and belief" that Levy provides catering services for the Arena. (*Id.*)

[2]   The facts alleged in the SAC are assumed to be true for the purposes of the motions to dismiss.

### b. The Arena

Plaintiffs allege that, prior to the construction of the Arena, the State of New York (the "State") expropriated the land on which the Arena now stands through eminent domain. (*Id.* ¶ 21.) Plaintiffs also allege that the Metropolitan Transit Authority leases the land on which the Arena is now located from the State. (*Id.*) Plaintiffs further allege that Forest receives "tax benefits and public subsidies" from the State, and the State "has also provided significant encouragement to Forest, and by association, to Levy and BEC." (*Id.* ¶ 22.)

The Arena is the home of the National Basketball Association team known as the Brooklyn Nets and is a venue for a variety of concerts and performances. (*See* Agreement 3; *see also* SAC ¶ 49.) There are 104 spectator suites with box-seating located within the Arena. (SAC ¶¶ 15, 26.)

### c. The Agreement

The Agreement states, "this Barclays Center Suite License Agreement (this '<u>License Agreement</u>') is entered into by and

between Brooklyn Events Center, LLC d/b/a Barclays Center ('<u>Licensor</u>') ... and Ludwig[']s Drug Store Inc. ('Licensee') ... this 10th day of October 2013 (the '<u>Commencement Date</u>')." (Agreement 1 (capitalization omitted).) Richard Mastrota, who is the President of Ludwig's and is Caucasian, signed the Agreement on behalf of Ludwig's. (Agreement 2; SAC ¶ 23.) Under the Agreement, BEC agreed to provide Ludwig's with a license to use the suite number B-5 (the "Suite") for a three-year term from October of 2013 to September of 2016. (Agreement 1; SAC ¶¶ 14, 16.) In exchange, Ludwig's agreed to pay license fees in accordance with a payment schedule. (Agreement 1, Schedule B; SAC ¶ 17.)

**\*3** Pursuant to the Agreement, Ludwig's is entitled to a set number of tickets to certain events held at the Arena, and the tickets may be used by Ludwig's employees and their guests to access the Suite during such events. (Agreement 1, 3–4; SAC ¶¶ 14–15.) The Agreement includes a provision regarding "Suite Services" that states, in relevant part:

> During the *Term*, Licensor shall furnish to the Suite at its expense the following: (a) Maintenance of the Suite and the appliances, fixtures, equipment and furniture included therein in good order and repair, subject to ordinary wear and tear; provided, however, that Licensee shall be responsible for any repairs or replacements beyond ordinary wear and tear, such repairs to be made at the direction of Licensor and at Licensee's cost (as described below). (b) Cleaning service, including vacuuming, removal of debris and general cleaning of space within a reasonable time after each Event during which Licensee uses the Suite.

(Agreement 5, ¶ 17.) The Agreement also provides for suite amenities including food and beverage service during events. (Agreement Schedule A; SAC ¶ 15.) The Agreement includes a provision regarding transfers and assignments, (Agreement 4, ¶ 8), and an integration clause, (*id.* at 6, ¶ 23). Plaintiffs allege that Levy provides food and beverage services for the Suite. (SAC ¶ 18.) Plaintiffs further allege, upon information and belief, that staff provided by Forest, BEC and Levy are

responsible for "clean[ing], maintain[ing], and servic [ing]" the Suite. [3] (*Id.* ¶ 19.)

[3]  The terms of the Agreement only confirm that BEC agreed to "furnish to the Suite at its expense" maintenance and cleaning services. (Agreement 5, ¶ 17.) The Agreement does not mention Levy, and Forest is only mentioned in provisions that have no bearing on this allegation. (*See id.* at 4, ¶ 7(a) (indemnity provision stating that BEC's corporate affiliates including Forest shall not be liable for injuries to persons or property caused by Ludwig's or its invitees); *id.* at 6, ¶ 21 (insurance provision stating that Ludwig's shall maintain commercial general liability insurance and providing that BEC and affiliates including Forest are to be named as additional insureds under the policy).)

### d. Alleged discrimination

According to Plaintiffs, each of the Individual Plaintiffs is "directly involved" with the Suite. (*Id.* ¶¶ 23–24.) Upon entering and signing the Agreement on Ludwig's behalf, Mastrota made Defreitas the "manager" of the Suite and tasked him with handling all "dealings" and communications with BEC and all ticket distributions in connection with the Agreement. (*Id.* ¶ 23.) The Individual Plaintiffs frequent the Suite during events at the Arena and they use the Suite to entertain guests. (*See id.* ¶¶ 24, 40–41.)

Plaintiffs allege, upon information and belief, that, as distinct from the Suite, none of the other suites in the Arena are "licensed, managed, or typically utilized by African[-]Americans." (*Id.* ¶ 25.) Plaintiffs further allege that Defendants discriminated against the Individual Plaintiffs and their African-American guests on account of their race. (*Id.* ¶ 27.)

### i. BEC's refusal to interface
### with Defreitas as Suite manager

According to Plaintiffs, at the time when BEC and Ludwig's entered the Agreement, Mastrota advised BEC that Defreitas would be managing the Suite. (*Id.* ¶ 23.) Although Mastrota directed BEC to interface solely with Defreitas and asked that BEC send all correspondence and tickets directly to Defreitas, BEC ignored these requests and instead sent all correspondence and tickets to Mastrota. (*Id.*) BEC also invited Mastrota, and not Defreitas, to a dinner organized

for suite holders. (*Id.* ¶ 28.) When Mastrota reiterated his instructions to BEC regarding Defreitas, BEC "refused to work through Defreitas." (*Id.* ¶ 23.) Plaintiffs also allege that Defendants did not provide them with tickets to certain "special events," including the "Legends Classic 2013," even though Plaintiffs were entitled to such tickets under the Agreement. (*Id.* ¶ 29.)

### ii. Harassment of the Individual
### Plaintiffs by Arena staff and security

**\*4**  Plaintiffs allege that the Individual Plaintiffs are "continually harassed, followed, and questioned" when they attend events at the Arena. (*Id.* ¶ 39.) Plaintiffs specifically allege three instances of such harassment. (*See id.* ¶¶ 30–31.) Plaintiffs allege, upon information and belief, that non-African-American patrons are not subjected to the same treatment by Arena staff. (*Id.* ¶ 39.)

On or about October 19, 2013, while using the Suite, the Individual Plaintiffs overheard a radio communication indicating that "the people in their Suite were considered a security threat." (*Id.* ¶ 31.) Shortly thereafter, Arena security raided suite number B-16, which is located on the same level of the Arena as the Suite. (*Id.*; Diagram of Approx. Location of the Suite, annexed to Agreement as Ex. A.) During the raid, the people present in suite B-16 were forced to remain on the ground while security checked their identification. (SAC ¶ 31.) Plaintiffs allege, upon information and belief, that the raid of suite B-16 was a mistake because security actually intended to raid the Suite. (*Id.*)

Plaintiffs also allege that Lawrence Saurs, who was employed by BEC as its "Manager of Premium Partnerships," "treated Defreitas as if he did not belong" in the Arena. (*Id.* ¶ 30.) Plaintiffs further allege, upon information and belief, that BEC "directed Saurs to treat Defreitas suspiciously based on his race." (*Id.*) On or about October 19, 2013, when Saurs encountered Defreitas at a "VIP entrance" to the Arena, Saurs asked Defreitas why he was frequently at the Arena. (*Id.*) Approximately one week later, during another encounter between Saurs and Defreitas at the same VIP entrance, Saurs again asked Defreitas why he was frequently at the Arena, and Defreitas told Saurs that he had licensed a suite. (*Id.*) In response, Saurs stated "sometimes I have to be the bad guy" and told Defreitas that he had a background in law enforcement. (*Id.*)

### iii. Substandard food, beverage, cleaning and maintenance services

Plaintiffs allege that when the Individual Plaintiffs and their African-American guests use the Suite, they are subjected to "deplorable" food, beverage, cleaning and maintenance services. (*Id.* ¶ 32.) Plaintiffs also allege, "[u]pon information and belief, [that] Levy executives have directed their staff to provide subpar" services to the Suite, (*id.* ¶ 35), and Jordan Beckerman, a "supervisor" at Levy, "has [ ] warned Levy employees to avoid [the Suite]," (*id.* ¶¶ 48, 50). Plaintiffs further allege that "proper" services are provided to the Arena's other suites, which are licensed by and used to host non-African-American patrons. (*Id.* ¶ 34.) Plaintiffs also allege that "when [the Suite] hosts numerous Caucasian guests, food and housekeeping service is proper." (*Id.* ¶ 33.)

#### 1. Cleaning services

Plaintiffs allege that "housekeeping does not clean [the Suite] without a specific request" and the Suite is "routinely" left "dirty and disorganized." (*Id.* ¶ 32.) Plaintiffs allege that on November 19, 2013, because housekeeping had "left [the Suite] as a mess," Pratt was cleaning the Suite himself and a patron from a neighboring suite licensed by CBS Radio observed Pratt doing so. (*Id.* ¶ 36.) Plaintiffs allege that the CBS Radio suite is "regularly and immaculately cleaned," and that the CBS Radio patron was "shocked" at the state of the Suite and asked Pratt why housekeeping was not cleaning the Suite. (*Id.* ¶¶ 36–37.)

#### 2. Food and beverage services

**\*5** Plaintiffs allege that food and drink orders are "routinely" delivered to the Suite "very late, if at all," and, "upon inquiries, African[-]Americans are frequently told that the kitchen is closed." (*Id.* ¶ 32.) Plaintiffs allege that on or about October 26, 2013, the Individual Plaintiffs attended an event at the Arena with a guest and they ordered pizza from the Suite. (*Id.* ¶ 40.) Plaintiffs also allege that they were falsely accused of not paying for the pizza and, after Pratt provided a credit card to resolve the issue, he was charged $1,000 for the pizza and this amount was never refunded or adjusted. (*Id.*)

According to Plaintiffs, on October 28, 2013, Defreitas used the Suite with a "dark-skinned" guest and they ordered food,

drinks and ice. (*Id.* ¶ 41.) When the order had not arrived after forty-five minutes, Defreitas inquired as to when the order would be delivered and was told that the order required approval from a supervisor. (*Id.*) When the ice arrived, it was delivered in a "dirty" bucket and Defreitas' guest was ultimately charged for multiple items that he neither ordered nor received. (*Id.*)

Plaintiffs also allege that on March 10, 2014, Defreitas hosted seven African-American guests in the Suite who ordered French fries. (*Id.* ¶ 44.) The French fries were not delivered until after an hour had passed and Defreitas had "intervened." (*Id.*) Plaintiffs allege that when the Suite hosts Caucasian guests, such delays do not occur. (*Id.* ¶ 45.) Finally, Plaintiffs allege that the Individual Plaintiffs are "routinely" denied access to refrigerators located in the Suite despite the fact that they are entitled to access the food in these refrigerators. (*Id.* ¶ 38.) When the Individual Plaintiffs attempt to access these refrigerators, they are told that verification from a supervisor is required, and access is often denied even after the Individual Plaintiffs obtain such verification. (*Id.*)

#### 3. Maintenance services

Plaintiffs allege that on December 25, 2013, Defreitas was using the Suite and he "called maintenance to secure a TV that was falling from the wall." (*Id.* ¶ 43.) In response to Defreitas' request, a "supervisor" stated, "did you or one of the kids pull the TV off of the wall? TV's don't just fall off walls!" (*Id.*) Defreitas responded to the supervisor's comment by explaining "that no one had touched the TV." (*Id.*) The supervisor then stated "it was just a question, it's weird that a TV would just fall off the wall." (*Id.*)

#### e. Additional allegations

Plaintiffs allege that "on numerous occasions" Defreitas' personal items were stolen from the Suite when Plaintiffs and their guests were not present in the Suite. (*Id.* ¶ 42.)

## II. Discussion

#### a. Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)); *see also Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir. 2009)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." [4] *Iqbal*, 556 U.S. at 678.

[4]   When deciding a motion to dismiss, a court's review is limited to the four corners of the complaint but a court may also review (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) documents deemed integral to the complaint, and (4) public records. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (documents attached to the complaint, those incorporated by reference, and those integral to the complaint); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (public records).

**b. Section 1983 claim**

**\*6**  Ruling from the bench, the Court granted Defendants' motion to dismiss Plaintiffs' claim pursuant to section 1983 for failure to sustain a claim for relief. In order to sustain a claim for relief under section 1983, a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v.*

*Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). The first element reflects the fact that section 1983 "constrains only state conduct, not the 'acts of private persons or entities.'" *Hooda v. Brookhaven Nat'l Lab.*, 659 F. Supp. 2d 382, 393 (E.D.N.Y. 2009) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982)). As such, "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation and internal quotation marks omitted).

**i. State action by private entities**

The conduct of a nominally private entity may be attributed to the state, satisfying the state action requirement, if:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the state," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the state," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)); *see Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013). Each of the three tests requires a fact-specific inquiry into the challenged conduct and, in order to find state action, a court must determine that the specific actions of which the plaintiff complains may fairly be attributed to the state. *See Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 265 (2d Cir. 2014) (examining public function test); *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491–92 (2d Cir. 2009) (examining joint action test); *Lynch v. Southampton Animal Shelter Found. Inc.*, 971 F. Supp. 2d 340, 349–50 (E.D.N.Y. 2013) (examining compulsion test).

In moving to dismiss Plaintiffs' section 1983 claim, Defendants asserted that Plaintiffs failed to adequately allege state action. (Forest & BEC Mem. 7–10; Compass & Levy Mem. 18 & n.17.) In opposition, Plaintiffs argued that they had sufficiency alleged that Defendants engaged in state action based on the joint action or close nexus test and the public function test. (Pls. Mem. in Opp'n to Forest &

BEC Mot. ("Opp'n to Forest & BEC Mot.") 6–8, Docket Entry No. 38; Pls. Mem. in Opp'n to Compass & Levy Mot. ("Opp'n to Compass & Levy Mot.") 19–20, Docket Entry No. 37.) In response, Defendants argued that the allegations in support of state action did not satisfy either of the tests relied on by Plaintiffs. (Reply Mem. in Supp. of Forest & BEC Mot. ("Forest & BEC Reply") 3–4, Docket Entry No. 33; Reply Mem. in Supp. of Compass & Levy Mot. ("Compass & Levy Reply") 10–11, Docket Entry No. 39.) Defendants also argued that Plaintiffs failed to allege state action because Plaintiffs did not allege that there was any state involvement in the specific conduct complained of. (Forest & BEC Reply 2–3; Compass & Levy Reply 11.) Defendants further argued that Plaintiffs instead relied on allegations about state involvement in activity that was unrelated to the specific activity claimed to have caused the injury giving rise to this action. (Forest & BEC Reply 2–3; Compass & Levy Reply 11.) The sufficiency of the allegations as to each test are discussed below.

### 1. Joint action or close nexus test

 *7  Plaintiffs allege that Forest receives tax benefits and public subsidies such that the State has "provided significant encouragement to [Forest], and by association, to Levy and BEC," (SAC ¶ 22); the Arena was built on land that New York State obtained by exercising its eminent domain power, (*id.* ¶ 21); and the Arena is located on land leased from the State, (*id.* ¶ 22). During oral argument, Plaintiffs' counsel also asserted that the Arena "was built using public funds," (Tr. of Mar. 30, 2015 Hr'g ("Tr.") 4:14), that police officers "assist the [A]rena ... [by directing] the flow of people [coming] in and out of the [A]rena," (Tr. 7:9–12), and that Levy is required to comply with State public health laws that regulate the sale of food and beverages to the public, (Tr. 8:16–21).

Under the close nexus or joint action test, the requisite nexus between the State and the challenged conduct exists "where a private actor has operated as a willful participant in joint activity with the State or its agents, or acts together with state officials or with significant state aid." *Abdullahi*, 562 F.3d at 188 (internal citations and quotation marks omitted); *Barrett v. Harwood*, 189 F.3d 297, 304 (2d Cir. 1999) ("A private person — not a government official — can act under color of state law for purposes of § 1983 when 'he has acted together with or has obtained significant aid from state officials' ...." (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982))). "[A] private entity does not become a

state actor for purposes of § 1983 merely on the basis of 'the private entity's creation, funding, licensing, or regulation by the government.'" *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003)). It is also not sufficient "to plead state involvement in some activity of the institution alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved with the activity that caused the injury giving rise to the action." *Sybalski*, 546 F.3d at 258 (emphasis, internal quotation marks and citations omitted).

That Forest receives tax benefits and public funding does not suffice to allege that Forest, or any other Defendant, engaged in state action. *See Young v. Halle Hous. Assocs., L.P.*, 152 F. Supp. 2d 355, 364 (S.D.N.Y. 2001) (granting summary judgment dismissing § 1983 claim brought by residents of privately-owned, low-income housing facility who challenged the facility's policy regarding overnight guests because mere fact that housing facility "benefitted from significant amounts of government funding" and public subsidies was not sufficient to satisfy state action requirement); *Elmasri v. England*, 111 F. Supp. 2d 212, 221 (E.D.N.Y. 2000) (granting summary judgment dismissing § 1983 claim challenging outcome of divorce and custody proceedings and holding that court appointed guardian and psychologist were not state actors even though they were paid with state funds). [5]

---

[5]     But see *Ludtke v. Kuhn*, 461 F. Supp. 86, 92–96 (S.D.N.Y. 1978) (concluding that City's involvement with Yankee Stadium was sufficient to satisfy state action requirement for purposes of § 1983 gender discrimination claim challenging Stadium policy that barred female reporters from entering Clubhouse locker room). In *Ludtke*, the court held that the Stadium's enforcement of the policy at issue constituted state action because the City acquired Yankee Stadium by exercising its eminent domain power, the Yankees leased the Stadium from the City, and public funds were used to pay for the Stadium's renovation and maintenance. *Id.* The *Ludtke* court based this holding on the "symbiotic relationship" test established by the Supreme Court in *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961). *Ludtke*, 461 F. Supp. at 93–94 (discussing *Burton* and noting that "[t]he facts of the case at hand so nearly resemble those of *Burton* that there can be little doubt that state action exists here"). Since the *Ludtke* opinion, however, the Second Circuit has indicated that "federal courts must assess the continued vitality of earlier state-action precedents in light of more recent decisional law."

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

*Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 314 (2d Cir. 2007) (discussing state action requirement and noting that while the "Warren Court took an expansive view of state action in its effort to combat racial discrimination[,] ... the subsequent Burger and Rehnquist Courts reversed this trend in order to shield private behavior from the reach of the Constitution"), *aff'd sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008). The Second Circuit has further stated that *Burton* was "one of the Warren Court cases that took an expansive view of state action" and that, "[a]lthough neither *Burton* nor the symbiotic relationship doctrine has been overruled, they have been severely narrowed in scope and diminished as precedent." *Id.* at 314 n.8 (quoting 1 Martin A. Schwartz, *Section 1983* Litigation: *Claims and Defenses* § 5.13[A], at 5–90–5–91 (4th ed. 2003)).

**\*8** The fact that Levy is subject to state regulation is also insufficient to allege state action. *See Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33–34 (2d Cir. 2010) (affirming dismissal of § 1983 gender discrimination claim challenging nightclubs' admissions policy and concluding that plaintiff failed to allege state action notwithstanding state regulations governing sale of alcohol by nightclubs and that nightclubs' liquor licenses were issued by state); *Cranley*, 318 F.3d at 112–13 (affirming dismissal of § 1983 claim and concluding that insurance company did not engage in state action during its reorganization into a holding company notwithstanding that reorganization was carried out in accordance with state law governing reorganization of insurance companies).

The allegations are also insufficient because Plaintiffs fail to allege any state involvement in the precise conduct on which Plaintiffs' claims are based, namely, the harassment and substandard service the Individual Plaintiffs have allegedly been subjected to when they attend events at the Arena and use the Suite. *See Hollander*, 624 F.3d at 34 (holding that allegedly discriminatory nightclub admissions policy was too attenuated from state regulation of alcohol sales and issuance of liquor licenses to satisfy state action requirement); *Young*, 152 F. Supp. 2d at 364 ("[T]he crucial relationship for a finding of state action is between the governmental entity and the *action* taken by the private entity, not between the governmental entity and the private *actor*."). Plaintiffs therefore failed to allege state action pursuant to the joint action or close nexus test.

### 2. Public function test

Plaintiffs allege that "[b]ecause [Forest] receives tax benefits and public subsidies, it is a public function of the state." (SAC ¶ 22.) Plaintiffs further allege that the Arena is "a place of public accommodation." (*Id.* ¶ 74.)

"Under the public function test, '[s]tate action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity.'" *Grogan*, 768 F.3d at 264–65 (quoting *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004)). The test is not satisfied where a private entity engages in activity that has merely "been regularly performed by governments." *Grogan*, 768 F.3d at 265. Rather, the private entity must engage in activity that has historically been the "exclusive prerogative" of the state. *Id.* This test is stringent because, "[w]hile many functions have been traditionally performed by governments, very few have been exclusively reserved to the State." *Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978) (internal quotation marks omitted). Courts have concluded that activities such as holding local primary elections, *Terry v. Adams*, 345 U.S. 461, 469–70 (1953), providing medical care for prison inmates, *West v. Atkins*, 487 U.S. 42, 54–57 (1988), and creating and operating post offices, *Cooper*, 577 F.3d at 492–93, have historically been the exclusive prerogative of the state. By contrast, the public function test is not satisfied by conduct such as supplying utility services, *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352–53 (1974), and providing nursing home services to Medicaid recipients, *Blum v. Yaretsky*, 457 U.S. 991, 1011–12 (1982).

While neither the Second Circuit nor any district courts within the Second Circuit have addressed the public function test with respect to the operation of stadiums like the Arena, two district courts outside the Second Circuit have held that the public function test is not satisfied in this context. *See Bessey v. Spectrum Arena, L.P.*, No. 11-CV-7099, 2011 WL 6779306, at \*1–2, \*4 (E.D. Pa. Dec. 23, 2011) (denying plaintiffs' motion to enjoin private entity that owned and operated sports arena from enforcing policy prohibiting protests at arena and holding that there was no state action under public function test because "[w]hile professional sports, concerts and other entertainment events enhance the cultural and civic life of a community, providing these services is not the exclusive province of the State and, in fact, is not a governmental function"); *Stark v. Seattle Seahawks*,

No. 06-CV-1719, 2007 WL 1821017, at *1–2, *7 (W.D. Wash. June 22, 2007) (granting summary judgment motion and dismissing § 1983 claim against private entity vested with exclusive power and authority to operate a publically-owned sports stadium because "the court is not persuaded that operating an event center is a function that has traditionally and exclusively been reserved to the state"). The Court agrees that because the operation of a sports arena is not a function that is traditionally and exclusively reserved to the state, Plaintiffs failed to allege state action pursuant to the public function test.

**\*9** Because the allegations are insufficient to satisfy the threshold state action requirement under either the joint action or close nexus test or the public function test, Plaintiffs failed to state a claim pursuant to section 1983 and, accordingly, the Court dismissed Plaintiffs' section 1983 claim as to all Defendants at the March 30, 2015 Hearing.

### c. Remaining claims against Forest and Compass

In addition to the section 1983 claim, the SAC also asserts four additional claims against Forest and Compass, under (1) section 1981, (2) the NYSHRL and (3) the NYCHRL, and (4) for breach of contract under New York State law. (*See* SAC ¶¶ 54–56, 60, 65, 69–71 (asserting foregoing claims against "Defendants" without limitation).) As further explained below, the Court dismissed these remaining claims against Forest and Compass during the March 30, 2015 Hearing for failure to state a claim. (Tr. 50:19–21, 56:24–57:2; Mar. 31, 2015 Min. Entry.)

In support of the remaining claims against Forest, the SAC alleges that Forest owns the Arena. (SAC ¶ 9.) The SAC also alleges that "[u]pon information and belief, [the Suite] was to be cleaned, maintained, and serviced by staff provided by [Forest], BEC, and Levy (the 'Staff')." (*Id.* ¶ 19.) While the SAC alleges that various actions were undertaken by "the Staff," as this term is defined in the SAC, and by "housekeeping" and "maintenance," which terms are not defined, the SAC fails to allege any specific conduct or action by Forest. [6] In addition, there are no facts alleged from which the Court may plausibly infer that Forest was involved in food and beverage, cleaning or maintenance services. [7] With respect to Compass, the SAC alleges only that Compass is the parent company of Levy. (SAC ¶ 12.)

[6]  (*See* SAC ¶ 32 (alleging that "[t]he Staff provides deplorable service" to the Individual Plaintiffs because food and drink deliveries are routinely late and "housekeeping does not clean" the Suite and routinely leaves it dirty and disorganized); *id.* ¶ 36 (alleging a specific instance in which "housekeeping left [the Suite] as a mess"); *id.* ¶ 38 (alleging that "the Staff tells" the Individual Plaintiffs that "supervisor verification" is needed to access refrigerators in the Suite); *id.* ¶ 39 (alleging that the Individual Plaintiffs are "continually harassed, followed, and questioned by Staff"); *id.* ¶ 40 (alleging a specific instance in which "the Staff accused" the Individual Plaintiffs and a guest of not paying for pizza); *id.* ¶ 43 (alleging a specific instance in which Defreitas "called maintenance" and stating comments of unidentified "supervisor" in response); *id.* ¶ 46 (alleging that when non-party Andrew Mapp attended events in the Suite "his treatment by the Staff was atrocious").)

[7]  For example, Plaintiffs make no allegations about specific Forest executives or employees and the Agreement provides only that BEC "shall furnish to the Suite at its expense" maintenance and cleaning services. (Agreement 5.) In fact, Forest is only mentioned in two provisions of the Agreement, neither of which suggests Forest was involved in the conduct of which Plaintiffs complain. (*Id.* at 4 (indemnity provision stating that BEC's corporate affiliates including Forest shall not be liable for injuries to persons or property caused by Ludwig's or its invitees); *id.* at 6 (insurance provision stating that Ludwig's shall maintain commercial general liability insurance and providing that BEC and affiliates including Forest must be named as additional insureds).)

**\*10** Rule 8(a) of the Federal Rules of Civil Procedure "does not demand that a complaint be a model of clarity or exhaustively present the facts alleged." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001). However, at a minimum the complaint must, "give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *Id.* (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)). This standard is not satisfied "[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct." *Id.* at 34. Rather, a complaint should provide "specification of any particular activities by any particular defendant." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007); *see In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417 (S.D.N.Y. 2011) ("Although Plaintiffs argue that they alleged that the [p]arent [c]ompanies were directly involved in the alleged conspiracy, a reading of the complaint indicates otherwise. The complaint

alleges direct involvement of the [p]arent [c]ompanies by way of generic references to 'defendants.' This approach is insufficient." (internal citations omitted)).

During the March 30, 2015 Hearing, counsel for both Forest and Compass argued that the SAC failed to allege any conduct by Forest or Compass. (Tr. 55:14–18 (Forest); Tr. 49:9–20 (Compass).) In response, Plaintiffs' counsel stated, "I don't think [Plaintiffs] were ever aware as to the extent of [Forest's] ... connection ... with [the Arena], and until I am able to do a deposition, I do not believe I can satisfy [the] requirement [of alleging conduct by Forest]." (Tr. 56:19–23.) Given the dearth of any allegations of conduct by Forest or Compass, the Court dismissed all remaining claims against Forest and Compass as insufficiently pled. *See Sherman v. Town of Chester*, 752 F.3d 554, 557–58, 567 (2d Cir. 2014) (affirming dismissal of § 1981 action brought by Jewish developer who claimed town discriminated against him by perpetually refusing to approve his subdivision proposal because, although town residents allegedly expressed fear that proposed subdivision "might become a 'Hassidic Village'" and plaintiff's model-home was allegedly vandalized with a swastika, no facts were alleged to link this conduct to the town).

### d. Breach of contract claim against Levy

As further explained below, the Court dismissed the breach of contract claim against Levy during the March 30, 2015 Hearing for failure to state a claim. (Tr. 68:12–21.)

Plaintiffs' breach of contract claim is based on the Agreement entered into by Ludwig's and BEC. (SAC ¶ 63.) The SAC asserts that "Defendants have failed to perform by failing [to] properly ... maintain and clean [the Suite] in violation of paragraph 17b of the Agreement." (*Id.* ¶ 65.) Paragraph 17 of the Agreement provides, in pertinent part: "Suite Services. During the Term, [BEC] shall furnish to the Suite at its expense the following: ... (b) Cleaning service, including vacuuming, removal of debris and general cleaning of space within a reasonable time after each Event during which [Ludwig's] uses the Suite." (Agreement 5, ¶ 17.) The Agreement does not mention Levy. However, the SAC alleges that Levy provides food and beverage services for the Suite. (SAC ¶ 18.)

In support of its motion to dismiss Plaintiffs' breach of contract claim, Levy argued that Plaintiffs could not state

a claim against Levy pursuant to the Agreement because Levy is not a party to the Agreement. (Compass & Levy Mem. 14–15.) In response, Plaintiffs conceded that Levy is not a party to the Agreement but asserted that the breach claim should nonetheless be permitted to proceed against Levy. (Opp'n to Compass & Levy Mot. 17.) Plaintiffs argued that, although Levy is not a party to the Agreement, their breach of contract claim against Levy should not be dismissed because "Plaintiffs would not be able to recover in unjust enrichment," (*id.*) given that "claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute even if one of the parties to the lawsuit is not a party to the contract," (*id.* (quoting *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 165 (E.D.N.Y. 2012))). Levy argued that Plaintiffs' position was meritless and that the case relied on by Plaintiffs is inapposite. (Compass & Levy Reply 7.)

**\*11**  "To state a claim for breach of contract under New York law, 'the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'" *Orlander v. Staples, Inc.*, ___ F.3d ___, ___, 2015 WL 5438783, at \*3 (2d Cir. Sept. 16, 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)); *see also Noise In the Attic Prods., Inc. v. London Records*, 782 N.Y.S.2d 1, 3 (App. Div. 2004). Contracts are generally unenforceable against non-parties given "the fundamental principle of contract law prohibiting the parties to a contract from binding nonparties." *Davis v. Blige*, 505 F.3d 90, 103 (2d Cir. 2007); *see Sheldon v. Khanal*, 396 F. App'x 737, 740 (2d Cir. 2010) ("We easily conclude that plaintiffs failed to state a claim for breach of contract against the ... defendants, as it is not alleged that they were party to any contract with plaintiffs."); *see also Kamdem-Ouaffo v. Pepsico, Inc.*, No. 14-CV-227, 2015 WL 1011816, at \*7 (S.D.N.Y. Mar. 9, 2015) ("It is hornbook law that an entity must be a party to a contract for a claim of breach of that contract to lie, unless the entity has assumed or been assigned the contract."); *Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 135 (S.D.N.Y. 2013) ("A contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter ego' of the party." (citation omitted)).

Here, Plaintiffs do not allege that Levy is a party to the Agreement. Nor do Plaintiffs allege that the Agreement was signed by Levy's agent or alter-ego, or that the Agreement was assigned to Levy. Accordingly, Plaintiffs fail to state

a breach claim against Levy. *See Sheldon*, 396 F. App'x at 740; *Malmsteen*, 940 F. Supp. 2d at 135. In arguing that their breach claim should not be dismissed because the Agreement may preclude an unjust enrichment claim against Levy, Plaintiffs rely on *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147 (E.D.N.Y. 2012). (Opp'n to Compass & Levy Mot. 17.) *LaRoss Partners*, however, does not support the proposition that a breach of contract claim may be stated against a non-party where the non-party is alleged to have been unjustly enriched in connection with the contract. *LaRoss Partners*, 874 F. Supp. 2d at 152, 165–66. In *LaRoss Partners*, the court determined that an unjust enrichment claim was precluded by the existence of a contract governing the subject matter of the dispute, notwithstanding that the claim was asserted against a non-signatory to the contract. *Id.* at 165–66. Although the plaintiff in *LaRoss Partners* also asserted a breach of contract claim against the non-signatory, the non-signatory did not move to dismiss the breach claim. *See id.* at 169. As such, the court did not address the merits of the breach claim or the issue of whether an otherwise deficient breach claim is viable in such circumstances due to the unavailability of an unjust enrichment claim. The breach of contract claim against Levy was therefore dismissed during the March 30, 2015 Hearing.

### e. Section 1981 claim against BEC and Levy

The Individual Plaintiffs allege that Defendants violated section 1981 by subjecting the Individual Plaintiffs and their African-American guests to racial discrimination and "interfer[ing] with Plaintiffs' rights to make and enforce contracts." [8] (SAC ¶ 60.) Having already determined during the March 30, 2015 Hearing that the SAC fails to state any claims against Forest and Compass, only the section 1981 claims against BEC and Levy remain.

[8]    The SAC asserts discrimination claims under section 1981, the NYSHRL and the NYCHRL on behalf of all Plaintiffs. (SAC ¶ 60.) In their motion to dismiss, BEC and Forest argued that the discrimination claims on behalf of Ludwig's should be dismissed because the SAC fails to allege that Ludwig's, the corporate entity, was subjected to discrimination. (Forest & BEC Mem. 16–17.) In response, Plaintiffs argued that "Ludwig's has been discriminated against due to its association with the Individual Plaintiffs." (Opp'n to Forest & BEC Mot. 15–16.) However, at the March 30, 2015 Hearing, Plaintiffs' counsel stated that the discrimination claims are only

asserted on behalf of the Individual Plaintiffs. (Tr. 60:9–20.) As such, the Court only addresses the discrimination claims brought by the Individual Plaintiffs and dismisses any discrimination claims by Ludwig's.

**\*12** The SAC states the following allegations in support of the Individual Plaintiffs' claims under section 1981: (1) the Individual Plaintiffs are harassed by Arena staff and security personnel when they attend events at the Arena, (*id.* ¶¶ 30–31, 39); (2) the cleaning services provided to the Suite are substandard, (*id.* ¶¶ 32–34, 36–37); (3) the maintenance services provided to the Suite are substandard, (*id.* ¶ 43); (4) BEC has refused to interface with Defreitas as the manager of the Suite and has not provided Defreitas with tickets to certain suite-holder events, (*id.* ¶¶ 23, 28–29); (5) Defreitas' personal items have been stolen from the Suite, (*id.* ¶ 42); (6) the Individual Plaintiffs and their African-American guests are subjected to substandard food and beverage services when they use the Suite, (*id.* ¶¶ 32–35, 40–41, 44–45); and (7) the Individual Plaintiffs are denied access to the refrigerators located in the Suite, (*id.* ¶ 38). The allegations regarding harassment by Arena staff and security, the cleaning services provided to the Suite, the maintenance services provided to the Suite, BEC's refusal to interface with Defreitas and to provide him with certain tickets, and the theft of Defreitas' personal items appear to be based solely on conduct allegedly undertaken by employees or agents of BEC. (Opp'n to Forest & BEC Mot. 2–3.) The food and beverage services allegations, by contrast, appear to be based solely on conduct allegedly undertaken by employees or agents of Levy. (Opp'n to Compass & Levy Mot. 2–3.) The Individual Plaintiffs also appear to allege that employees or agents of both BEC and Levy have prevented them from accessing the Suite's refrigerators. (Opp'n to Forest & BEC Mot. 2–3; Opp'n to Compass & Levy Mot. 2–3.) BEC and Levy argue that the allegations are insufficient to state a claim under section 1981.

Section 1981 states that:

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like

punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). For purposes of claims premised on the impairment of a plaintiff's right to make and enforce contracts, section 1981 defines the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). To state a claim under section 1981, a plaintiff must allege that "(1) [he] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Bentley, Jr. v. Mobil Gas Station*, 599 F. App'x 395, 396 (2d Cir. 2015) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)). BEC and Levy argue that the Individual Plaintiffs fail to sufficiently allege the second and third elements. (Forest & BEC Mem. 10–15; Compass & Levy Mem. 9–14.) Because, for the reasons explained below, the Court concludes that the Individual Plaintiffs fail to allege "circumstances giving rise to a plausible inference of racially discriminatory intent," *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994), the second element is dispositive and the Court therefore declines to address the sufficiency of the allegations as to the third element.

Direct evidence of discriminatory intent is not required to satisfy the second element of a section 1981 claim, as a plaintiff may instead rely on circumstantial evidence that supports an inference of discrimination. *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) (stating, in context of reviewing grant of summary judgment dismissing § 1981 claims brought by restaurant patrons, that "direct evidence of discrimination is not necessary" because discrimination claims may be based on "sufficient circumstantial evidence"). An inference of discrimination may be drawn where "similarly situated" patrons, who are not members of the relevant protected class, are treated differently than the plaintiffs who allege discrimination under section 1981. *See id.* at 101. "When plaintiffs seek to draw inferences of discrimination by showing that they were 'similarly situated in all material respects' to the individuals to whom they compare themselves, their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Id.* (internal citation omitted).

**\*13** At the motion to dismiss stage, a plaintiff must "specifically allege the 'circumstances giving rise to a plausible inference of racially discriminatory intent.'" *Bentley, Jr.*, 599 F. App'x at 396 (quoting *Yusuf*, 35 F.3d at 713). "A plaintiff's naked allegation that the defendant acted based on the plaintiff's race and color is too conclusory to survive a motion to dismiss." *Id.* (citing *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) (en banc)).

BEC and Levy argue that the SAC fails to sufficiently allege that the Individual Plaintiffs were subjected to intentional discrimination due to their race. (Forest & BEC Mem. 10–15; Compass & Levy Mem. 10–12.) Essentially, BEC and Levy contend that Plaintiffs rely on conclusory allegations without alleging sufficient facts, (Forest & BEC Mem. 13; Compass & Levy Mem. 10–11), and that Plaintiffs improperly state a number of allegations "upon information and belief," (Forest & BEC Mem. 2–3, 11–12; Compass & Levy Mem. 11). The parties' specific arguments as to each of the categories of allegations of discriminatory treatment are addressed below.

### i. Harassment by Arena staff and security

In support of their claim against BEC,[9] the Individual Plaintiffs allege that they are "continually harassed, followed, and questioned" when they attend events at the Arena, and that, "upon information and belief, non-African-American patrons are not treated this way by the Staff." (*Id.* ¶ 39.) Plaintiffs also allege, upon information and belief, that BEC "directed Saurs to treat Defreitas suspiciously based on his race." (*Id.* ¶ 30.) Specifically, Plaintiffs allege that on two occasions Saurs asked Defreitas why he was frequently at the Arena and, during the second encounter, Saurs told Defreitas that he had a background in law enforcement and stated "sometimes I have to be the bad guy." (*Id.* ¶ 30.) The Individual Plaintiffs also allege that on one occasion they overheard a radio communication indicating that "the people in [the] Suite were considered a security threat" and, shortly thereafter, security raided another suite located in the Arena. (*Id.* ¶ 31.) The Individual Plaintiffs further allege, upon information and belief, that security's actual intent had been to conduct the raid in the Suite but, due to a mistake, the raid was carried out in another suite. (*Id.*) Plaintiffs argue that asserting their allegations on information and belief is appropriate as to the treatment of non-African-American patrons by Arena staff and security, BEC's instruction to Saurs regarding Defreitas, and the raid of a neighboring suite because these allegations pertain to facts within the exclusive

possession and control of BEC. (Opp'n to Forest & BEC Mot. 5, 14–15.) With respect to the alleged instruction to Saurs, Plaintiffs assert that the Individual Plaintiffs "were not present when BEC directed its employees to treat Plaintiff Defreitas suspiciously because of his race, such information is company policy and is therefore within the sole control of Defendants." (*Id.* at 5 (internal citation omitted).) Similarly, Plaintiffs argue that they "cannot allege definitively that [the raid] was intended for [the Suite] because this information is also within the sole control of the Defendants." (*Id.* (internal citation omitted).)

9  The Court understands the discrimination claims based on harassment by Arena staff and security to be asserted against BEC only because, as discussed above, the allegations regarding harassment by Arena staff and security appear to be based solely on conduct allegedly undertaken by the employees or agents of BEC. (*Compare* Opp'n to Forest & BEC Mot. 3 (reciting allegations regarding harassment by Arena staff and security in statement of facts included in opposition to BEC's motion), *with* Opp'n to Compass & Levy Mot. 2–3 (including no allegations regarding harassment by Arena staff and security in statement of facts set forth in opposition to Levy's motion).)

**\*14**  BEC argues that Plaintiffs' allegations are conclusory and otherwise insufficient to support a plausible inference of discriminatory intent. BEC asserts that Plaintiffs fail to allege any facts to suggest a plausible basis for the "information and belief" that, in contrast to the Individual Plaintiffs, non-African-American patrons are not "continually harassed, followed, and questioned." (Forest & BEC Mem. 11–12; Forest & BEC Reply 6.) In addition, BEC argues that Plaintiffs misstate the circumstances in which it is appropriate to assert allegations upon information and belief and fail to appreciate that such allegations must be accompanied by facts on which the belief is founded. (Forest & BEC Reply 5.) BEC also contends that "Plaintiffs fail to articulate any basis whatsoever for their supposed belief that BEC instructed Saurs to [treat Defreitas suspiciously based on his race]." (Forest & BEC Reply 6; *see* Forest & BEC Mem. 11, 16.) BEC argues that Saurs' alleged conduct during the specific instances cited by Plaintiffs does not support a plausible inference of discriminatory intent. (Forest & BEC Reply 6 n.7.) BEC further argues that Plaintiffs fail to plead any facts as to the basis for their belief regarding the intended target of the raid conducted by security. (Forest & BEC Mem. 11–12), and that Plaintiffs fail to allege a connection between the raid and the Individual Plaintiffs' race in any event because "Plaintiffs have actually alleged that Arena security's actions

were ... [undertaken] because 'people in [the Suite] were considered a security threat,'" (Forest & BEC Reply 7.)

"When a plaintiff sets out allegations on information and belief, he is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are based on secondhand information that [he] believes to be true." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (internal quotation marks and citation omitted) (alteration in original). The Second Circuit has explained that the "*Twombly* plausibility standard ... does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). Some district courts in this Circuit have required that allegations upon information and belief be accompanied by a statement of the facts upon which the belief is founded. *See JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 527 (S.D.N.Y. 2013) ("[A]lthough a plaintiff may [plead facts upon information and belief] where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible, such allegations must be accompanied by a statement of the facts upon which the belief is founded." (citations omitted)); *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006) ("[A]llegations pled on 'information and belief' are proper if 'accompanied by a statement of the facts upon which the belief is founded.'"); *see also Sanders v. Grenadier Realty, Inc.*, 367 F. App'x 173, 175 (2d Cir. 2010) (affirming dismissal of discrimination claim under Fair Housing Act for failure to state a claim where plaintiffs alleged racial animus based on facts pled on information and belief and "plaintiffs allege[d] no basis for the 'information and belief' on which their assertion" was based).

Here, the Court has no basis from which to infer that Plaintiffs' belief regarding BEC's alleged instruction to Saurs is other than pure speculation and that facts in BEC's exclusive possession may plausibly support this contention. Nor do the allegations regarding Defreitas' encounters with Saurs support a plausible inference of any connection between Defreitas' race and Saurs' questions about why Defreitas was frequently at the Arena or between Defreitas' race and Saurs' comments about his law enforcement background and being "the bad guy." In addition, the Court has no basis from which to infer that Plaintiffs' belief that Arena security intended to raid the Suite is more than speculation. However, even if

Arena security did intend to raid the Suite, the allegations suggest that Arena security's interest in raiding the Suite was connected to the determination that "people in [the] Suite were considered a security threat." (SAC ¶ 31.) There are no allegations in the SAC to support an inference that this security threat determination was connected to the race of the Individual Plaintiffs and their guests. *See Yusuf*, 35 F.3d at 714 (affirming dismissal of § 1981 claim for failure to state a claim and concluding that plaintiff failed to sufficiently allege discriminatory intent because "the abundance of other possible reasons for the [challenged conduct] combined with the lack of any specific factual support for [the plaintiff's] claim of a racial motivation illustrate[d]" that the claim was based on a "naked allegation" of racial discrimination). Therefore, the Individual Plaintiffs fail to plausibly allege discriminatory intent based on the allegations regarding harassment by Arena staff and security.

### ii. Cleaning services

**\*15** In support of their claim against BEC based on substandard cleaning services,[10] Plaintiffs allege that "housekeeping does not clean [the Suite] without a specific request, routinely leaving it dirty and disorganized." (SAC ¶ 32.) Plaintiffs also allege that "housekeeping service is proper" when the Suite hosts "numerous" Caucasian guests, (*id.* ¶ 33), and that "housekeeping service is proper at other suites, which are licensed by non-African Americans, and which host non-African Americans," (*id.* ¶ 34). Plaintiffs allege a specific instance in which Pratt was cleaning the Suite himself because "housekeeping [had] left it as a mess" when a patron from the neighboring CBS Radio suite observed Pratt cleaning and was "shocked" and asked Pratt why housekeeping was not cleaning the Suite. (*Id.* ¶ 36.) Plaintiffs further allege that the CBS suite is "regularly and immaculately cleaned." (*Id.* ¶ 37.) In addition, during the March 30, 2015 Hearing, Plaintiffs' counsel asserted that the CBS Radio suite is "run by various white people." (Tr. 26:14–19.)

[10] The Court understands the discrimination claims based on the cleaning services provided to the Suite to be asserted against BEC only because, as discussed above, the cleaning service allegations appear to be based solely on conduct allegedly undertaken by the employees or agents of BEC. (*Compare* Opp'n to Forest & BEC Mot. 2–3 (reciting allegations regarding cleaning services provided to the Suite in statement of facts included in

opposition to BEC's motion), *with* Opp'n to Compass & Levy Mot. 2–3 (including no allegations regarding cleaning services provided to the Suite in statement of facts set forth in opposition to Levy's motion).)

Plaintiffs contend that the SAC provides sufficient allegations "based on the personal knowledge of the Plaintiffs" that "specifically demonstrate the disparate treatment afforded to Plaintiffs, and their non-Caucasian guests, as compared to the treatment afforded the Caucasian licensees and guests." (Opp'n to Forest & BEC Mot. 10.) BEC contends that Plaintiffs fail to plead any specific facts to support a plausible inference of discriminatory intent based on the allegations regarding cleaning services. (Forest & BEC Mem. 13.) BEC also argues that Plaintiffs' contention that "housekeeping service is proper at other suites, which are licensed by non-African Americans, and which host non-African Americans," (SAC ¶ 34), is not sufficient to allege that the other suites are similarly situated comparators because "Plaintiffs have not even endeavored to allege or explain how or at what events the suites were treated differently," (Forest & BEC Reply 8). During the March 30, 2015 Hearing, counsel for BEC also argued that the allegations regarding the CBS Radio suite and the encounter between Pratt and the CBS Radio patron are insufficient because the SAC does not allege sufficient facts to suggest the two suites are similarly situated. (*See* Tr. 13:16–14:2, 34:20–39:8.)

Plaintiffs have not alleged sufficient facts to support a plausible inference that BEC's alleged failure to provide adequate cleaning services to the Suite was racially motivated. Plaintiffs allege that, although the Suite is generally left "dirty and disorganized," (SAC ¶ 32), "housekeeping service is proper" when the Suite hosts Caucasian guests, (*id.* ¶ 33). However, the Agreement states that BEC is required to provide cleaning services "within a reasonable time *after* each Event during which Licensee uses the Suite." (Agreement 5, ¶ 17(b) (emphasis added).) In contrast to food and beverage services, which are necessarily provided contemporaneously with the Suite's use during events, (*see id.* 4–5, ¶ 15), the individual BEC employees tasked with cleaning the Suite are not obligated to do so until after the Individual Plaintiffs and their guests have used it during an event and Plaintiffs have not alleged otherwise. Thus, the circumstances under which food and beverage services are provided to the Suite are such that the Court can infer the individual employees responsible for such services were aware of the race of the Individual Plaintiffs and their guests upon serving the Suite. However, the circumstances

under which cleaning services are provided — after events and, presumably, in the absence of the Individual Plaintiffs and their African-American guests — do not give rise to a similar inference with respect to the individual employees responsible for cleaning the Suite. Nor have Plaintiffs alleged any facts about the particular people who cleaned the Suite, or the particular circumstances under which the Suite was cleaned, to support an inference that the individuals who cleaned the Suite had a way of knowing whether it had been used to host African-American or Caucasian guests such that they were in a position to modify the quality of the cleaning services accordingly. *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 758–59 (7th Cir. 2006) (upholding grant of summary judgment as to section 1981 claim because defendant had no way of knowing plaintiff's race at time of allegedly discriminatory conduct), *as amended on denial of reh'g* (May 25, 2006).

**\*16** Plaintiffs' cleaning-services claim is premised on the alleged discrepancies between (1) the cleaning services provided to the Suite depending on whether it is used to host African-American or Caucasian guests and (2) the cleaning services provided to the Suite and the Arena's other suites. However, Plaintiffs fail to allege specific facts and instead rely solely on a series of adjectives which Plaintiffs use to characterize the nature of the cleaning services provided in each case and the condition in which the Suite is generally left. Specifically, Plaintiffs allege that the cleaning services provided to the Suite are "deplorable," (SAC ¶ 32), that the Suite is "routinely le[ft] [ ] dirty and disorganized," (*id.*), that "proper" cleaning services are provided to the other suites in the Arena and to the Suite when it hosts Caucasian guests, (*id.* ¶¶ 33–34), and that the CBS Radio suite is "immaculately cleaned," (*id.* ¶ 37). Given their failure to allege facts to support these descriptive and conclusory allegations, the Individual Plaintiffs fail to state a claim based on the cleaning services provided to the Suite. *See Green v. McLaughlin*, 480 F. App'x 44, 49 (2d Cir. 2012) (affirming dismissal of prisoner's Eighth Amendment excessive force claim based on encounter with correctional officers because, "[a]lthough [the plaintiff] characterize[d] his encounter with the officers as an 'attack,'" the plaintiff failed to allege facts about the encounter and, as such, the court had no basis to infer that the officers' conduct constituted cruel and unusual punishment); *see also DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) ("While the plaintiff's 'facts' must be accepted as alleged, this does not automatically extend to ... subjective characterizations ...." (citation omitted)); *Fisher Bros. Sales v. United States*, 46 F.3d 279, 286 (3d Cir. 1995)

(affirming dismissal of claims brought under Federal Tort Claims Act and stating "the fact that we must accept the plaintiffs' version of the facts as true does not mean that we must accept plaintiffs' *characterization* of those facts").

In addition, the Court is not persuaded that a single specific reference to the alleged discrepancy between the cleaning services provided to the Suite and the CBS Radio suite on a single occasion, (*see* SAC ¶ 36), is sufficient to infer that racial animus is a plausible explanation. Therefore, the Individual Plaintiffs fail to plausibly allege discriminatory intent based on the cleaning-services allegations.

### iii. Maintenance services

In support of their claim against BEC based on substandard maintenance services, Plaintiffs allege that, on one occasion when Defreitas was using the Suite, he "called maintenance to secure a TV that was falling from the wall," and the supervisor who responded stated, "did you or one of the kids pull the TV off of the wall? TV's don't just fall off walls!" (SAC ¶ 43.) Plaintiffs further allege that, when Defreitas explained "that no one had touched the TV," the supervisor stated, "it was just a question, it's weird that a TV would just fall off the wall." (*Id.*) Plaintiffs fail to plead any facts to suggest a connection between the alleged condition of the television located in the Suite or Defreitas' encounter with the supervisor, and the race of the Individual Plaintiffs or their guests. Therefore, the Individual Plaintiffs fail to plausibly allege discriminatory intent based on the maintenance services allegations.

### iv. BEC's refusal to interface with Defreitas

Plaintiffs allege that BEC has refused to send correspondence, tickets and invitations to Defreitas in his capacity as "manager" of the Suite. (SAC ¶ 23.) Plaintiffs allege that, at the time when BEC and Ludwig's entered the Agreement, Mastrota advised BEC that Defreitas would be managing the Suite and directed BEC to send all correspondence and tickets directly to Defreitas. (*Id.*) Plaintiffs also allege that BEC ignored these requests and instead sent all correspondence and tickets to Mastrota, (*id.*), including an invitation to a dinner organized for suite holders, (*id.* ¶ 28). Plaintiffs further allege that Defendants did not provide them with tickets to certain "special events," including the "Legends Classic 2013," even though Plaintiffs were entitled to such tickets

under the Agreement. (*Id.* ¶ 29.) When Mastrota reiterated his instructions to BEC regarding Defreitas, BEC "refused to work through Defreitas." (*Id.* ¶ 23.)

Plaintiffs have not stated any allegations that suggest BEC's failure to re-direct correspondence and tickets from Mastrota to Defreitas was related to Defreitas' race. Although Plaintiffs allege Mastrota advised BEC of Defreitas' appointment at the time the parties entered the Agreement, the Agreement does not reflect Defreitas' appointment as Suite manager. The integration clause included in the Agreement provides, in pertinent part:

> **\*17** This License Agreement is an integrated contract which contains all agreements of the parties with respect to the License, the Suite, the Arena and any other subject hereof. No other prior or contemporaneous agreement or understanding pertaining to the Suite shall be effective. This License Agreement may be modified in writing only, signed by the parties in interest at the time of the modification. There are no oral or written statements, representation, agreements *or* understandings that modify, amend or vary any of the terms of this License Agreement.

(Agreement 6, ¶ 23; *see also id.* at 4, ¶ 8 (provision precluding transfers or assignments).) Thus, the terms of the Agreement requiring written modifications undermine Plaintiffs' allegation, as it is possible that BEC failed to re-direct correspondence, tickets and invitations to Defreitas, not because of Defreitas' race, but because BEC did not view Defreitas' appointment as Suite "manager" as a valid modification of the Agreement, which is a valid and non-discriminatory explanation. *See Yusuf*, 35 F.3d at 714 (affirming dismissal of § 1981 claim and noting that "[the] complaint itself identifies a number of other, race-neutral factors that may have led to" the challenged conduct); *Rodriguez v. City of New York*, No. 13-CV-6552, 2014 WL 1399415, at *3–4 (E.D.N.Y. Apr. 10, 2014) (granting motion to dismiss employment discrimination claims because, although plaintiff alleged that she was subjected to discrimination on the basis of race and gender, "[plaintiff's] own complaint seem[ed] to offer an alternative, nondiscriminatory reason for the" challenged conduct); *Hussey v. N.Y.S. Dep't of Law/Office of Atty. Gen.*, 933 F. Supp. 2d 399, 407–08 (E.D.N.Y. 2013) (granting motion to dismiss employment discrimination claims because allegations failed to support a plausible inference of racially discriminatory intent where "plaintiff's own [c]omplaint provide[d] at least two additional nondiscriminatory reasons for" the challenged conduct). Plaintiffs have therefore failed to allege facts supporting a plausible inference that BEC's alleged refusal to "work through" Defreitas was motivated by discriminatory intent.

### v. Theft of Defreitas' personal items

In support of their claim against BEC,[11] Plaintiffs allege that "on numerous occasions" Defreitas' personal items have been stolen from the Suite when the Individual Plaintiffs and their guests were not present. (SAC ¶ 42.) Plaintiffs fail to allege any facts to suggest a connection between Defreitas' race and the theft of his belongings. Plaintiffs therefore fail to plausibly allege that the theft of Defreitas' belongings was motivated by discriminatory intent.

[11] The Court understands the discrimination claim based on the theft of Defreitas' personal items to be asserted against BEC only because, as discussed above, the allegations regarding the theft of Defreitas' personal items appear to be based solely on conduct allegedly undertaken by the employees or agents of BEC. (*Compare* Opp'n to Forest & BEC Mot. 3 (reciting allegation regarding the theft of personal items from the Suite in statement of facts included in opposition to BEC's motion), *with* Opp'n to Compass & Levy Mot. 2–3 (including no allegation regarding theft of personal items in statement of facts set forth in opposition to Levy's motion).)

### vi. Food and beverage services

In support of their claim against Levy,[12] Plaintiffs allege that the Individual Plaintiffs and their African-American guests are subjected to "deplorable" food and beverage service when they use the Suite based on three specific instances. (*Id.* ¶ 32.) During the first instance, the Individual Plaintiffs were accused of not paying for a pizza and Pratt was then charged $1,000 for the pizza, (*id.* ¶ 40); during the second instance, Defreitas and a "dark-skinned" guest were made to wait in excess of forty-five minutes for food and drinks they had

ordered, ice was delivered to them in a "dirty" bucket, and Defreitas's guest was overcharged, (*id.* ¶ 41); and during the third instance, Defreitas and his African-American guests were made to wait an hour for the French fries they ordered to be delivered, (*id.* ¶ 44). Plaintiffs further allege that, when the Suite hosts Caucasian guests, such delays do not occur, (*id.* ¶ 45), and food service is "proper," (*id.* ¶ 33). Plaintiffs allege that "proper" food and beverage service is provided to the Arena's other suites, which are licensed and frequented by non-African-American patrons. (*Id.* ¶ 34.) Finally, Plaintiffs allege "upon information and belief, [that] Levy executives have directed their staff to provide subpar" services to the Suite, (*id.* ¶ 35.), and Levy "supervisor" Beckerman "has [ ] warned Levy employees to avoid [the Suite]," (*id.* ¶¶ 48, 50).

12    The Court understands the discrimination claims based on the food and beverage services provided to the Suite to be asserted against Levy only because, as discussed above, the allegations regarding food and beverage services appear to be based solely on conduct allegedly undertaken by the employees or agents of Levy. (*Compare* Opp'n to Compass & Levy Mot. 2–3 (reciting allegations regarding food and beverage services provided to the Suite in statement of facts included in opposition to Levy's motion), *with* Opp'n to Forest & BEC Mot. 2–3 (including no allegations regarding food and beverage services in statement of facts set forth in opposition to BEC's motion).)

**\*18** Levy argues that Plaintiffs fail to allege facts that support a plausible inference of discriminatory intent based on the food and beverage services provided to the Individual Plaintiffs and their African-American guests. (Compass & Levy Mem. 11.) Levy also argues that Plaintiffs fail to allege any facts as to the basis for their belief that Levy executives issued the directive to their staff. (*Id.*) Levy further argues that, even assuming Beckerman warned Levy staff to avoid the Suite, Plaintiffs fail to allege facts to suggest a connection between Beckerman's warning and the Individual Plaintiffs' race. (Compass & Levy Reply 4.) Plaintiffs argue that the directive from Levy executives is properly alleged on information and belief because "Plaintiffs were not at the meeting when [Levy executives] directed [their] employees to provide subpar service to [the Suite], [and] such information is company policy and is therefore within the sole control and knowledge of Defendants." (Opp'n to Compass & Levy Mot. 6.) Plaintiffs also contend that the SAC pleads sufficient facts to allege discriminatory intent because Plaintiffs allege that Beckerman "warned Levy employees to avoid [the Suite], [and] thereby provide[ ] subpar service to the Individual Plaintiffs and their guests." (*Id.* at 11–12.)

The food and beverage service allegations are not sufficient to allege discriminatory intent. First, the conduct alleged during the three instances specified — in which Levy employees were allegedly responsible for delayed food deliveries, erroneous charges and a "dirty" ice bucket — does not, by itself, give rise to a plausible inference of discriminatory intent. *See Bentley v. Mobil Gas Station*, No. 12-CV-6586, 2014 WL 1478697, at *1–2 (W.D.N.Y. Apr. 15, 2014) (dismissing § 1981 claim because plaintiff failed to allege any facts to suggest a racial motivation for conduct of gas station employees who served other customers prior to plaintiff and then banned plaintiff from store), *aff'd sub nom.*, *Bentley, Jr.*, 599 F. App'x at 396. Second, while Plaintiffs allege that "proper" and prompt food and beverage service is provided to the other suites in the Arena and to the Suite when it hosts Caucasian guests, these allegations are descriptive and conclusory and are not supported by any specific factual allegations. Finally, even assuming Levy executives directed employees to provide subpar service to the Suite and Beckerman warned employees to avoid the Suite, the Court has no basis to infer a connection between these instructions and the race of the Individual Plaintiffs and their guests. *See Watson v. N.Y. Pressman's Union No. 2*, 444 F. App'x 500, 502 (2d Cir. 2011); *Yusuf*, 35 F.3d at 714. Plaintiffs therefore fail to sufficiently allege discriminatory intent based on the allegations regarding food and beverage services.

### vii. Access to Suite refrigerators

In support of their claims against both BEC and Levy, the Individual Plaintiffs allege that they are "routinely" denied access to refrigerators located in the Suite despite their entitlement to access the refrigerators as reflected by the inclusion of their names on an "access list." (SAC ¶ 38.) The Individual Plaintiffs further allege that they are directed to obtain verification from a supervisor, and access is often still denied even after they obtain such verification. (*Id.*) Plaintiffs do not allege any facts to support a connection between the limitations imposed on their access to the Suite refrigerators and their race. *See Bentley, Jr.*, 599 F. App'x at 396. Plaintiffs have therefore failed to allege facts that support a plausible inference of discriminatory intent based on the extent of their access to the Suite refrigerators.

For the reasons set forth above, the Individual Plaintiffs fail to sufficiently allege discriminatory intent in support

of their section 1981 claims against BEC based on the alleged harassment by Arena staff and security, the cleaning services allegations, the maintenance services allegations, BEC's refusal to interface with Defreitas, and the theft of Defreitas' personal items. The Individual Plaintiffs also fail to sufficiently allege discriminatory intent in support of their section 1981 claim against Levy based on the food and beverage services allegations, and their claims against BEC and Levy based on allegations regarding the Suite refrigerators. Because the Individual Plaintiffs' failure to sufficiently allege discriminatory intent is dispositive, the Court concludes that the Individual Plaintiffs fail to state a claim under section 1981 and grants the motions by BEC and Levy as to the Individual Plaintiffs' section 1981 claims. [13]

[13]   Because of the Court's ruling on Plaintiffs' failure to allege discriminatory intent, the Court does not address BEC and Levy's additional arguments in support of their motions to dismiss the section 1981 claims.

### f. NYSHRL claims against BEC and Levy

**\*19**  Plaintiffs allege that BEC and Levy violated the Individual Plaintiffs' rights under the NYSHRL by discriminating against the Individual Plaintiffs and their African-American guests on the basis of race. (SAC ¶¶ 54–55.)

The NYSHRL states, in relevant part:

> It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, ... of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof ....

N.Y. Exec. Law § 296(2)(a). A plaintiff must sufficiently allege that the defendant intended to discriminate on the basis of race to state a claim under both section 1981 and the NYSHRL. See Self v. Dep't of Educ. of the City of N.Y., 844 F. Supp. 2d 428, 434, 436–38, 439 (S.D.N.Y. 2012)

(granting defendants' motion for summary judgment as to discrimination claims under § 1981 and NYSHRL because plaintiff failed to establish racial animus); Perez Rivera v. Hertz Corp., 990 F. Supp. 234, 236–37 (S.D.N.Y. 1997) ("To establish a claim under section 1981 or the NY[S]HRL, plaintiffs must prove that ... [the] defendant's actions were purposefully discriminatory and racially motivated."). Therefore, the Court need not conduct a separate analysis. For the reasons set forth above with respect to the section 1981 claims, the Individual Plaintiffs fail to sufficiently allege discriminatory intent in support of their NYSHRL claims. The Individual Plaintiffs therefore fail to state a claim under the NYSHRL against BEC or Levy and the motions are granted as to the NYSHRL claims.

### g. NYCHRL claims against BEC and Levy

Plaintiffs allege that BEC and Levy violated the Individual Plaintiffs' rights under the NYCHRL by discriminating against the Individual Plaintiffs and their African-American guests on the basis of race. (SAC ¶¶ 69–71.)

The NYCHRL states, in relevant part:

> It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation, because of the actual or perceived race ... of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof ....

N.Y.C. Admin. Code § 8-107(4)(a). "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (citations omitted). "To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive ...." Gorokhovsky v. N.Y.C. Hous. Auth., 552 F. App'x 100, 102 (2d Cir. 2014) (citing

*Mihalik*, 715 F.3d at 114). However, even under this more liberal pleading standard, a plaintiff must still plausibly allege that he was subjected to unequal treatment because of his protected characteristic. *See Mihalik*, 715 F.3d at 110 ("[D]istrict courts must be mindful that the NYCHRL is not a 'general civility code.' The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive."); *LaSalle v. City of New York*, No. 13-CV-5109, 2015 WL 1442376, at *6 (S.D.N.Y. Mar. 30, 2015) (granting motion to dismiss race discrimination claim under NYCHRL because, notwithstanding "the more lenient standard of the NYCHRL," plaintiff failed to allege facts supporting an inference that "she was treated 'less well' than other employees because of her race"); *see also Sosa v. Local Staff, LLC*, 618 F. App'x 19, 20 (2d Cir. 2015) ("Although we construe the NYCHRL more broadly than its federal and state counterparts, we recognize that it still does not operate as a general civility code." (internal quotation marks and citations omitted)).

**\*20** As discussed above with respect to the section 1981 claims, the Individual Plaintiffs fail to allege facts that support a plausible inference of discriminatory intent and, therefore, they cannot state a claim under the NYCHRL. Accordingly, the Court grants the motions and dismisses the NYCHRL claims against BEC and Levy.

### h. Supplemental jurisdiction over breach of contract claims against BEC

Having dismissed all of Plaintiffs' federal claims — under sections 1983 and 1981 — over which the Court had original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining breach of contract claims against BEC. [14]

[14] The SAC asserts a breach of contract claim pursuant to paragraph 17(b) of the Agreement on behalf of all Plaintiffs. (SAC ¶¶ 62–67.) As the Court dismissed the breach claims against Forest, Compass and Levy during the March 30, 2015 Hearing for the reasons set forth above, only the breach claims against BEC remain. While BEC moved to dismiss the Individual Plaintiffs' breach of contract claim, it did not challenge the breach claim asserted by Ludwig's. (Forest & BEC Mem. 17.) Because the Court declines to exercise supplemental jurisdiction over the breach of contract claims, the Court does not address the sufficiency of the Individual

Plaintiffs' breach claim against BEC pursuant to the Agreement.

District courts have supplemental jurisdiction over state law claims "in any civil action of which the district court[ ] ha[s] original jurisdiction," provided the claims "are so related to claims in the action ... that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 332 (2d Cir. 2011) (noting that federal courts may exercise supplemental jurisdiction when federal claims and state claims "stem from the same 'common nucleus of operative fact'" (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966))). A district court "may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." [15] 28 U.S.C. § 1367(c)(3); *Alliance of Auto. Mfrs., Inc. v. Currey*, ___ F. App'x ___, ___, 2015 WL 1529018, at *3 (2d Cir. Apr. 7, 2015) (holding it was "not improper for the court to decline to exercise its supplemental jurisdiction" after it properly dismissed the plaintiff's constitutional claims); *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (alteration in original) (quoting *Castellano v. Bd. of Trustees*, 937 F.3d 752, 758 (2d Cir. 1991))). Accordingly, Plaintiffs' breach of contract claims against BEC are dismissed without prejudice.

[15] The Court may decline to exercise supplemental jurisdiction over Plaintiffs' breach of contract claims notwithstanding the Court's decision to exercise supplemental jurisdiction over the merits of the Individual Plaintiffs' NYSHRL and NYCHRL claims. *See McCaul v. Ardsley Union Free Sch. Dist.*, 514 F. App'x 1, 4–6 (2d Cir. 2013) (holding that district court did not abuse its discretion in exercising supplemental jurisdiction to decide motion to dismiss one state law claim while declining to exercise supplemental jurisdiction over another state law claim and noting that the elements of the state law claim dismissed pursuant to Rule 12(b)(6) were "substantially the same" as those of the federal claim); *see also* 32A Am. Jur. 2d Federal Courts § 615 ("A court may decline supplemental jurisdiction at any stage of litigation, and the fact that it may have previously exercised such jurisdiction is not a bar to later relinquishing it.").

### III. Conclusion

**\*21** For the foregoing reasons, the Court grants BEC's motion to dismiss the SAC in part and grants Levy's motion to dismiss in its entirety. The Court dismisses Plaintiffs' section 1981, NYSHRL and NYCHRL claims against BEC and declines to exercise supplemental jurisdiction over Plaintiffs' breach of contract claims against BEC.

SO ORDERED:

**All Citations**

Slip Copy, 2016 WL 915102

---

**End of Document**                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Ritchie v. Northern Leasing Systems, Inc., S.D.N.Y., March 31, 2014

2004 WL 136636
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mitchell MEDINA, Plaintiff,

v.

Irving BAUER, Alex Fischer, Matthew Fischer, Eli Kaufman, Randolph–Rand Corp. of New York, Magnetic Snap Corp., Lanfran Reality Corp., John Doe 1–10, and Abc Corps. 1–10, Defendants.

No. 02 Civ. 8837(DC).
|
Jan. 27, 2004.

**Synopsis**
**Background:** Sole shareholder of corporation that was transferee under invention agreement of all creator's inventions before corporation's liquidation sued individual patentees, corporation's successor, and affiliated businesses after patentees filed numerous patent applications on handbag magnetic snap inventions, asserting violations of the Copyright Act, Racketeer Influenced and Corrupt Organizations Act (RICO), and various state laws based on alleged misrepresentations in issued patents as to identity of inventor. Defendants moved to dismiss the complaint.

**Holdings:** The District Court, Chin, J., held that:

[1] District Court had subject matter jurisdiction over misjoinder and nonjoinder claims regarding alleged misidentification of true inventor in patents;

[2] sole shareholder had standing as interested party to move for correction of inventor in issued patents;

[3] alleged inventor was not indispensable party to action;

[4] complaint failed to allege that patentees engaged in predicate act establishing pattern of racketeering activity, as required to assert valid claim under RICO; and

[5] amended complaint failed to satisfy pleading requirements giving fair notice of the claim and the ground upon which it rested as to certain defendants, and would be dismissed as to those defendants.

Motion granted in part and denied in part.

West Headnotes (6)

[1] **Patents**
    👍 Court-ordered correction

District court had subject matter jurisdiction over claim that individual patentees had allegedly misjoined the wrong inventor of handbag magnetic snap inventions in issued patents, regardless of whether the misjoinder occurred with or without deceptive intent. 35 U.S.C.A. § 256.

Cases that cite this headnote

[2] **Patents**
    👍 Court-ordered correction

District court had subject matter jurisdiction over nonjoinder claim asserting that patentees misidentified inventor in patents issued on handbag magnetic snap inventions, even if court could not order correction of nonjoined inventor when inventor acted with deceptive intent; it was unclear whether inventor in fact acted with such intent. 35 U.S.C.A. § 256.

Cases that cite this headnote

[3] **Patents**
    👍 Court-ordered correction

Sole shareholder of corporation, that was transferee under invention agreement of all creator's inventions before corporation liquidated and successor assumed its assets which included invention agreement, had standing as interested party to move for correction of identity of inventor in patents issued to individual patentees and successor for magnetic handbag snap inventions based on

claim that patents misidentified true inventor; there was no admissible evidence indicating that sole shareholder was not the assignee of any patent. 35 U.S.C.A. § 256.

Cases that cite this headnote

[4]   **Patents**
       👈 Court-ordered correction

Alleged inventor was not indispensable party to action brought by sole shareholder of corporation that was transferee under invention agreement of all of alleged inventor's inventions against corporation's successor and individual patentees on handbag magnetic snap inventions to seek to have patent ownership changed to reflect true inventor; alleged inventor gave up whatever ownership interest he may have had in inventions when he entered into invention agreement. 35 U.S.C.A. § 256; Fed.Rules Civ.Proc. Rule 19(a), 28 U.S.C.A.

Cases that cite this headnote

[5]   **Postal Service**
       👈 Nature of scheme or device in general

Complaint alleging that two individual patentees "committed pattern of acts of mail fraud" on the Patent and Trademark Office (PTO) by misrepresenting true identity of inventor in patent applications did not amount to allegation of mail fraud, and thus failed to allege a predicate act for purposes of establishing pattern of racketeering activity, as required to assert valid claim under Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. §§ 1341, 1961(1)(B), 1962(c).

1 Cases that cite this headnote

[6]   **Copyrights and Intellectual Property**
       👈 Pleading

**Racketeer Influenced and Corrupt Organizations**
       👈 Pleading

Amended complaint that asserted that individual patentees and affiliated corporations had violated the Racketeer Influenced and Corrupt

Organizations Act (RICO), the Copyright Act, and various state laws by misidentifying true inventor in patents issued on magnetic handbag snap inventions failed to satisfy pleading requirements giving fair notice of the claim and the ground upon which it rested, and would be dismissed as to those defendants; complaint lumped all the defendants together and did not distinguish their conduct so as to allege cognizable acts of wrongdoing. 18 U.S.C.A. § 1961 et seq.; 35 U.S.C.A. § 256.

8 Cases that cite this headnote

**Attorneys and Law Firms**

Zimmerman & Levi, LLP, By: Jean–Marc Zimmerman, Westfield, New Jersey and Kakkar & Kadish, By: Balram Kakkar, New York, New York, for Plaintiff.

Jaroslawicz & Jaros, By: David Jaroslawicz, New York, New York, for Defendants.

*MEMORANDUM DECISION*

CHIN, J.

**\*1**  Plaintiff Mitchell Medina brings the instant action pursuant to the Copyright Act, 35 U.S.C. § 256, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and various state laws. Defendants Irving Bauer, Alex Fischer, Matthew Fischer, Eli Kaufman, Randolph–Rand Corp. of New York ("RRNY"), Magnetic Snap Corp. ("Magnetic Snap"), and Lanfran Realty Corp. ("Lanfran Realty") (collectively "defendants") move (1) to dismiss plaintiff's first amended complaint pursuant to Fed. R. Civ. 12(b)(1), 12(b)(6) and 19; and (2) for costs and attorneys' fees pursuant to 28 U.S.C. § 1927. For the reasons set forth below, defendants' motion is granted in part and denied in part.

*BACKGROUND*

A. *Facts*
The relevant facts, as alleged by plaintiff and drawn from the first amended complaint, are as follows:

In 1989, Randolf–Rand of Delaware ("RR–Del") and Robert Riceman ("Riceman"), who is not a party to this action, entered into a written agreement (the "Invention Agreement") whereby Riceman agreed to (1) transfer all of his inventions to RR–Del, of which plaintiff was the sole shareholder, and (2) disclose and market all of his inventions through RR–Del in exchange for compensation. (Am.Compl.¶ 11). Eventually, Medina, the principal of RR–Del, liquidated RR–Del and succeeded to all of its assets, including the Invention Agreement. (Am.Compl.¶¶ 19).

At some point, beginning in 1994 and continuing through 2001, Bauer, Alex Fischer ("A.Fischer"), and Kaufman filed patent applications on numerous handbag magnetic snap inventions identifying Bauer and/or Kaufman as the inventor(s) even though the actual inventor is Riceman and, pursuant to the Invention Agreement, the actual owner is Medina. (*Id.* ¶ 20). These applications eventually issued as U.S. Patent Numbers 5,515,581, 5,572,773, 5,868,445, 5,937,487, 5,953,795, 5,983,464, 6,009,601, 6,048,004, 6,182,336, 6,295,702 (the "Patents"). (*Id.* ¶ 21).

With respect to each of the Patents, Bauer, A. Fischer, Kaufman, and others allegedly defrauded the United States Patent and Trade Office ("PTO") by (1) filing and prosecuting each Patent application with representations that Bauer and/ or Kaufman were the Patent inventors and (2) concealing the fact that Riceman was the true inventor. (Compl.¶¶ 26, 27).

B. *The Instant Action*
Plaintiff commenced the instant action on November 6, 2002. On February 11, 2003, he served a first amended complaint, the subject of the instant motion, alleging (1) fraud on the PTO, (2) tortious interference with contract, (3) tortious interference with prospective economic advantage, (4) conversion, (5) misappropriation, (6) unjust enrichment, and (7) RICO violations.

On February 27, 2003, defendants moved to dismiss the amended complaint on the following grounds: (1) lack of subject matter jurisdiction pursuant to Civ. R. Fed. P. 12(b) (1), (2) failure to state a claim pursuant to Rule 12(b) (6) because plaintiff lacks standing, (3) failure to join an indispensable party pursuant to Rule 12(b)(7), (4) failure to state a claim for RICO, [1] (5) failure to state a claim for breach of contract; and (6) as against Magnetic Snap, A. Fischer, Matthew Fischer, and Lanfran Realty, failure to allege any

wrongdoing. Defendants also request costs and attorneys' fees.

[1] Defendants also move to dismiss the RICO count for failure to plead fraud with specificity pursuant to Rule 9(b); in light of the rulings below there is no need to address that argument.

**\*2** For the reasons set for below, defendants' motion is granted in part and denied in part.

*DISCUSSION*

A. *Subject Matter Jurisdiction*

1. *Applicable Law*

a. *Fed.R.Civ.P. 12(b)(1)*
In considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), federal courts "need not accept as true contested jurisdictional allegations." *Jarvis v. Cardillo,* 98 Civ. 5793, 1999 U.S. Dist. LEXIS 4310, at \*7 (S.D.N.Y. Apr. 5, 1999). Rather, a court may resolve disputed jurisdictional facts by referring to evidence outside the pleadings. *See Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000); *Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir.1998). As the party "seeking to invoke the subject matter jurisdiction of the district court," the plaintiff bears the burden of demonstrating that there is subject matter jurisdiction in the case. *Scelsa v. City Univ. of New York,* 76 F.3d 37, 40 (2d Cir.1996).

b. *35 U.S.C. § 256*
Title 35 vests federal courts with the authority to order correction of named inventors in issued patents in accordance with § 256:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intent on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in

question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

*35 U.S.C. § 256*.

This section addresses two types of inventorship errors— misjoinder and nonjoinder. *Stark v. Advanced Magnetics, Inc. et al .,* 119 F.3d 1551, 1553 (Fed.Cir.1997). Misjoinder occurs when a person who is not an inventor is listed as an inventor in error. *Id.* Section 256 provides for the deletion of a misjoined inventor "whether that error occurred by deception or by innocent mistake." *Id.* at 1555. Nonjoinder occurs when, in error, a person who is an inventor has not been listed as such. *Id.* at 1553. With respect to nonjoinder, however, "the error cannot involve any deceptive intention by the nonjoined inventor." *Id.* at 1553. Thus, subject matter jurisdiction exists "in all misjoinder cases featuring an error and in those nonjoinder cases where the unnamed inventor is free of deceptive intent." *Id.* at 1555.

### 2. *Analysis*

**[1]** This case involves both claims of misjoinder and nonjoinder. As to misjoinder, defendants contend that "the allegation [in the amended complaint] is that the defendants fraudulently and willfully put down the wrong inventor and that this was not an 'innocent error .' " (Mem. of Law in Support of Defs.' Motion to Dismiss ("Defs.' Mem.") dated Feb. 27, 2003 at 5) (emphasis omitted). "Where there is willful fraud," defendants state, "[§ ] 256 does not apply." (*Id.*). Plaintiff responds by asserting that "[t]he Federal Circuit has repeatedly held that correction of inventorship under [§ ] 256 is proper when a misjoinder occurred with deceptive intent." (Mem. in Support of Pl.'s Opp. to Defs.' Mot. to Dismiss ("Pl.'s Mem.") dated March 27, 2003 at 5).

**\*3** Contrary to defendants' belief that "*Stark* [a Federal Circuit case] is not binding on this Court" (*see* Defs.' Reply Mem. of Law ("Defs.' Reply Mem.") dated April 7, 2003 at 3), "Congress conferred exclusive jurisdiction of all patent appeals on the Court of Appeals for the Federal Circuit." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 142, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (providing that Congress conferred such jurisdiction "in order to 'provide nationwide uniformity in patent law' ") (quoting H.R.Rep. No. 97–312, p. 20 (1981)). Accordingly, "all appeals in patent cases go to the same appellate court irrespective of the district in which they are determined." *Lonza Inc. v. Rohm and*

*Haas, Inc.,* 951 F.Supp. 46, 47 (S.D.N.Y.1997). Thus, *Stark* is binding on this Court. Consequently, regardless of whether the misjoinder occurred with or without deceptive intent, this Court has subject matter jurisdiction over the alleged misjoinder pursuant to § 256. *See id.* at 1555.

**[2]** As to nonjoinder, defendants contend that the Court lacks subject matter jurisdiction to correct the Patents pursuant to § 256 because Riceman is not an innocent inventor. (*See* Defs.' Reply Mem. at 2). Although it is true that the Court may not order correction of a nonjoined inventor when that inventor acted with deceptive intent, *see Stark,* 119 F.3d at 1553, it is unclear at this juncture whether Riceman did, in fact, act with deceptive intent. In any event, because it is clear that the Court has subject matter jurisdiction over the misjoinder, defendants' motion to dismiss the amended complaint for lack of subject matter jurisdiction is denied.

### B. *Standing*
Defendants move to dismiss for failure to state a claim on the basis that plaintiff lacks standing.

### 1. *Applicable Law*

#### a. *Fed.R.Civ.P. 12(b)(6)*
On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, the Court must accept the factual allegations of the amended complaint as true and draw all reasonable inferences in favor of the plaintiff. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim. *Id.*

Dismissal is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In other words, the issue before the Court on this motion to dismiss "is not whether ... plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (citation omitted), *cert . denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996).

Additionally, on a motion to dismiss a court generally may only consider facts alleged in the complaint or in documents

attached to the complaint as exhibits or incorporated by reference. *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991).

### b. *35 U.S.C. § 256*

**\*4** *Section 256* "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent." *Fina Oil & Chem. Co. v. Ewen,* 123 F.3d 1466, 1471 (Fed.Cir.1997). "A patentee or its assignee may state a claim under this section even where there is not a consensus on the correct inventorship as long as all parties are given notice and an opportunity to be heard." *Id.* at 1471 (citing *MCV, Inc. v. King–Seeley Thermos Co.,* 870 F.2d 1568, 1570 (Fed.Cir.1989); *see also Kucharczyk v. Regents of the Univ. of Cal.,* 48 F.Supp.2d 964, 974 (N.D.Ca.1999) ("as the entirety of the case law demonstrates, [§ 256] is invoked when an errant or fraudulent listing of inventorship allegedly deprives the plaintiff of his rightful ownership interest in the patent") (citations omitted).

### 2. *Analysis*

**[3]** Defendants argue that plaintiff fails to state a claim because he lacks standing to move to correct the Patents pursuant to *§ 256* because, *inter alia,* plaintiff "is not the assignee of any patent." (Defs.' Reply Mem. at 2). In support of this assertion, defendants rely on various documents not attached to or relied upon in the amended complaint. Because the Court may not consider such evidence, *see Goldman v. Belden,* 754 F.2d 1059, 1065–1066 (2d Cir.1985) (a *Rule 12(b)(6)* motion is addressed to the face of the pleading, which is deemed to include any document attached as an exhibit or incorporated by reference) (citations omitted), and the amended complaint sufficiently alleges that plaintiff has an ownership interest in the patent (*see* Am. Compl. ¶¶ 11, 16–19), plaintiff has standing to bring a claim pursuant to *§ 256. See Kucharczyk,* 48 F.Supp.2d at 974. Thus, defendants' motion to dismiss the amended complaint for lack of standing is denied.

### C. *Indispensable Party*

### 1. *Applicable Law*

"*Fed.R.Civ.P. 19* sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party. First, the court must determine whether an absent party belongs in the suit, *i.e.,* whether the party

qualifies as a 'necessary' party under *Rule 19(a)*." *Viacom Int'l, Inc. v. Kearney,* 212 F.3d 721, 724 (2d. Cir.), *cert. denied,* 531 U.S. 1051, 121 S.Ct. 655, 148 L.Ed.2d 558 (2000). Second, if a party is deemed necessary, the Court must then determine whether the party's absence warrants dismissal pursuant to *Rule 19(b). Id.* at 725.

*Rule 19(a)* provides that the absent party shall be joined in the suit, if feasible, where:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

**\*5** *Fed.R.Civ.P. 19(a).* "If a party does not qualify as necessary under *Rule 19(a),* then the court need not decide whether its absence warrants dismissal under *Rule 19(b)*." *Viacom Int'l, Inc. v. Kearney,* 212 F.3d at 724 (citing *Associated Dry Goods Corp. v. Towers Fin. Corp.,* 920 F.2d 1121, 1123 (2d Cir.1990)).

### 2. *Analysis*

**[4]** Defendants claim that because Riceman is the alleged inventor of the Patents, he is a necessary and indispensable party to this action. (*See* Defs.' Reply Mem. at 11). The Court disagrees. Viewing the amended complaint in the light most favorable to plaintiff, Riceman gave up whatever ownership interest he may have had in his inventions upon entering into the Invention Agreement. Consequently, Riceman has no claim against defendants with respect to any ownership interest in the Patents. His presence as a party, therefore, is unnecessary to accord complete relief to the existing parties to this action.

As Riceman is not a necessary party, the Court need not decide whether his absence warrants dismissal under *Rule 19(b). See Viacom Int'l, Inc.,* 212 F.3d at 724. Thus,

defendants' motion to dismiss the amended complaint for failure to join a necessary party is denied.

## D. *RICO*
Defendants move to dismiss the RICO count for failure to state a claim.

### 1. *Applicable Law*
Pursuant to § 1962(c), "any person employed by or associated with any enterprise" is prohibited from conducting or participating in the "enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To state a claim under § 1962(c), a plaintiff must establish that a "person" (1) conducted or participated in the conduct of (2) an enterprise's affairs (3) through a pattern (4) of racketeering activity (5) that caused injury to the plaintiff's business or property. *See Lippe v. Bairnco Corp.,* 225 B.R. 846, 860 (S.D.N.Y.1998).

To plead a pattern of racketeering activity, a plaintiff must allege that each defendant committed at least two acts of racketeering activity ("predicate acts") within a ten-year period. 18 U.S.C. § 1961(5). The statute defines "racketeering activity" to include mail fraud. 18 U.S.C. §§ 1341, 1961(1)(B). In addition, where, as here, a RICO claim sounds in fraud, plaintiff must plead fraud with particularity, as required by Fed.R.Civ.P. 9. *See Mehrkar v. Schulmann,* 99 Civ. 10974, 2001 U.S. Dist. LEXIS 717, at *13 (S.D.N.Y. January 30, 2001).

### 2. *Analysis*
**[5]** Defendants argue that plaintiff has failed to state a RICO claim for a variety of reasons, including failure to adequately plead (1) a continuing unit, (2) a RICO enterprise, (3) a separate entity, and (4) a predicate act. (Defs.' Mem. at 7–8). Because plaintiff has failed to allege sufficient predicate acts in support of his RICO claim, however, the Court need not address defendants' arguments to the extent that they go beyond the predicate act requirement.

The law is clear that "inequitable conduct before the PTO cannot qualify as an act of mail fraud ... for purposes of the predicate act requirement." *Semiconductor Energy Laboratory Co. v. Samsung Electronics Co.,* 204 F.3d 1368, 1380 (Fed.Cir.2000); *see also Univ. of W. Va. v. Van Voorhies,* 278 F.3d 1288, 1303 (Fed.Cir.2002) (affirming district court's dismissal of plaintiff's § 1962(c) claim where the plaintiff asserted, as the specific predicate acts for his

RICO claims, that defendants committed mail fraud by making false submissions to the PTO in prosecuting certain patent applications). Here, in pleading the predicate act requirement, plaintiff only alleges that Bauer and A. Fischer "commit[ed] a pattern of acts of mail fraud." (Am.Compl.¶ 98). Thus, plaintiff has failed to allege a valid RICO claim. Consequently, defendants' motion to dismiss plaintiff's RICO claim is granted.

## E. *Breach of Contract*
**\*6** Defendants move to dismiss a breach of contract claim. (*See* Defs.' Mem. at 10 ("The complaint ... does not properly plead a breach of contract claim."); Defs.' Reply Mem. at 11 (same)). But no such claim is asserted in the amended complaint. Hence, this prong of the motion is denied.

## F. *Notice to Defendants*

### 1. *Applicable Law*
Fed.R.Civ.P. 8 requires, at a minimum, that a complaint give each defendant "fair notice of what the plaintiff's claim is and the ground upon which it rests." *See Ferro v. Ry. Express Agency, Inc.,* 296 F.2d 847, 851 (2d Cir.1961); *see also Lippe v. Bairnco Corp.,* 96 Civ. 7600, 1998 U.S. Dist. LEXIS 16060, at *39 (S.D.N.Y. Oct. 14, 1998) ("plaintiffs cannot simply 'lump' all the defendants together and allege that the purported acts of every defendant can be imputed to every other defendant").

### 2. *Analysis*
**[6]** Defendants argue, for a variety of reasons, that the amended complaint fails to allege any wrongful acts on the part of A. Fischer, Matthew Fischer, Magnetic Snap, and Lanfran Realty. (Defs.' Mem. at 15).

Although the amended complaint often refers to the defendants collectively, the only allegations against Matthew Fischer, Magnetic Snap, and Lanfran Realty are as follows:

1. "[Mathew] Fischer is an officer of RRNY";

2. "In 1994, Riceman executed a contract with Magnetic Snap [ ] under which Riceman actually worked for RRNY"; and

3. "Lanfran Realty [ ] provided financial guarantees on behalf of Bauer as part of this transaction [the sale of a portion of RR–Del]."

(Am.Compl.¶¶ 6, 18, 17).

By lumping all the defendants together and failing to distinguish their conduct, plaintiff's amended complaint fails to satisfy the requirements of Rule 8. Specifically, the allegations fail to give adequate notice to these defendants as to what they did wrong. Accordingly, defendants' motion to dismiss the amended complaint for failure to state any valid claims as against Matthew Fischer, Magnetic Snap, and Lanfran Realty is granted. The amended complaint is dismissed as to these three defendants.

*CONCLUSION*

For the reasons set forth above, the defendants' motion to dismiss is granted in part and denied in part. Defendants' request for Rule 11 sanctions is denied, as is its request for costs and attorneys' fees. The parties shall appear for a pretrial conference in Courtroom 11A on February 13, 2004 at 11:00 am.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 136636

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

🏷 KeyCite Yellow Flag - Negative Treatment
**Distinguished by**  Barnet v. Drawbridge Special Opportunities Fund LP,
S.D.N.Y.,  September 5, 2014

2012 WL 6082387
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

OCHRE LLC, a New York Limited
Liability Corporation, Plaintiff,
v.
ROCKWELL ARCHITECTURE PLANNING
AND DESIGN, P.C., a New York Professional
Corporation; Project Dynamics, Inc., a
Delaware Corporation; Brad H. Friedmutter–
CA, Inc., a California Corporation d/b/
a Friedmutter Group; Nevada Property 1
LLC, A Nevada Limited Liability Corporation
and wholly owned subsidiary of Deutsche
Bank Trust Company Americas, Defendants.

No. 12 Civ. 2837(KBF).
|
Dec. 3, 2012.

*CORRECTED MEMORANDUM & ORDER*

KATHERINE B. FORREST, District Judge.

 **\*1**  In this action alleging copyright infringement and various
implied contract claims related to plaintiff Ochre LLC's
designs for luxury chandelier elements at the Cosmopolitan
Hotel in Las Vegas, plaintiff has failed to demonstrate it has
a valid copyright, the sole basis upon which original federal
jurisdiction is premised.

Plaintiff filed the instant action on April 10, 2012 (Dkt.
No. 1.) Ochre alleges that Rockwell Architecture, Planning
and Design, P.C. ("Rockwell"), the design firm that was in
charge of procuring the chandeliers, committed copyright
infringement when it solicited and ordered chandelier
elements from a competitor, based on Ochre's designs for
its "Arctic Pear" glass drop elements. Ochre had great
hopes that its glass drop elements would be selected by
the Cosmopolitan for the chandeliers in its luxury suites.
Ochre's designers created shop drawings and other design

specifications to provide a prototype lighting fixture for a
model hotel room that it hoped would lead to a larger contract.
In the end, Ochre's hopes went unfulfilled and it never
received a purchase order for the chandeliers, despite what it
characterizes as an "express understanding" of such an order.
It has sued for, *inter alia,* copyright infringement as to all
defendants, despite the finding by the U.S. Copyright Office
that Ochre's designs did not contain copyrightable subject
matter.

In its Second Amended Complaint ("SAC"), filed June
28, 2012 (Dkt. No. 12), Ochre joined as defendants
(1) Rockwell, (2) Brad H. Friedmutter—CA, Inc.—
the project's Executive Architect, (3) the owner of the
Cosmopolitan, Nevada Property 1 LLC, a subsidiary
of Deutsche Bank Trust Company Americas ("Deutsche
Bank"), and (4) the Cosmopolitan's procurement agent,
Project Dynamics, Inc. The SAC alleges six causes
of action: copyright infringement, fraudulent inducement,
quantum meruit, promissory estoppel, unjust enrichment, and
misappropriation and unfair competition. Only the copyright
infringement cause of action arises under federal law; the
remaining five causes of action raise state law claims. As both
plaintiff and defendant Rockwell are alleged to reside in New
York, there is no basis for diversity jurisdiction.

In four separate motions, defendants have moved for
the dismissal of the SAC under Fed.R.Civ.P. 12(b)(6).
(Dkt.Nos.14, 18, 21, 34.) As plaintiff fails to allege plausible
facts to support its copyright infringement claim—the
sole basis for this Court's original jurisdiction—defendants'
motions to dismiss are GRANTED.

FACTUAL ALLEGATIONS

Plaintiff Ochre is a specialized furniture, lighting, and
accessory design company. (SAC ¶ 2.) Among its products
are a line of "Arctic Pear" specialty chandeliers with rows
of glass "drop" elements shaped like the eponymous fruit.
(*Id.* ¶ 15.) Ochre filed a single copyright application for both
the "Arctic Pear Round 45" and "Arctic Pear Round 60"
designs with the U.S. Copyright Office on March 22, 2012.
(SAC Ex. C.) The Copyright Office denied the application on
May 14, 2012, on the basis that the two designs were for a
"useful article" and lacked "any separable authprship" from
the functional aspects of the article. (SAC Ex. D.)

Ochre LLC v. Rockwell Architecture Planning and Design, P.C., Not Reported in...
Case 3:15-cv-01877-AWT   Document 55-2   Filed 05/19/16   Page 29 of 51

2012 WL 6082387

 **\*2**  In May 2009, defendant Rockwell, a specialty design
firm, solicited plaintiff to submit prototype lighting fixtures
for the Cosmo Room, a model room at the Cosmopolitan
hotel and condominium complex then under construction in
Las Vegas. (*Id.* ¶ 28–29.) Ochre provided defendant Project
Dynamics, the procurement agent for the Cosmopolitan,
with shop drawings and design information for lighting
fixtures for the Cosmo Room, based on the "Round 45"
and "Round 60" designs. (*Id.* ¶ 30, 36, 46.) Plaintiff alleges
that Project Dynamics shared the shop drawings and design
information with Rockwell and defendant Friedmutter, the
chief architectural firm on the project. (*Id.* ¶ 46.) After Project
Dynamics approved the drawings, plaintiff sent prototype
fixtures to the hotel for display in the model room. (*Id.* ¶¶ 46–
48.)

Plaintiff alleges it only submitted the detailed designs and
samples to "defendants"—undifferentiated by the text of the
SAC—on the "express understanding" that it was going to be
awarded a contract to provide hundreds of similar fixtures for
the Cosmopolitan. But shortly after sending the prototypes,
Project Dynamics informed Ochre that it would have to
go through a competitive bidding process. (*Id.* ¶ 49.) As
part of that process, Ochre submitted what it characterizes
as "confidential" financial and other information relating to
the designs, information it told Project Dynamics it was
furnishing "in good faith that the [purchase order] deposit
will be received in a timely manner." (*Id.* ¶ 50–52.) Ochre
alleges that "defendants" assured it that the bidding process
run by Deutsche Bank's "eAuction" system was merely a
"formality." (*Id.* ¶ 53.)

Ochre alleges that Friedmutter, the architect, issued two
specifications for the light fixtures in September 2009, both
of which included photographs of Ochre's Arctic Pear design
for "inspiration" and the "look of" only, and referred to a
drawing that allegedly incorporated the designs Ochre had
provided to Rockwell and Project Dynamics. (*Id.* ¶¶ 73–
75, 76–80.) Ochre alleges that the Friedmutter specifications
falsely claimed that "[t]he custom item described herein
is the proprietary design or Nevada Properties 1 dba the
Cosmopolitan Resort and Casino." (*Id.* ¶¶ 76, 79.)

Despite the "assurances" of "defendants" Ochre did
not receive a purchase order. Ochre alleges that cost-
cutting in light of the Las Vegas housing bust and the
related sale of the Cosmopolitan to Deutsche Bank in
the summer of 2008 prompted defendants to outfit the
hotel "on the cheap." (*Id.* ¶¶ 64–70.) "Defendants" had

used "Ochre's design, specifications and shop drawings to
procure unlicensed copies or 'knockoffs' of the Arctic Pear
Chandeliers from a cheap overseas supplier." (*Id.* ¶ 84.) On
information and belief, Ochre states that the knockoffs were
installed in "hundreds or perhaps thousands" of hotel rooms
not only at the Cosmopolitan, but also at other hotels where
defendants had design responsibility. (*Id.* ¶ 87.)

 **\*3**  Ochre filed suit on April 10, 2012. (Dkt. No. 1.) It
amended its complaint on June 15, 2012. (Dkt. No. 8.) At
the initial pretrial conference on June 27, 2012, the Court
permitted plaintiff to file one "final" amendment. (Dkt. No.
10.) In response, plaintiff filed the SAC on June 28, 2012,
which added a cause of action for misappropriation and unfair
competition and included information regarding the denial
of plaintiffs copyright application. (Dkt. No. 12.) Defendants
Friedmutter (Dkt. No. 14), Deutsche Bank (Dkt. No. 18),
Rockwell (Dkt. No. 21), and Project Dynamics (Dkt. No. 34),
filed motions to dismiss the SAC for failure to state a claim.
These motions were fully briefed as of October 12, 2012.

## STANDARD OF REVIEW

On a motion to dismiss, this Court accepts as true all well-
pleaded factual allegations. *See Ashcroft v. Iqbal,* 129 S.Ct.
1937, 1949–50 (2009). This means that this Court must
accept plaintiff's factual allegations in its complaint as true
and draw all reasonable inferences in plaintiff's favor. *See
Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106,
108 (2d Cir.2010). Taking those factual allegations as true,
to withstand dismissal, "a complaint must contain sufficient
factual matter, accepted as true, to 'state a claim to relief that
is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (*quoting
Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).
"Threadbare recitals of the elements of a cause of action,
supported by mere conclusory statements, do not suffice." *Id.*
Thus, while "Rule 8 marks a notable and generous departure
from hyper-technical, code-pleading regime of a prior era,
[ ] it does not unlock the doors of discovery for a plaintiff
armed with nothing more than conclusions." *Id.* at 1950.
"[W]here the well-pleaded facts do not permit the court
to infer more than the mere possibility of misconduct, the
complaint has alleged-but it has not shown-that the pleader is
entitled to relief." *Id.* (internal punctuation omitted); *see also*
Fed.R.Civ.P. 8(a)(2).

Ochre LLC v. Rockwell Architecture Planning and Design, P.C., Not Reported in...

Case 3:15-cv-01877-AWT   Document 55-2   Filed 05/19/16   Page 30 of 51

2012 WL 6082387

DISCUSSION

A. *Copyright Infringement*

1. *Non–Copyrightability*
The SAC fails to state a cognizable copyright infringement cause of action because, quite simply, the designs at issue are not copyrightable.

To state a cognizable claim for copyright infringement, a plaintiff must allege plausible facts that it owned a valid copyright and that the defendants copied the copyrighted work without authorization. *See Heptagon Creations, Ltd. V. Core Group Mktg. LLC,* No. 11 Civ. 01794(LTS) (AJP), 2011 WL 6600267, at *3 (Dec. 22, 2011) (*citing Kregos v. Associated Press,* 3 F.3d 656, 661 (2d Cir.1993)); *Computer Assocs. Int'l v. Altai,* 982 F.2d 693, 701 (2d Cir.1992). "Where the Copyright Office denies registration, and the unsuccessful applicant subsequently brings an infringement action, courts nonetheless make an independent determination as to copyrightability." *Aqua Creations USA Inc. v. Hilton Hotels Corp.,* 10 Civ. 246(PGG), 2011 WL 1239793, at *3–*4 (S.D.N.Y. Mar. 28, 2011) *aff'd sub nom. Aqua Creations USA Inc. v. Hilton Worldwide, Inc.,* 11–1798–CV, 2012 WL 2687957 (2d Cir. July 9, 2012).

 **\*4** Here, plaintiff alleges that the designs for which it sought copyrights were lighting fixtures for hotel rooms. There is no doubt that they constitute "useful articles." *See, e.g., id.* at *4–*7. For a plaintiff to issue with respect to a "useful article"— one that possesses an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information—the party seeking the copyright must prove that there exist attributes of the design that are physically or conceptually separable from its functional aspects. *Id.,* at *3–*4.

Physical separability exists where "a component of a useful article can actually be removed from the original item and separately sold, without adversely impacting the article's functionality ...." *See Chosun Int'l. Inc. v. Chrisha Creations, Ltd.,* 413 F.3d 324, 327 (2d Cir.2005).

Conceptual separability does not exist in a design where "design elements reflect a merger of aesthetic and functional considerations ." *Brandir Int'l. Inc. v. Cascade Pac. Lumber Co.,* 834 F.2d 1142, 1145 (2d Cir.1987). Only "where design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences, [does] conceptual separability exist[ ]." *Aqua Creations,* 2011 WL 1239793, at *4 (*quoting Brandir,* 834 F.2d at 1145). Even though particular utilitarian objects may be highly pleasing to the eye, "Congress has explicitly refused copyright protection for works of applied art or industrial design which have aesthetic or artistic features that cannot be identified separately from the useful article." *Carol Barnhart Inc. v. Econ. Cover Corp.,* 773 F.2d 411, 418 (2d Cir.1985).

Ochre fails to meet its burden as to copyrightability because it has not plausibly alleged physical or conceptual aspects of the Arctic Pear chandeliers separable from their functional aspects. Nowhere does the SAC allege that any element of the Arctic Pear design is physically separable from the fixture such that it could be sold without impacting the article's functionality.

Nor does the SAC allege conceptual separability. It is clear that in order to create a light fixture such as the Arctic Pear, its designer must think about its functional use—i.e., how it will refract, reflect, and absorb light. *See Aqua Creations,* 2012 WL 1239793, at *6 (noting, where lamp shade designer sued hotel for infringement in similar circumstance that "[i]t strains belief that the creator of [lampshade] designs would have selected a shape for the lamp shades without giving any consideration to the need for illumination.") That the Arctic Pear designs provided to the Cosmopolitan were designed to illuminate hotel rooms—no matter how stylish—suggests that the functional aspect of those designs is conceptually inseparable from their functional aspects.

Ochre cites *Carol Barnhart* for the proposition that where the ornamental aspects of an object were "not in any respect required by their utilitarian functions," those aspects could be copyrighted. (Pl.'s Mem. of L. in Opp. to Defs.' Mot. to Dismiss the 2d Amend. Compl. at 13–14 (*citing Carol Barnhart,* 773 F.2d at 419)). Yet Ochre fails to allege plausible facts that the elements of the Arctic Pear designs are not required for the fixture's utilitarian function. The belt buckle ornaments on which the analyses in Carol Barnhart and its predecessor case, *Kieselstein–Cord v. Accessories by Pearl, Inc.,* 632 F.2d 989 (2d Cir.1980), were based contributed nothing to the functionality of the buckles themselves. The Arctic Pear glass drops at issue here are different; because those drops aid in the transmission and dissemination of electric light, their ornamental aspects are inextricably intertwined with the utilitarian function of those lamps. While it would be possible to operate the lamp without

Ochre LLC v. Rockwell Architecture Planning and Design, P.C., Not Reported in...

2012 WL 6082387

the drops, that does not mean the ornamental aspects are "not in any way required." Rather, without the presence of the glass drops, the utilitarian function of the electric lamp would be diminished. It is not conceptually possible to separate one function from the other.

**\*5** The Court—in its independent judgment—agrees with the Copyright Office's determination that the Arctic Pear designs are not copyrightable. In the absence of a valid copyright, plaintiff's copyright infringement cause of action cannot proceed. *See Aqua Creations,* 2012 WL 2687957, at *1.

2. *Pleading Insufficiency*

Even if plaintiff's designs were indeed copyrightable, this Court would still dismiss the copyright cause of action because it is insufficiently pled in two additional ways: first, even assuming a valid design, it fails to allege facts constituting copyright infringement. Second, it improperly "lumps" together the allegations against the various defendants.

a. *Failure to Allege Facts Constituting Copyright Infringement*

As to Friedmutter, Rockwell, Deutsche Bank and Project Dynamics, plaintiff fails to allege facts to show that each infringed Ochre's alleged copyrights.

To prove copyright infringement, in addition to ownership of a valid copyright in the allegedly infringed work, plaintiff must prove that defendants "copied" the work without permission. *See Heritage Lace, Inc. v. Fresh Finds, LLC,* 10 CIV. 7880(KBF), 2012 WL 345904, at *3 (S.D.N.Y. Feb. 1, 2012) (*citing Island Software and Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 260 (2d Cir.2005); *Rogers v. Koons,* 960 F.2d 301, 306 (2d Cir.1992)).

The term "copy" is defined broadly by the Copyright Act and subsequent case law to include violation of any of the exclusive rights in the bundle conferred on the copyright holder. *See* 17 U.S.C. § 501; *Island Software,* 413 F.3d at 260. Such rights include the right to make reproductions, to make derivative works, to distribute copies by sale or transfer of ownership, and to display the work publicly. *See* 17 U.S.C. § 106.

Plaintiff's complaint is insufficient in that it lacks specific allegations of copyright infringement against each of

the defendants (whether as direct infringement or on a theory of secondary liability). For example, as regards Friedmutter, the SAC makes three specific allegations: first, that "Cosmopolitan's design team was led by defendant Friedmutter as executive architect;" second, that "Interior design ... was handled by Friedmutter which worked with various specialty design firms, including Rockwell" (SAC ¶¶ 26–27); and third, that Friedmutter issued the specifications for the bidding process. (*Id.* ¶¶ 71–79.) The SAC contains no specific allegations that Friedmutter was involved in the selection of the fixture supplier or caused any "knockoffs" to be produced.

Rockwell is alleged to have 1) discussed the Cosmo Room with plaintiff, 2) forwarded the proposed design Ochre submitted for the model room, and 3) received the proprietary information that Ochre sent to Project Dynamics. (SAC ¶¶ 28, 29–30, 45.) None of those allegations go to whether Rockwell copied or wrongfully displayed Ochre's designs.

**\*6** The allegations with respect to Project Dynamics are similarly insufficient. The only allegations specific to Project Dynamics in the SAC state that Project Dynamics acted as the procurement agent for the Cosmopolitan—a role in which it was essentially the owner's agent. Project Dynamics issued the request for quotation for the Ochre design samples, received Ochre's designs, and emailed bid forms to Ochre. (SAC ¶¶ 31, 32, 47, 49.) The SAC contains no allegations specific to Project Dynamics regarding its approval or requisition of copies of the "Arctic Pear" designs.

With respect to Deutsche Bank, only one of plaintiff's specific allegations is relevant to the copyright infringement cause of action. That allegation is that Deutsche Bank, as owner of the property, has caused and continues to cause infringing products to be displayed at the hotel and on its website. (SAC ¶ 99.) Such an allegation, if supported by a sufficiently pled allegation of a valid copyright, might support a copyright infringement cause of action on an unauthorized public display theory. *See* 17 U.S.C. § 106 (West 2012) (noting exclusive right of copyright holder to display a "sculptural" work publicly).

b. *Lumping of Allegations*

The remaining key facts pled in the SAC are "lumped" together and thus do not afford each defendant adequate notice of the factual allegations it faces. This failure to isolate the key allegations against each defendant supports dismissal under the standards set forth in *Twombly* and *Iqbal.*

Ochre LLC v. Rockwell Architecture Planning and Design, P.C., Not Reported in...

2012 WL 6082387

Case 3:15-cv-01877-AWT Document 55-2 Filed 05/19/16 Page 32 of 51

Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants. *See Atuahene v. City of Hartford,* 10 Fed. App'x 33, 34 (2d Cir.2001) (noting Fed.R.Civ.P. 8 "requires, at a minimum, that a complaint give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests' ") (*citing Ferro v. Ry. Express Agency, Inc.,* 296 F.2d 847, 851 (2d Cir.1961); *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995)). A plaintiff cannot merely "lump[ ] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct." *Id.*

Ochre lists a number of undifferentiated allegations in the SAC. For instance, the SAC alleges "defendants" gave an "express understanding" that Ochre would win the full purchase order (SAC ¶ 46); that "defendants" used "Ochre's design [s] ... to procure unlicensed copies or 'knockoffs' ", (SAC ¶ 84); and that "defendants ... have actually held out the chandeliers utilized at the Cosmopolitan as authentic Ochre creations in communications to the public, in response to inquiries and otherwise." (SAC ¶ 89.) These statements do not allege which of the defendants or agents of those defendants engaged in the infringing activities, even where, as with the "express understanding", Ochre would have had a course of dealing with particular individuals and could allege which of those individuals made improper representations to Ochre.

**\*7** Such "lumping" of allegations is exactly what the Second Circuit warned against in *Atuahene* and *Simmons;* plaintiff cannot force the various defendants to guess at the nature of its claims.

Plaintiff thus fails to allege plausible facts supporting its claim of a copyrightable design or conduct by each individual defendant constituting wrongful copying. As the Court previously gave plaintiff one final leave to amend its complaint, the copyright infringement cause of action against all defendants is DISMISSED WITH PREJUDICE.

B. *Remaining State Law Causes of Action*

This Court has supplemental jurisdiction over the remaining causes of action for fraudulent inducement, quantum meruit, promissory estoppel, unjust enrichment, and misappropriation and unfair competition. 28 U.S.C. § 1367(a).

Having dismissed all claims over which it has original jurisdiction, the Court, in its discretion, declines to exercise supplemental jurisdiction over the remaining state law causes of action. *See* 28 U.S.C. § 1367(c)(3); *see also Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y.,* 464 F.3d 255, 262–63 (2d Cir.2006). Those claims are dismissed without prejudice.

CONCLUSION

Ochre's copyright infringement cause of action is DISMISSED WITH PREJUDICE as to defendants. The Court declines to exercise supplemental jurisdiction over the fraudulent inducement, quantum meruit, promissory estoppel, unjust enrichment, and misappropriation and unfair competition causes of action, which are DISMISSED WITHOUT PREJUDICE as to all defendants.

The Clerk of Court is directed to close the motions at Docket Nos. 14, 18, 21, and 34, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6082387

---

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3769217
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Sasha RODRIGUEZ and Cathelyn Gregoire, on
behalf of all persons similarly situated, Plaintiffs,

v.

SLM CORPORATION and
Sallie Mae, Inc., Defendants.

No. 07cv1866 (WWE).
|
Nov. 10, 2009.

West KeySummary

1    **Federal Civil Procedure**
     👉 Fraud, mistake and condition of mind
     Student loan borrowers failed to state a claim that
     fraudulent concealment tolled the one-year Truth
     in Lending Act (TILA) statute of limitations. The
     borrowers did not state with particularity their
     efforts to discover the nature of their claimed
     TILA violations. Although they alleged that they
     could not obtain adequate or full information
     from the lender regarding their loans, they failed
     to indicate what questions they asked and how
     the requested information would have revealed
     the inadequacy of the prior TILA disclosures.
     Truth in Lending Act, § 102 et seq., 15 U.S.C.A.
     § 1601 et seq. (TILA).

     2 Cases that cite this headnote

**Attorneys and Law Firms**

Christopher Casper, J. Andrew Meyer, Jillian L. Estes, John
A. Yanchunis, Jonathan B. Cohen, Nicole C. Mayer, Terry
A. Smiljanich, W. Christian Hoyer, James Hoyer Newcomer
& Smiljanich, P.A., Tampa, FL, J. Anthony Doran, M.
Hatcher Norris, Butler, Norris & Gold, Hartford, CT, Allen
M. Stewart, James D. Piel, Steve B. Jensen, Allen Stewart,
P.C., Dallas, TX, Gary K. Shipman, Jean S. Martin, Matthew
W. Buckmiller, Shipman & Wright, LLP, Wilmington, NC,

Joseph Bree Burns, Rome McGuigan Sabanosh, Hartford,
CT, for Plaintiffs.

Jennifer R. Rossi, Robinson & Cole, Hartford, CT, Lisa M.
Simonetti, Mary D. Manesis, Stroock Stroock & Lavan, LLP,
Los Angeles, CA, for Defendants.

*MEMORANDUM OF DECISION ON MOTION
TO DISMISS SECOND AMENDED COMPLAINT*

WARREN W. EGINTON, Senior District Judge.

 **\*1**  In this action, plaintiffs Sasha Rodriguez and Cathelyn
Gregoire, on behalf of themselves and the putative class, sue
defendants Sallie Mae Incorporated and SLM Corporation for
violation of the Equal Credit Opportunity Act ("ECOA") and
the Truth in Lending Act ("TILA") stemming from allegedly
discriminatory policies for the underwriting of private student
loans. In a prior ruling, this Court dismissed plaintiffs' TILA
claim without prejudice and instructed plaintiffs to amend the
complaint to plead with particularity their claim that equitable
tolling applies. After plaintiffs filed a second amended
complaint, defendant Sallie Mae filed another motion to
dismiss. For the following reasons, the motion to dismiss will
be granted.

**BACKGROUND**

For purposes of ruling on this motion, the Court takes the facts
alleged in the complaint to be true. The Court incorporates
herein the facts recited in this Court's prior ruling. The Court
provides only the facts relevant to the TILA and equitable
tolling claims.

Sallie Mae failed to disclose adequately that additional fees
would be charged on the loan. The additional fees included
a "prepaid finance" charge, "disbursement" fee, "repayment"
fee, insurance premium, or "supplemental" fee. Sallie Mae
also violated TILA by failing to provide a statement of the
consumer's right to obtain, upon written request, a written
itemization of the amount financed.

Sallie Mae waited to make disclosures required by TILA until
plaintiffs and class members had already begun classes or
until their schools had received the loan funds, at which time
plaintiffs and class members had no choice but to accept the
loan terms or forego school for a semester. Often, Sallie Mae
failed to disclose fully the loan terms to an applicant.

Although the students might have found the required information online, Sallie Mae would not allow students to manage their loans online until after the student had received the borrowed funds. Sallie Mae's late disclosure denied plaintiffs and class members the ability to compare various credit terms available to them.

Sallie Mae failed to train its agents to explain to students the manner in which their loan terms would be disclosed. Sallie Mae encouraged its agents to confuse borrowers when inquiries were made.

Plaintiffs attempted to discover all of the relevant terms and conditions of their loans by reviewing the loan documents they received, and by communicating with their respective schools and with Sallie Mae by email, telephone and the loan management website. Nevertheless, plaintiffs remained unaware that they were entitled to more complete and thorough disclosures of the loan terms.

A borrower of student loans does not learn the terms of a loan until that loan goes into repayment six months after the student leaves school or graduates.

Rodriguez, whose loans went into repayment status in September 2005, sought information from Sallie Mae by phone, email and website management. However, she was given no information or incomplete documentation. She attempted to contact her school for financial aid information and was unable to obtain a proper response. She also spoke to similarly-situated friends who had experienced the same lack of information.

 **\*2** Gregoire asked for information concerning the loan and loan terms from her financial aid office, which had a close relationship with Sallie Mae. She sought disclosure from her school and Sallie Mae by email, and she regularly used Sallie Mae's loan management website.

Plaintiffs assert that the dates of inquiries occurred prior to the origination dates of the loans. Plaintiffs allege that they could not discover the nature of TILA violations until "shortly before the filing of this action" on December 18, 2007.

## DISCUSSION

The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The complaint must contain the grounds upon which the claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). The complaint is sufficient if the well-pleaded factual allegations plausibly give rise to an entitlement to relief. *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

**TILA**
In its prior ruling, this Court found plaintiffs' TILA claims untimely because the one-year statute of limitations had run prior to the December 2007 filing of this action. [1] However, plaintiffs counter that equitable tolling based on fraudulent concealment applies to delay the commencement of the running of the statute of limitations. Plaintiffs' allegations of fraudulent concealment are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b) and must be stated with particularity. *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 582 (2d Cir.2005).

[1]   *See* 15 U.S.C. § 1640(e)

In order to satisfy Federal Rule of Civil Procedure 9(b), a complaint must: (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. *Antian v. Coutts Bank (Switzerland) Ltd.,* 193 F.3d 85, 88 (2d Cir.1999). Plaintiffs may make general allegations of malice, intent, knowledge or other state of mind, but the facts must give rise to a strong inference of fraudulent intent. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). The purpose of the specificity requirement is: (1) to ensure that a complaint provides defendant with fair notice of the plaintiffs' claim; (2) to safeguard defendant's reputation from improvident charges; and (3) to protect defendant from a strike suit. *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991).

**\*3** For the federal doctrine of fraudulent concealment to apply, plaintiffs must show: (1) that defendant engaged in a course of conduct to conceal evidence of defendant's alleged wrong-doing; and (2) that plaintiffs failed to discover the facts giving rise to their claim despite their exercise of due diligence. *Pettola v. Nissan Motor Acceptance Corp.,* 44 F.Supp.2d 442, 450 (D.Conn.1999). Plaintiffs must show that they exercised due diligence during the relevant time period and that defendant's act of fraudulent concealment frustrated discovery of their cause of action. *Id.*

This Court has already ruled that plaintiffs have adequately alleged that defendant took steps to conceal relevant information to students by (1) encouraging its agents to confuse borrowers when inquiries were made; (2) not allowing students to manage their loans online, where they may have had access to the required TILA information; and (3) training its sales force to avoid disclosure of the loan terms.

Plaintiffs' complaint asserts further that they could not ascertain their cause of action until just prior to filing this action due to such concealment, and that their attempts to discover relevant information were blocked by Sallie Mae's deceptive tactics such as training and encouraging its sales force to confuse plaintiffs and not to disclose the required TILA information.

In this instance, plaintiffs do not dispute that they had received TILA disclosures related to their loans. In their amended complaint, plaintiffs allege that they made inquiries about their loan terms but were unaware that they were entitled to more complete and thorough disclosures of the loan terms. Plaintiffs assert that the concealment continues to this day.

"The exercise of reasonable diligence is determined by examining the nature of the misleading statements alleged, the opportunity to discover the misleading nature of the statements, and the subsequent actions of the parties."

*Kennedy v. Josephthal & Co.,* 814 F.2d 798, 803 (1st Cir.1987).

Here, plaintiffs' allegations fail to state with particularity their efforts to discover the nature of their claimed TILA violations. Although plaintiffs allege that they could not obtain adequate or full information from Sallie Mae regarding their loans, plaintiffs fail to indicate what questions plaintiffs asked and how the requested information would have revealed the inadequacy of the prior TILA disclosures. It remains unclear how either plaintiff eventually ascertained that the alleged TILA cause of actions existed shortly before filing this action.

Plaintiffs argue that it is unreasonable to expect that college students such as plaintiffs could determine which terms were required by TILA to be disclosed. However, a plaintiff's lack of legal expertise will not toll the statute of limitations until the time that a plaintiff seeks legal advice. *See Moore v. OneWest Bank, F.S.B.,* 2009 WL 3270181 (E.D.Mich.2009) (rejecting argument that plaintiff could not have ascertained illegal lending practices until she sought legal advice). Accordingly, the Court finds that plaintiffs' allegations are not sufficient to state a claim of fraudulent concealment and will dismiss the TILA allegations based on the bar of the relevant statutes of limitations. The Court will not afford plaintiffs another leave to amend because it appears that they cannot cure the deficiency to their pleading.

## CONCLUSION

**\*4** For the foregoing reasons, the motion to dismiss [Doc. # 107] is GRANTED. Plaintiffs are instructed to amend the complaint to delete the TILA count consistent with this ruling within fifteen days of this ruling's filing date.

## All Citations

Not Reported in F.Supp.2d, 2009 WL 3769217

---

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1600414, Prod.Liab.Rep. (CCH) P 19,377

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Suffolk County Water Authority v. Dow Chemical Co.,
N.Y.Sup., June 16, 2014

2014 WL 1600414
United States District Court,
W.D. New York.

S.F., as parent and natural guardian
of S.E.F., an infant, Plaintiff,

v.

ARCHER–DANIELS–MIDLAND COMPANY,
Cargill, Inc., Ingredion Incorporated, Penford
Products Co., Tate & Lyle Ingredients Americas,
LLC, and Roquette America, Inc., Defendants.

No. 13–CV–634S.
|
Signed April 21, 2014.

**Attorneys and Law Firms**

J. Michael Hayes, Law Offices of J. Michael Hayes, Buffalo,
NY, for Plaintiff.

Kevin M. Hogan, Phillips Lytle LLP, David R. Adams,
Hurwitz & Fine, P.C., Buffalo, NY, Cornelius M. Murphy,
Dan K. Webb, Scott P. Glauberman, Stephen V. D'Amore,
Winston & Strawn LLP, Chicago, IL, Peter Neil Wang,
Yonaton Aronoff, Foley & Lardner, New York, NY, for
Defendants.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, Chief Judge.

**I. INTRODUCTION**

 **\*1**  The Plaintiff asserts that high-fructose corn syrup is a
toxic substance and that its manufacturers are liable under
the tort doctrines of strict liability, negligence, and failure to
warn. Both the true Plaintiff, S.E.F, and her mother, S.F., who
brings this claim on her daughter's behalf, are identified only
by their initials to protect the daughter's identity. [1] Invoking
this Court's diversity jurisdiction, Plaintiff, who was fourteen
years old at the time the complaint was filed, asserts that high-
fructose corn syrup, which she consumed in familiar foods

like Pepsi and McDonald's hamburger buns, was a substantial
factor in causing her to develop Type 2 diabetes.

[1]   Under Rule 5.2(a) of the Federal Rules of Civil
Procedure, only a minor's initials should be used in
all publicly filed documents. Further, "[s]ince a parent
must proceed on behalf of a minor child, the protection
afforded to the minor would be eviscerated unless the
parent was also permitted to proceed using initials."
P.M. v. Evans–Brant Cent. Sch. Dist., No. 08–CV–168A,
2008 WL 4379490, at *3 (W.D.N.Y. Sept.22, 2008)
(Schroeder, Jr., M.J.) (Report and Recommendation
adopted in full).

All Defendants—five manufacturers of high-fructose corn
syrup (commonly referred to in the industry by the initialism
"HFCS")—now move to dismiss this action under Federal
Rule of Civil Procedure Rule 12(b)(6). They contend that
Plaintiff has failed to state a plausible claim for relief. More
to the point, they argue that Plaintiff cannot causally connect
HFCS to the disease; that, by grouping all the manufacturers
together as one unit, she cannot connect the alleged harm
to any one particular defendant; and last, that federal food-
additive laws preempt her claim.

In response to Defendants' motions to dismiss, Plaintiff
filed required briefing and moved for leave to amend her
complaint; she contends that the proffered amendments cure
any deficiencies highlighted by Defendants in their motions.
Defendants disagree. The proposed amendments, they argue,
are futile and do not save her deficient claim.

As an initial matter, this Court will grant the motion to amend
and construe the motion to dismiss against the amended
complaint, which Plaintiff attached to her motion for leave
to file it. The new complaint adds context and detail to her
claim; it does not add new causes of action. And Defendants
—in what effectively resulted in another round of briefing
on the motions to dismiss—have responded to the amended
complaint, eliminating the potential for any undue prejudice
they may have suffered by virtue of the amended pleading.
See, e.g., Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227,
230, 9 L.Ed.2d 222 (1962).

Despite this, for the reasons discussed below, the amended
complaint must be dismissed.

**II. BACKGROUND**

2014 WL 1600414, Prod.Liab.Rep. (CCH) P 19,377

## A. High-fructose corn syrup & Plaintiff's claim

Some facts are universally regarded as accurate. For one, as the name suggests, high-fructose corn syrup is derived from corn; though it is an over-simplification, HFCS is essentially made by exposing cornstarch to various enzymes and water. That process ultimately produces a sweet aqueous solution consisting of fructose and glucose. Fructose is often (though not always) found in slightly higher concentrations in HFCS than it is in sucrose—or simple table sugar, which has a 1:1 ratio of glucose and fructose. [2] Other, less common forms of HFCS, however, can contain much more fructose than sugar. (*See* Am. Compl. ¶ 25.)

[2]    According to a study published in the American Journal of Clinical Nutrition, it is called "high" fructose corn syrup because there is more fructose than ordinary corn syrup, which contains more glucose and is not as sweet as sugar or HFCS. John S. White, *Straight talk about high-fructose corn syrup: what it is and what it ain't* 88, No. 6 Am. J. Clin. Nutr. 1716–21 (2008), available at http://ajcn.nutrition.org/content/88/6/1716S.full

**\*2** HFCS was first integrated into the American food supply in the 1970s. (*Id.* ¶ 21) Because of the syrup's lower cost, it is commonly used as a substitute for sugar in processed foods. (*Id.* ¶ 23.) The Coca-Cola Company and PepsiCo., for example, began using HFCS instead of sugar in many of their beverage products in the 1980s. (*Id.* ¶ 23). There is no dispute that each defendant manufactures HFCS. There is also no dispute that fructose itself is an organic compound found naturally in a wide variety of fruits—like grapes, pears, and figs.

Other facts, this Court is aware, are vigorously contested by those in the science and nutrition communities, as well as by close observers of what has become a developing controversy. [3] But that debate is largely immaterial to the motion before this Court because facts alleged in Plaintiff's complaint (though not labels or legal conclusions) must be accepted as true for the purposes of resolving this motion. *See Ashcroft v. Iqbal,* 556 U.S. 662, 668, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). This Court is not in a position to make findings of fact on the hotly debated health effects of sugar and high-fructose corn syrup. Rather, this Court summarizes the allegations here for the purposes of context and background.

[3]    The Corn Refiner's Association's website, http://sweetsurprise.com, urges its visitors to learn why "HFCS has become a frequent topic of health discussions." The association represents companies that make the syrup.

To that end, Plaintiff alleges that fructose is metabolized differently than glucose—"almost entirely in the liver"—and that it can therefore lead to insulin resistence. (Am.Compl.¶ 28.) This lack of insulin, she alleges, creates rising levels of glucose, which in turn, leads to Type 2 diabetes. High-fructose corn syrup, Plaintiff also alleges, "by-passes the insulin-driven satiety system, suppressing the degree of satiety that would normally result from a meal of glucose or sucrose." (*Id.* ¶ 35 .) High-fructose corn syrup, in short, makes Plaintiff and others feel hungry when they should feel full. This "stimulates excessive and continued consumption." (*Id.* ¶ 46.) By extension, fructose is a "major cause of metabolic syndrome and Type 2 diabetes." (*Id.* ¶ 52.)

Plaintiff therefore alleges that her consumption of HFCS, supplied by Defendants and used in various end-products, such as popular soft drinks that "contain[ ] an average of 64–65% fructose" (*id.,* ¶ 66), caused, or at least was a substantial factor in causing, the disease from which she now suffers —Type 2 diabetes.

## B. Procedural history

Plaintiff filed a complaint in this Court on June 17, 2013. After the parties stipulated to an extension, Archer–Daniels–Midland Company, Cargill, Inc., Ingredion, Inc., and Tate & Lyle Ingredients Americas, LLC filed a joint motion to dismiss on August 30, 2013. Roquette America, Inc. filed a separate motion on September 13, 2013, but it largely incorporated the arguments made in the earlier motion.

Plaintiff then moved to amend her complaint on September 25, 2013. Briefing concluded on all the motions on November 15, 2013, at which time this Court took them under consideration.

## III. DISCUSSION

## A. Rule 12(b)(6)

**\*3** Rule 12(b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of a claim. Fed.R.Civ.P. 8(a)(2). But the plain

2014 WL 1600414, Prod.Liab.Rep. (CCH) P 19,377

statement must "possess enough heft to show that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1966, 167 L.Ed.2d 929 (2007).

When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. *ATSI Commc'ns,* 493 F.3d at 98. Legal conclusions, however, are not afforded the same presumption of truthfulness. *See Iqbal,* 556 U .S. at 678 ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id. at 678* (quoting *Twombly,* 550 U.S. at 570). Labels, conclusions, or a "formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged. *Iqbal,* 556 U.S. at 678. The plausibility standard is not, however, a probability requirement: the pleading must show, not merely allege, that the pleader is entitled to relief. *Id.* at 678; Fed.R.Civ.P. 8(a) (2). Well-pleaded allegations must nudge the claim "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570.

## B. Defendants' motion to dismiss [4]

[4] All parties apply New York law. Plaintiff resides in New York and presumably consumed HFCS in New York. Thus, sitting in diversity, this Court will apply New York law. *See, e.g., Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 61 (2d Cir.2004) (implied consent to New York law implicitly answers any choice-of-law question).

In essence Plaintiff contends that Defendants are liable for placing an unreasonably dangerous product in the stream commerce and for failing to warn of its dangerousness. To this end, she brings three causes of action: negligence (and gross negligence), strict products liability, and failure to warn.

To state any of these claims, a plaintiff must plausibly plead that her injury was a result, was a proximate cause, of the defendant's conduct. *See, e.g., Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 450 N.E.2d 204, 208 (1983). Defendants contend that Plaintiff has not adequately alleged that their HFCS—and not one of the many other factors that can lead to the development of Type 2

diabetes—plausibly caused (or was a substantial factor in causing) her disease. They therefore argue that the complaint must be dismissed for failure to plead proximate causation.

"Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. 662 at 679, 129 S.Ct. 1937, 173 L.Ed.2d 868. And where "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown —that the pleader is entitled to relief." *Id.* (citing Fed.R.Civ.P. 8(a)(2)).

**\*4** As Defendants point out, Type 2 diabetes is a multifactorial disease. It can be caused by, for example, a lack of exercise, genetics, or poor diet—or some combination of several factors. No expert opinion is required to arrive at this conclusion. *See id.,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief ... requires the reviewing court to draw on its judicial experience and common sense."). Yet, even accepting the allegations in the complaint as true, there is little in it to suggest that Plaintiff could prove that her consumption of some foods containing HFCS over the course of her life was a substantial factor in causing Type 2 diabetes. In other words, aside from idly listing various common foods she has eaten, Plaintiff offers limited facts that might lead this Court to believe that she could ultimately show that it was her consumption of these foods, and specifically the HFCS found within these foods (manufactured by these defendants) that led to her disease. One treatise captures this problem in a manner that calls to mind the now-relevant pleading standard by noting that "[a] mere possibility of such causation is not enough." WILLIAM L. PROSSER, LAW OF TORTS § 41 (4th ed.1971); *see Twombly,* 550 U.S. at 557–58 ("[W]e explained that something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value."). It may be possible that HFCS caused Plaintiff to develop Type 2 diabetes, but (based on the facts in the complaint) is it plausible?

In a case brought against McDonald's for its high-fat content food in the Southern District of New York, the court there essentially answered this question in the negative; it found that the plaintiffs failed to plead proximate causation. *Pelman ex rel. Pelman v. McDonald's Corp.,* No. 02 CIV.

7821(RWS), 2003 WL 22052778, at *12 (S.D.N.Y. Sept.3, 2003). Specifically, the district court found that the plaintiffs failed to "isolate the particular effect of McDonald's foods on their obesity and other injuries," and thus dismissed the case under Rule 12(b)(6). *Id.* In other words, the plaintiffs failed to show through their pleadings that McDonald's foods could have been a substantial factor in causing their obesity. Although the Second Circuit reversed, finding that "this sort of information [ ] is appropriately the subject of discovery," 396 F.3d 508, 512 (2d Cir.2005), that ruling's "continuing viability is open to question in view of the Supreme Court's subsequent interpretation of the requirements of Rule 8(a)." *Lovell v. GEICO Gen. Ins. Co.,* No. 12–CV–00546 AM, 2013 WL 7871497, at *5 (W.D.N.Y. Mar.29, 2013) (McCarthy, M.J.). Indeed, the concept that implausible claims can be weeded out in discovery, a concept highlighted by the *Pelman* panel ("Th [e] simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to ... dispose of unmeritorious claims," the panel wrote), was dispelled by *Iqbal* and *Twombly.* The Supreme Court held in *Twombly* that "[i]t is no answer to say that a claim just shy of a plausible entitlement to relief" can, if groundless, be weeded out early in the discovery process." 550 U.S. at 559. The *Iqbal* Court echoed that sentiment: "only a complaint that states a plausible claim for relief" can "unlock the doors of discovery." 556 U.S. at 679.

**\*5** But even assuming Plaintiff could surpass this hurdle, her claims fail for other reasons.

**1. Market-share liability does not apply**
In response to Defendants' arguments that Plaintiff has engaged in impermissible group pleading—that is, making undifferentiated allegations against the defendants as a group without identifying any wrongdoing on the part of any particular defendant—Plaintiff effectively concedes as much, but asserts that her claim should not be dismissed on this ground because she is proceeding under the doctrine of market-share liability.

Although the New York Court of Appeals has not determined whether market-share liability would apply in a situation such as this, this Court finds that New York would not permit Plaintiff to proceed under that theory. [5]

---

[5]    "Where there is no decision by the state's highest court[,] then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant

rulings of other courts of the State." *Travelers Ins. Co. v. 633 Third Associates,* 14 F.3d 114, 119 (2d Cir.1994).

Market-share liability, which has been "sparingly adopted," *Matter of New York State Silicone Breast Implant Litig.,* 166 Misc.2d 85, 88, 631 N.Y.S.2d 491, 493 (Sup.Ct.1995), "provides an exception to the general rule that ... a plaintiff must prove that the defendant's conduct was a cause-in-fact of the injury." *Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 240, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001). When the theory is permitted, "a defendant can be held liable absent any showing that it caused or contributed to the plaintiff's injury; instead, a defendant may be presumed liable to the extent of its share of the relevant product market." *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.,* 725 F.3d 65, 115 (2d Cir.2013) (citing *Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 511–12, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989)); *see also New York Tel. Co. v. AAER Sprayed Insulations, Inc.,* 250 A.D.2d 49, 54, 679 N.Y.S.2d 21, 25 (1st Dep't 1998) ("[T]he burden of proof may shift upon a mere showing that the defendants were engaged in manufacturing the product at issue, without reference to any proof that it was their particular product that caused injury to the plaintiff.").

In New York, the doctrine finds its roots in *Hymowitz,* where the New York Court of Appeals held that "plaintiffs injured by the drug DES were not required to prove which defendant manufactured the drug that injured them but instead, every manufacturer would be held responsible for every plaintiff's injury based on its share of the DES market." *Hamilton,* 96 N.Y.2d at 240, 727 N.Y.S.2d 7, 750 N.E.2d 1055.

"Key" to the court's decision in *Hymowitz* "were the facts that (1) the manufacturers acted in a parallel manner to produce an identical, generically marketed product; (2) the manifestations of injury were far removed from the time of ingestion of the product; and (3) the Legislature made a clear policy decision to revive these time-barred DES claims." *Hamilton,* 96 N.Y.2d at 240, 727 N.Y.S.2d 7, 750 N.E.2d 1055. "New York courts have declined to apply the theory in cases that do not meet that criteria." *Moreno v. Am. Home Products, Inc.,* No. A–3935–07T2, 2010 WL 4028605, at *6 (N.J.Super.Ct.App.Div. July 12, 2010) (citing *Hamilton,* 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055). In fact, New York's highest court has "refused to recognize [market-share liability] in any other context." *Enright by Enright v. Eli Lilly & Co.,* 77 N.Y.2d 377, 385, 568 N.Y.S.2d 550, 570 N.E.2d 198, 202 (1991).

*6 Plaintiff contends she ought to be able to proceed under this theory because HFCS is a fungible product and she cannot identify which company manufactured the HFCS that she consumed. But "[i]nability to locate evidence [ ] does not alone justify the extraordinary step of applying market share liability." *Hamilton,* 96 N.Y.2d 241. And fungibility is only one factor germane to the analysis. The other two "key" factors are absent here; there is no claim that the "manifestations of injury were far removed from the time of ingestion of the product" and certainly there has been no legislation suggesting an overriding public interest in allowing claims like this to proceed in this manner. Plaintiff does not argue otherwise.

Other considerations contemplated in determining if a plaintiff can proceed under this theory are also lacking. The Fourth Department of New York's Appellate Division identified those factors in *Brenner v. Am. Cyanamid Co.,* 263 A.D.2d 165, 171, 699 N.Y.S.2d 848, 852 (4th Dep't 1999). Weighing each factor, the *Brenner* court concluded that application of the market-share theory was inappropriate for claims against manufacturers of lead used in lead-based paint.

Like *Brenner*—but unlike *Hymowitz*—here there is no "signature injury" definitively linking the product to the harm—as adenosis is linked to DES, mesothelioma is linked to asbestos, or emphysema is linked to cigarette smoke. The *Brenner* court's finding on this point is applicable here. It rejected the plaintiff's claim because the plaintiff's "injuries could have been caused by some source other than [the alleged defective product]." 263 A.D.2d at 173, 699 N.Y.S.2d 848; *see also Giles v. A. Gi Yi,* 105 A.D.3d 1313, 1318, 964 N.Y.S.2d 319, 323 (4th Dep't 2013) (dismissing complaint because, among other reasons, the injuries alleged "could have been caused by some source other than lead").

Another factor "considered by the court in *Hymowitz* was the exclusive control of DES manufacturers over any risk produced by their product." *Brenner,* 263 A.D.2d at 172, 699 N.Y.S.2d 848. But here, again like *Brenner,* manufacturers of HFCS do not have exclusive control of the risk. There is no dispute that the makers of the end-products—not the defendants—decide "what quantities" of HFCS to use, just as the manufacturers of the paint—and not the manufacturers of the lead—decided how much lead to use.

Because these factors, some deemed "key," are absent on the face of Plaintiff's complaint, and considering the telling fact that New York has not recognized market-share liability as a permissible theory of recovery outside the DES context (a context which the New York Court of Appeals stressed was "singular"), this Court concludes that New York would not allow Plaintiff to recover under a market-share theory in this case. Because Plaintiff concedes that this is *the* theory under which she seeks recovery, her claims—whether for negligence, strict liability, or failure to warn—must be dismissed. *See, e.g., Zalewski v. T.P. Builders, Inc.,* No. 1:10–CV–876 GLS/RFT, 2011 WL 3328549, at *5 (N.D.N.Y. Aug.2, 2011)* ("The court will not accept ... vague group pleading to serve as a basis for liability."). *See also Robbins v. Oklahoma,* 519 F.3d 1242, 1250 (10th Cir.2008) ("Given the complaint's use of [ ] the collective term 'Defendants' ... with no distinction as to what acts are attributable to whom," the complaint must be dismissed); *Atuahene v. City of Hartford,* 10 F. App'x 33, 34 (2d Cir.2001) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the plaintiff's] complaint failed to satisfy [Rule 8's] minimum standard.").

**2. Not unreasonably dangerous**

*7 There is a second reason why this complaint must be dismissed even if causation is adequately pled: Plaintiff fails to plead that HFCS is unreasonably dangerous.

Plaintiff points to the high concentration of fructose in HFCS as the source of her illness. HFCS, she alleges, is more dangerous than sugar because of the way fructose is processed in the body. (*See, e.g.,* Am. Compl. ¶ 28) ("Since fructose is metabolized differently than glucose, it can and does lead to insulin resistence ."). But fructose is a naturally occurring compound, found in everyday, commonly-consumed fruits like grapes and pears. Certainly Plaintiff is not suggesting that these fruits are "toxic" substances. Yet this is precisely what Plaintiff appears to suggest: she does not distinguish between fructose found in fruit and fructose found in HFCS; rather, she alleges that "[f]ructose"—*not high-fructose corn syrup*—"is a major cause of metabolic syndrome and type 2 diabetes." (Am.Compl.¶ 52.) The studies attached to Plaintiff's amended complaint, on which she relies in bringing this claim, naturally arrive at the same conclusion: it is the *over-consumption* of *fructose* that may lead to increased obesity and other adverse health effects. *See* Miriam E. Borcarsly, *et al., High-fructose corn syrup causes characteristics of obesity in rats: Increased body weight, body fat, and triglyceride levels,* 97 Pharmacology, Biochemistry and Behavior, 101–06 (2010) (concluding that "over-consumption of HFCS could very well be a major

factor in the 'obesity epidemic' because *fructose* is processed differently than sucrose) (emphasis added); Theodore J. Angelopoulos, *et al.*, *The Effect of High–Fructose Corn Syrup Consumption on Triglycerides and Uric Acid,* The Journal of Nutrition (Supplement) (2009) ("There is considerable evidence of a detrimental effect on metabolic health of *excess fructose consumption.*"). (Emphasis added.)

But even accepting this premise as true, it alone does not state a products-liability claim. To be liable, Defendants' product must be "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." Restatement (Second) of Torts § 402A (1965). If there is no difference between HFCS and simple fructose, HFCS can hardly be said to be unreasonably dangerous. As the Second Restatement of Torts memorably puts it: "good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks." *Id.* Indeed, "many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption." *Id.* Particularly relevant to that final point is the uncontested fact that Defendants—as manufacturers of HFCS—do not control how much HFCS is used in the finished products that Plaintiff consumed.

Each cause of action therefore must be dismissed because the amended complaint fails to plausibly allege that HFCS is unreasonably dangerous. *See Affuso v. Crestline Plastic Pipe Co., Inc.,* 194 A.D.2d 884, 885, 599 N.Y.S.2d 157, 158 (1993) (dismissing claims because "[p]laintiffs [ ] failed to show that [the defendant] breached a duty of care owed to plaintiff by placing a defective, *unreasonably dangerous* product on the market, with actual or constructive notice of the defect, due to a mistake in the manufacturing process, improper design or because of a failure to warn") (emphasis added).

### 3. No safer alternative pled

 **\*8** Finally, regarding Plaintiff's claims for negligence and design defect, there is a third reason why this case must be dismissed even if the complaint adequately pleads causation.

Under New York law, in addition to a claim for failure to warn, a plaintiff may make two types of claims sounding in strict products liability: (1) a manufacturing defect, which results when a mistake in the manufacturing process renders a product that is ordinarily safe dangerous, and (2) a design defect, which results when the product as designed is not reasonably safe for its intended or foreseeable use. *Caruolo*

*v. A C & S, Inc.,* No. 93 CIV. 37529 RWS, 1999 WL 147740 (S.D.N.Y. Mar.18, 1999) (citing *Voss,* 59 N.Y.2d at 106–07, 463 N.Y.S.2d 398, 450 N.E.2d 204).

Plaintiff does not distinguish between manufacturing-defect and design-defect claims, but only a design-defect claim would be appropriate based on the facts alleged in her complaint; she is not claiming that there was some mistake or error in the manufacturing process. [6]

[6]  This applies to her negligence claim too. "In a defective design cause of action, a claim for negligent design defect is functionally synonymous with a claim for strict products liability with respect to the manufacturer." *Rose v. Brown & Williamson Tobacco Corp.,* 53 A.D.3d 80, 94, 855 N.Y.S.2d 119 (1st Dep't 2008) (Catterson, J., dissenting) (citing *Denny v. Ford Motor Co.,* 87 N.Y.2d 248, 258, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995)).

"To state a claim for defective design under New York law, a plaintiff must allege: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury." *DiBartolo v. Abbott Labs.,* 914 F.Supp.2d 601, 621 (S.D.N.Y.2012) (internal quotation marks omitted).

Plaintiff's claim here fails at the second prong; she does not attempt to allege how HFCS could be made safer. If, as Plaintiff suggests, it is the elevated levels of fructose in HFCS that make it unreasonably dangerous, then it is at least conceivable that a formulation of HFCS with lower levels of fructose would be a safer alternative. But Plaintiff fails to allege as much. Instead she argues that all HFCS—even those formulations with a lower fructose-to-glucose ratio than sugar—is unsafe, regardless of its composition. "High Fructose Corn Syrup in varying and multiple concentrations," she alleges, "was not reasonably safe and not fit for the ordinary purposes for which it was used." (Am.Compl.¶ 80.) This contradicts her earlier claim that HFCS is more dangerous than sugar *because* of its elevated levels of fructose and it fails to demonstrate how HFCS' risks could be removed without destroying its utility. *See. e.g., Voss,* 59 N.Y.2d at 109, 463 N.Y.S.2d 398, 450 N.E.2d 204; *see also DiBartolo,* 914 F.Supp.2d at 623 (dismissing design-defect claim on a 12(b)(6) motion because plaintiff failed to adequately allege a safer alternative design).

Plaintiff might be suggesting that HFCS should not be used at all, and that sugar ought to be used in its place.

But such an "impos[ition] [of] state law tort liability on the manufacture and sale of [HFCS] now on the market" would constitute "a virtual ban on [HFCS]." *Clinton v. Brown & Williamson Holdings, Inc.,* 498 F.Supp.2d 639, 648 (S.D.N.Y.2007) (discussing failure of plaintiff to show that there was a feasible alternative design for cigarettes). The *Clinton* court went on, "The vast majority of courts have been markedly unreceptive to the call that they displace markets, legislatures, and governmental agencies by decreeing whole categories of products to be 'outlaws.' " *Id.* Finally, it concluded emphatically, "This is exactly the type of claim that *Voss'* s alternative feasible design requirement was meant to disallow." *Id.* Thus, if the only alternative is an outright ban, no design-defect claim will stand. For this reason too, the negligence and design-defect claims must be dismissed.

**IV. CONCLUSION**

 **\*9** Plaintiff brings causes of action for negligence, design defect, and failure to warn against several makers of high-fructose corn syrup. Each of those claims, however, must be dismissed for several reasons, including Plaintiff's failure to plead that HFCS is unreasonably dangerous and her failure to connect her disease to the actions of any one defendant.

Plaintiff's claims for negligence and design defect must be dismissed for an additional reason: she has not alleged that there exists a feasible safer alternative method for the manufacture of HFCS.

Accordingly, Defendants' motions are granted and the complaint is dismissed.

**V. ORDERS**

IT HEREBY IS ORDERED, that Plaintiff's motion for leave to amend her complaint (Docket No. 28) is GRANTED.

FURTHER, Defendants' motions to dismiss (Docket Nos. 21, 25), construed against the amended complaint, are GRANTED.

FURTHER, that the Clerk of Court is directed to close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2014 WL 1600414, Prod.Liab.Rep. (CCH) P 19,377

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Distinguished by**   Adobe Systems Incorporated v. Blue Source Group, Inc.,  N.D.Cal.,  August 31, 2015

2010 WL 4916935
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Bernard S. SOUTHERLAND, Plaintiff,

v.

The NEW YORK CITY HOUSING AUTHORITY;
Sonya M. Kaloyanides, Acting General Counsel
and Attorney of Record for Nycha, in her official
capacity and individually; Irene Kambos, Attorney
for Nycha, in her official capacity and individually;
Joan Pannell, Nycha Hearing Officer, in her official
capacity and individually; Raquel Miranda in her
official capacity and individually; Regina Chu,
Current Project Manager for Nycha, in her official
capacity and individually; Earl Roberts, Former
Project Manager for Nycha; Chanelle Davis, Housing
Assistant for Nycha, in her official capacity and
individually; Kings County Landlord/Tenant
Court; Oymin Chin in her official capacity as a
Judge and individually; Maria Milin in her official
capacity as a Judge and individually, Defendants.

No. 10–CV–5243 (SLT).
|
Nov. 23, 2010.

**Attorneys and Law Firms**

Bernard S. Southerland, Brooklyn, NY, pro se.

*MEMORANDUM and ORDER*

TOWNES, District Judge.

**\*1**  On November 15, 2010, plaintiff Bernard S. Southerland, a New York City Housing Authority ("NYCHA") tenant, filed this fee-paid, *pro se* action seeking an injunction to prevent defendants from evicting plaintiff and unspecified damages for alleged violations pursuant to 42 U.S.C. §§ 1983, 1985, 1988 and 18 U.S.C. §§ 242 and 245. Subsequently, plaintiff requested that this Court: (1) issue a temporary restraining order; and (2) direct defendants to show cause why the Court should not issue a preliminary injunction enjoining defendants from evicting him from his NYCHA residence. As set forth below, this Court denies plaintiff's request without prejudice and directs plaintiff to amend his complaint within 30 days of the date of this Memorandum and Order.

**Background**

Plaintiff's complaint alleges that "defendants have failed to provide essential building services" including but not limited to "lack of elevator service," "refrigerator leaking," and "failure to provide security." Compl. at ¶ 22. Plaintiff also refers to an "administrative hearing process" as well as a bankruptcy proceeding and sues, among others, two judges presiding in landlord-tenant court in Kings County. Compl. at ¶ 23. Plaintiff files the instant fee-paid action alleging civil rights violations under 42 U.S.C. § 1983, malicious abuse of process, denial of a fair administrative hearing, denial of due process, and violation of a bankruptcy injunction. Compl. at ¶¶ 26–41.

Plaintiff's complaint also alleges that defendants "retaliat[ed] due to the fact respondent spoke [ ] out about the illegal tenant[s] Association, and how the Administrative hearing process denies tenants due process and forces tenant [s] to accept probation or face termination." Complaint at ¶ 22.

Plaintiff also filed an Affirmation in support of his request for this Court to: (1) issue a temporary restraining order; and (2) direct defendants to show cause why the Court should not issue a preliminary injunction enjoining defendants from evicting him from his NYCHA residence. [Docket Nos. 3 and 4.] The affirmation states that plaintiff and his family "will be homeless and suffer immediate and irreparable injury, loss, and damage ..." Affirmation at 3–4.

**Standard of Review**

In reviewing plaintiff's complaint, the Court is mindful that, "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers ." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (internal quotation marks omitted); *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*

*Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint need not include "detailed factual allegations," but it must do more than put forth "labels and conclusions." *Id.* at 555. A claim will be considered "plausible on its face" "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). If the Court determines that the action is frivolous, the court may dismiss the complaint *sua sponte* even if the plaintiff has paid the filing fee. *Fitzgerald v. First East Seventh Street Tenants Corp.,* 221 F.3d 362, 363–64 (2d Cir.2000) (*per curiam* ).

**Request for Injunctive Relief**

**\*2**  With respect to plaintiff's request for injunctive relief, this Court notes that both temporary restraining orders and preliminary injunctions are extraordinary remedies "that should not be granted as a routine matter." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir.1990); *D.D. v. New York City Bd. of Educ.,* CV–03–2489 (DGT), 2004 WL 633222, at \*23 (E.D.N.Y. Mar. 30, 2004). To obtain either a temporary restraining order or preliminary injunction, the moving party must show "that 1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.,* 175 F.3d 266, 270 (2d Cir.1999).

"[T]here is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it." *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Rels.,* 107 F.3d 979, 984 (2d Cir.1997) (internal quotations and citations omitted). Indeed, motions for preliminary injunctions are "frequently denied if the affidavits [in support of the motion] are too vague or conclusory to demonstrate a clear right to relief under Rule 65." 11A C.Wright & A. Miller, *Fed. Practice & Proc.,* § 2949 (2004); *see, e.g., McGillicuddy v. Laidlaw, Adams & Peck, Inc.,* No. 88 Civ. 4928, 1995 WL 1081307, at \*12, n. 19 (S.D.N.Y. Aug.14, 1995) (summarily denying an application for preliminary injunctive relief where the movant's papers failed to demonstrate a basis for granting "this extraordinary remedy").

Plaintiff's Affirmation alleges that he has a "weekly cable show," that he has made "report[s] to City, State, and Federal government agencies [about] ... dangerous conditions ... in the buildings," and that his "eviction is [a] retaliatory one." Affirmation at 4. However, plaintiff also alludes to on-going landlord-tenant proceedings, stating that he was recently "denied a stay from Landlord/Tenant Court in the Kings County," where presumably he had the opportunity to raise these issues. Affirmation at 4. Accordingly, plaintiffs Affirmation is insufficient to establish that plaintiff is likely to succeed on the merits.

**The Sufficiency of Plaintiffs Complaint**

In this connection, this Court notes that plaintiff's complaint itself does not allege sufficient facts to put defendants on notice regarding plaintiff's claims. Under *Federal Rule of Civil Procedure* 8(a)(2), a plaintiff's complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *See Goonewardena v. State of New York,* 475 F.Supp.2d 310, 320 (2d Cir.2007) (quoting Fed. Rule Civ. Pro. 8(a)(2)). The "statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (citations omitted); *Gillette Co. v. Philips Oral Healthcare, Inc.,* 2001 WL 1442637, \*7 (S.D.N.Y.2001) (internal citations in original). Additionally, "[a]lthough Fed.R.Civ.P. 8 does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Atuahene v. City of Hartford,* 2001 WL 604902, at \*1 (2d Cir.2001) (internal quotations and citations omitted) (dismissing complaint because plaintiff "lump [ed] all the defendants together" and "provid[ed] no factual basis to distinguish their conduct"). Accordingly, plaintiff's complaint "must, at the very least, fairly inform [each defendant] of the nature of the claims asserted, so that [a defendant] can understand those claims, and be able to prepare an answer and an adequate defense." *Gillette Co.,* 2001 WL 1442637 at \*7.

**\*3**  Plaintiff's complaint fails to give the defendants fair notice of plaintiff's claims and fails to allege facts against each individual and agency. Plaintiff's statement of facts lists allegations against "defendants" generally, however, it fails to distinguish defendants' conduct or allege facts against any individual defendant. *See, e.g., Atuahene,* 2001 WL 604902 at \*1 ("By lumping all the defendants together in

each claim and providing no factual basis to distinguish their conduct, [plaintiff's] complaint failed to satisfy this minimum standard, even after the district court graciously accorded him several opportunities to correct its manifest flaws."). Moreover, plaintiff's complaint fails to state how defendants violated 42 U.S.C. §§ 1983, 1985, 1988 or 18 U.S.C. §§ 242 and 245, the statutes under which plaintiff seeks relief.

Additionally, Plaintiff's complaint appears to be alleging a claim for First Amendment retaliation, however, it does not specify which defendants are associated with these allegations. Complaint at ¶ 22. Thus, plaintiff's complaint should be dismissed without prejudice for failure to state a claim under Rule 8(a).

**Leave to Amend**

When addressing a *pro se* complaint, a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

Accordingly, in light of this Court's duty to liberally construe *pro se* complaints, plaintiff is given 30 days from the date of this Order to file an amended complaint. *Cruz v. Gomez,* 202 F.3d 593 (2d Cir.2000). Plaintiff is directed that his amended complaint must comply with Rule 8(a) of the Federal Rules of Civil Procedure. Should plaintiff elect to file an amended complaint, plaintiff is directed to name as proper defendants those individuals who have some personal involvement in the actions he alleges in the amended complaint and provide the dates and locations for each relevant event. Even if plaintiff does not know the names of the individuals, he may identify each of them as John Doe or Jane Doe. To the best of his ability, plaintiff must describe each individual and the role he or she played in the alleged deprivation of his rights. In addition, he must set forth the factual allegations to support his claim against each named defendant, the dates and locations of all relevant events and the relief he is seeking.

The amended complaint must be captioned as an "Amended Complaint," name all individual defendants in the caption, and bear the same docket number as this Order. No summons shall issue at this time and all further proceedings shall be stayed for 30 days counted from the date of this Order.

If plaintiff fails to amend his complaint within 30 days as directed by this order, the Court shall dismiss this complaint.

**Conclusion**

**\*4** For the reasons stated above, this Court denies plaintiff's request without prejudice and directs plaintiff to amend his complaint within 30 days of the date of this Memorandum and Order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4916935

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3328549
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

James E. ZALEWSKI and Draftics, Ltd., Plaintiffs,
v.
T.P. BUILDERS, INC.; Thomas Paonessa; Roxanne
K. Heller; Deraven Design & Drafting; V.S.
Sofia Engineering; Sofia Engineering, PLLC;
Vincenzo S. Sofia; Cicero Building Dev., Inc.;
Luigi Cicero; Shelroc Homes, LLC; Capital
Framing, Inc.; Joseph M. Clark; Cillis Builders,
Inc.; and Theodore Cillis III, Defendants.

No. 1:10–cv–876 (GLS/RFT).
|
Aug. 2, 2011.

**Attorneys and Law Firms**

Delain Law Office, PLLC, Nancy B. Delain, Esq., of Counsel,
Schenectady, NY, for Plaintiffs.

Schmeiser, Olsen Law Firm, Arlen L. Olsen, Esq., of
Counsel, Latham, NY, for the Defendants T.P. Builders and
Thomas Paonessa.

Heslin, Rothenberg Law Firm, Annette I. Kahler, Esq.,
Caroline B. Ahn, Esq., Susan E. Farley, Esq., of Counsel,
Albany, NY, for the Defendants Roxanne Heller and
DeRaven Design.

Sugarman, Wallace Law Firm, Kevin R. Van Duser, Esq.,
Samuel M. Vulcano, Esq., of Counsel, Syracuse, NY, for the
Defendants V.S. Sofia Engineering, Sofia Engineering, and
Vincenzo Sofia.

Harris, Beach Law Firm, James R. Muldoon, Esq., of
Counsel, Syracuse, NY, for the Defendants Shelroc Homes,
Capital Framing, and Joseph Clark.

DeGraff, Foy Law Firm, George J. Szary, Esq., of Counsel,
Albany, NY, for the Defendants Cillis Builders and Theodore
Cillis.

Cicero Building Dev. and Luigi Cicero, No Appearance.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

### I. *Introduction*

**\*1** Plaintiffs James Zalewski and Draftics, Ltd. commenced
this action for copyright infringement under the Copyright
Act of 1976[1] against defendants T.P. Builders, Inc.
and Thomas Paonessa (T.P. defendants); Roxanne Heller
and DeRaven Design & Drafting (DeRaven defendants);
V.S. Sofia Engineering, Sofia Engineering, PLLC, and
Vincenzo Sofia (Sofia defendants); Cicero Building Dev.,
Inc. and Luigi Cicero (Cicero defendants); Shelroc Homes,
LLC, Capital Framing, Inc., and Joseph Clark (Shelroc
defendants); and Cillis Builders, Inc. and Theodore Cillis
(Cillis defendants). (*See* 2d Am. Compl., Dkt. No. 60.)
Pending are Shelroc defendants' motion to dismiss, (Dkt.
Nos.76, 77); T.P. defendants' motions to dismiss DeRaven
defendants' cross-claims, (Dkt. No. 101), and motion to
dismiss or, in the alternative, for summary judgment on
plaintiffs' claims, (Dkt. No. 107); DeRaven defendants'
motion to dismiss, (Dkt. No. 104); Cillis defendants' motion
to dismiss, (Dkt. No. 106); and Sofia defendants' motion to
dismiss or, in the alternative, for summary judgment, (Dkt.
No. 109). For the reasons that follow, defendants' motions
are granted insofar as plaintiffs' complaint is dismissed as
insufficiently pled, and plaintiffs are granted limited leave to
amend their complaint a third time.

[1]     17 U.S.C. § 101, *et seq.*

### II. *Background*

Plaintiff James Zalewski is a building designer who
specializes in the architectural and floor-plan design of
residential homes. (*See* 2d Am. Compl. ¶ 2, Dkt. No. 60.)
Plaintiff Draftics is a New York corporation, of which
Zalewski is the sole shareholder. (*See id.* at ¶¶ 3, 26.) Draftics
develops, drafts, and sells home designs for use in new home
construction. (*See id.* at ¶ 4.)

Between 1994 and 1998, Zalewski made the following home
designs: DRA210; DRA211; DRA212; DRA213; DRA216a;
DRA217; DRA218; DRA219; DRA313; DRA 316; and
DRA327. (*See id.* at ¶ 27.) According to Zalewski, at some

point he "made one single-use license per design to [T.P. defendants] to build each of the homes Zalewski designed." (*Id.* at ¶ 28.) Zalewski ceased doing business with T.P. defendants in 1998. (*See id.* at ¶ 33.) Since then, Zalewski has not made any assignment or transfer of copyright or "any license to use with any other contractor, builder, architect, engineer, or home designer." (*Id.* at ¶¶ 29, 31.) Nor has Zalewski entered into any type of agreement with any person or entity "outside of the normal course of business wherein [they] license their customers (who are not parties to the present action) to build one (1) house based on one (1) of [their] designs." (*Id .* at ¶¶ 30, 32.)

On July 16, 2010, plaintiffs commenced this action, naming ninety defendants, including the owners of record of numerous homes. (*See* Compl., Dkt. No. 1.) Shortly thereafter, on August 24, 2010, plaintiffs filed an amended complaint to add an additional defendant. (*See* Am. Compl., Dkt. No. 11.) Acting on the court's advice, plaintiffs stipulated to the dismissal of all but the T.P. defendants, DeRaven defendants, Sofia defendants, Cicero defendants, and Shelroc defendants. (*See* Dkt. Nos. 47, 51, 52, 53, 56, 61, 64, 68, 85.) Plaintiffs subsequently filed a second amended complaint, which additionally included Cillis defendants. (*See* 2d Am. Compl., Dkt. No. 60.)

 **\*2**  With minimal detail, plaintiffs allege that after successfully registering copyrights of their original home designs, (*see id.* at ¶¶ 35–38), the defendants unlawfully infringed on these designs. Plaintiffs seek (1) preliminary and permanent injunctive relief against all defendants; (2) actual damages under 17 U.S.C. § 504(b) for each infringement; (3) statutory damages under § 504(c) for each qualifying infringement; (4) treble damages under § 504(c) (2) for each qualifying infringement; and (5) attorneys' fees and costs under § 505. (*See id.* at 22–23.)

In the first cause of action, plaintiffs allege that T.P. defendants currently advertise homes that are being constructed or can be built in accordance with DRA210, DRA211, DRA212, DRA216a, DRA217, and DRA313. (*See id.* at ¶¶ 42–44.) Similarly, plaintiffs allege that Cicero defendants are advertising to build homes in accordance with DRA217 on the lots available in the "Kaleen Manor" development. (*See id.* at ¶ 45.)

As to the second cause of action, plaintiffs allege that, in reliance on the DRA211 design, Cicero defendants constructed and Sofia defendants designed and drew plans for a home constructed at 9 Kaleen Drive, Ballston Spa, New York. (*See id.* at ¶ 52.) According to plaintiffs, Cicero defendants and Sofia defendants "were, upon information and belief, aware of [his] DRA211 design at the time they made the designs[,] drawings[,] and specifications for ... and [began] construction of the [DRA211 home]." (*Id.* at ¶ 55.) In like conclusory fashion, plaintiffs allege that Cicero defendants and Sofia defendants had access to the DRA211 design through the T.P. defendants' single-use license, and that they knowingly, willfully, and intentionally participated in the infringing activities. (*See id.* at ¶¶ 56–59.)

In the third cause of action, plaintiffs allege that, based on the DRA212 design, Cillis defendants constructed and DeRaven defendants made the drawings for a home constructed at 11 Nicole Court, Clifton Park, New York. (*See id.* at ¶ 68.) Like the second cause of action, plaintiffs allege that Cillis defendants and DeRaven defendants, "were, upon information and belief, aware of [his] DRA212 design at the time they made the design and the construction of the [DRA212 home]." (*Id.* at ¶¶ 72–73.) According to plaintiffs, Cillis defendants and DeRaven defendants had access to the DRA212 design because Thomas Cillis had received a copy of the design from Zalewski, whereby Cillis and DeRaven defendants copied the DRA212 design in preparing the architectural drawings and constructing the DRA212 home. (*See id.* at ¶¶ 74–76.) And again, plaintiffs conclusorily allege that Cillis defendants and DeRaven defendants knowingly, willfully, and intentionally participated in the infringing activities. (*See id.* at ¶ 78.) But unlike the second cause of action, plaintiffs allege that construction of the DRA212 home commenced after Zalewski obtained copyright protection of the DRA212 design. (*See id.* at ¶ 68.)

 **\*3**  Plaintiffs' fourth and fifth causes of action largely mirror the second. In the fourth cause of action, plaintiffs allege that T.P. defendants, Shelroc defendants, and DeRaven defendants "[j]ointly and severally, upon information and belief," designed and constructed two homes based on the DRA217 design, the first located at 24 Arch Street, Albany, New York, and the second at 4186 Albany Street, Albany. (*Id.* at ¶¶ 87–97.) In the fifth cause of action, plaintiffs allege that, using the DRA210 design, DeRaven defendants made the drawings for and T.P. defendants are currently constructing a home at 23A Thoroughbred Circle, Bethlehem, New York. (*See id.* at ¶¶ 106–13.)

On November 19, 2010, Shelroc defendants filed a motion to dismiss, asserting, among other things, that plaintiffs' claims are barred under the three-year statute of limitations set forth by 17 U .S.C. § 507(b). (*See* Shelroc Defs. Mem. of Law at 5–7, Dkt. No. 76:6.) Presented with obvious questions regarding when plaintiffs' causes of action accrued, and forecasting a flurry of motions to dismiss from the other defendants, Magistrate Judge Randolf F. Treece ordered that Zalewski submit to a deposition limited to the accrual issue. (*See* Dec. 7, 2010 Order, Dkt. No. 83.) On December 22, 2010, Zalewski participated in a pre-discovery deposition. (*See* Delain Jan. 2, 2011 Letter, Dkt. No. 90.) As expected, DeRaven defendants, Cillis defendants, T.P. defendants, and Sofia defendants then moved on Zalewski's claims. (Dkt. Nos.104, 106, 107, 109.) T.P. defendants also moved to dismiss DeRaven defendants' cross-claims. (Dkt. No. 101.)

### III. *Standards of Review*

The standards of review under the Federal Rules of Civil Procedure 12(b)(6) and 56 are well established and will not be repeated here. For a full discussion of the standards, the court refers the parties to its previous opinions in *Ellis v. Cohen & Slamowitz, LLP,* 701 F.Supp.2d 215, 217–18 (N.D.N.Y.2010) (Rule 12(b)(6)); and *Bain v. Town of Argyle,* 499 F.Supp.2d 192, 194–95 (N.D.N.Y.2007) (Rule 56).

In bringing a copyright infringement action, the courts in the Second Circuit are generally in agreement that a heightened pleading standard must be met. To sufficiently plead a copyright infringement claim, a plaintiff must allege: "(1) which specific original works are the subject of the copyright claim; (2) that plaintiff owns the copyrights in those works; (3) that the copyrights have been registered in accordance with the statute; and (4) by what acts during what time the defendant infringed the copyright." *Plunket v. Doyle,* No. 99 Civ. 11006, 2001 WL 175252, at *4 (S.D.N.Y. Feb. 22, 2001) (citing, inter alia, *Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 36 (S.D.N.Y.1992)); *see also Jacobs v. Carnival Corp.,* No. 06 Civ. 0606, 2009 WL 856637, at *4 (S.D.N.Y. Mar. 25, 2009); *Krasselt v. Joseph E. Seagram & Sons, Inc.,* No. 01 CV 2821, 2002 WL 1997926, at *1 (S.D.N.Y. Aug. 29, 2002); *In re "Santa Barbara Like It Is Today" Copyright Infringement Litig.,* 94 F.R.D. 105, 108 (D.Nev.1982); *Gee v. CBS, Inc.,* 471 F.Supp. 600, 643 (E.D.Pa.1979). At a minimum, "a plaintiff [must] plead with specificity the acts by which a defendant has committed copyright infringement." *Marvullo v. Gruner & Jahr,* 105 F.Supp.2d 225, 230 (S.D.N.Y.2000).

*4 Rule 15(a) provides that where a party seeks to amend his pleading before trial, "[t]he court should freely give leave when justice so requires." FED.R.CIV.P. 15(a)(2). "A motion to amend should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party." *Richardson Greenshields Sec., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987) (internal quotation marks and citation omitted). "An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead,* 282 F.3d 83, 88 (2d Cir.2002) (citation omitted). Accordingly, where the plaintiff submits a proposed amended complaint, "the district judge may review that pleading for adequacy and need not allow its filing if it does not state a claim upon which relief can be granted." *Ricciuti v. N.Y .C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). However, the court "should not deny leave to file a proposed amended complaint ... unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief ...." *Id.* (internal quotation marks and citation omitted).

### IV. *Discussion*

At the threshold, the court is faced with several preliminary legal and procedural issues that must be resolved before this case can move forward. While these issues are specific to an action sounding in copyright infringement, they largely are a result of the manner in which plaintiffs have pursued this action. Particularly concerning is the fact that (1) over seventy-five defendants—many of whom were clearly not amenable to suit—have been dismissed from this action, (2) plaintiffs have already been given two opportunities to amend their complaint, and (3) plaintiffs continue to provide facially insufficient allegations and seek relief that is clearly unavailable under federal law. Stressing the continued insufficiency of plaintiffs' pleadings, defendants contend that the second amended complaint fails to meet the heightened specificity standard required in copyright infringement actions under FED.R.CIV.P. 8. (*See* Shelroc Defs. Mem. of Law at 3–5, Dkt. No. 76:6; DeRaven Defs. Mem. of Law at 13–14, Dkt. No. 104:1; Cillis Defs. Mem. of Law at 4–7, Dkt. No. 106:9; T.P. Defs. Mem. of Law at 5–6, Dkt. No. 107:1; Sofia Defs. Mem. of Law at 9–10, Dkt. No. 109:6 .) In response, plaintiffs counter that they should not be held to a heightened pleading requirement, but that if a

heightened standard is found to apply, the complaint satisfies —or can be amended to satisfy—such a standard. (*See* Pls. Resp. Mem. of Law at 7–11, Dkt. No. 89:1; Pls.2d Resp. Mem. of Law at 14–23, Dkt. No. 122.)

The court fully concurs with defendants that plaintiffs' second amended complaint is woefully underpled. [2] *See Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("Dismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." (citation omitted)). Nonetheless, the court will afford plaintiffs one more opportunity to amend their complaint in full compliance with the above-articulated pleading standards. Additionally, the court offers the following guiding principles and directives.

[2]    Insofar as plaintiffs contend that a heightened pleading standard is not appropriate in copyright cases, the court highlights plaintiffs' second amended complaint as a perfect example of why a heightened pleading standard is both appropriate and necessary. Because the complaint wholly fails to enable the court to evaluate the claims under the motion to dismiss framework, there can be no question that the complaint equally fails to provide the defendants with any meaningful notice of those claims.

**\*5** First, plaintiffs are advised that "an amended complaint supersedes the original complaint," *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.,* 129 S.Ct. 1109, 1122 n. 4 (2009) (citation omitted), and "renders it of no legal effect," *Int'l Controls Corp. v. Vesco,* 556 F.2d 665, 668–69 (2d Cir.1977) (citations omitted). Consequently, the court will not consider any of the allegations contained in plaintiffs' three prior complaints in future motion practice. Moreover, should plaintiffs wish to have any documents attached as exhibits to the complaint, those exhibits must be filed with the newly amended complaint; any already filed exhibits will not relate forward. And having reviewed the myriad exhibits filed with the original complaint, (*see* Dkt. Nos. 1:1–83), the court warns plaintiffs that any future filings must be clearly labeled and germane to the action and allegations in the complaint. "The [c]ourt will not search through [the] documents looking for evidence .... " *W. Supreme Buddha Ass'n Inc. v. Oasis World Peace & Health Found.,* No. 08–CV–1374, 2010 WL 3488134, at *1 (N.D.N.Y. Aug. 30, 2010). Nor will the court permit a dump of irrelevant documents into the record.

Second, the court is highly skeptical of whether plaintiffs have an adequate factual basis to establish each defendant's

actual involvement and susceptibility to suit. *See Peter F. Gaito Architecture, LLC v. Simone* Dev. Corp., 602 F.3d 57, 63 (2d Cir.2010); *Hamil Am. Inc. v. GFI,* 193 F.3d 92, 99–100 (2d Cir.1999); *Innovative Networks, Inc. v. Young,* 978 F.Supp. 167, 176 (S.D.N.Y.1997); *Demetriades v. Kaufmann,* 680 F.Supp. 658, 664 (S.D.N.Y.1988). The court will not accept conclusory allegations, conjecture, or vague group pleading to serve as a basis for liability. The same goes for the relief and damages sought. In particular, while the request for injunctive relief currently stands on what appears to be infertile ground, the record evidences few—if any—bases for the statutory and treble damages and attorneys' fees sought by plaintiffs. [3]

[3]    In their response papers, plaintiffs essentially admit that various aspects of their relief demands are not actually available. (*See* Pls. Resp. Mem. of Law at 18–19, Dkt. No. 89:1.) However, plaintiffs argue that it is defendants who "misconstrued" the complaint to assert any unavailable demands. (*See id.*) Again, it is not the defendants' misconstruction but rather the plaintiffs' poor draftsmanship that has given rise to the current problems.

Third, as to the issues regarding accrual under the statute of limitations, the court can only provide some legal observations. There is no dispute that civil actions brought pursuant to the Copyright Act are subject to a three-year statute of limitations, which precludes any action "unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b); *see also Merchant v. Levy,* 92 F.3d 51, 56 (2d Cir.1996). However, the parties ardently dispute the scope of the term "accrued" governed by the "discovery rule," such that a copyright claim begins to accrue when the plaintiff "knows or has reason to know of the injury upon which the claim is premised." *Merchant,* 92 F.3d at 56 (citation omitted). Defendants, on the other hand, contend that the "injury rule" applies, whereby a claim accrues at the time of the infringement. Defendants' contention is based principally on the Supreme Court's decision in *TRW Inc. v. Andrews,* 534 U.S. 19 (2001), and derivatively on a line of decisions that have emerged from the Southern District of New York.

**\*6** Historically, operating under a presumption that the discovery rule applies "when a statute is silent on the issue," federal courts have generally followed the discovery rule in the copyright context. *See, e.g., Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992); *Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 796 (4th Cir.2001); *Daboub v. Gibbons,* 42 F.3d 285, 291 (5th Cir.1995); *Zurich v. First Am. Title Ins. Co.,* 833 F.2d 233, 234–35 (10th Cir.1987).

In 2001, however, the Supreme Court—without deciding whether and to what extent the discovery rule presumption still endures—found it erroneous to imply a general discovery rule into the Fair Credit Reporting Act's statute of limitations where the statute's text and structure "evince[d] Congress'[s] intent to preclude judicial implication of a discovery rule" by, inter alia, expressly providing a more limited discovery rule exception. *See TRW,* 534 U.S. at 27–28, 33.

Following the *TRW* decision, several Circuit Courts continued to apply the discovery rule in copyright cases without addressing *TRW's* applicability. *See, e.g., Comcast of Ill. X v. Multi–Vision Elecs., Inc.,* 491 F.3d 938, 944 (8th Cir.2007); *Polar Bear Prods., Inc. v. Timex Corp.,* 384 F.3d 700, 706–07 (9th Cir.2004); *Bridgeport Music, Inc. v. Rhyme Syndicate Music,* 376 F.3d 615, 621 (6th Cir.2004); *Gaiman v. McFarlane,* 360 F.3d 644, 653 (7th Cir.2004); *cf. Guilbert v. Gardner,* 480 F.3d 140, 149 (2d Cir.2007) ("A federal court generally employs the 'discovery rule' ...." (citation omitted)). Not surprisingly, it was the district courts that began confronting the interplay of § 507(b) and *TRW,* with the majority finding that the discovery rule still applies in copyright infringement cases. *See, e.g., Frank Betz Assocs., Inc. v. J.O. Clark Constr., LLC,* No. 3–08–0159, 2009 WL 47143, at *1–2 (M.D.Tenn. Jan. 7, 2009); *Thornton v. J Jargon Co.,* 580 F.Supp.2d 1261, 1286 (M.D.Fla.2008); *Home Design Servs., Inc. v. B & B Custom Homes, LLC,* 509 F.Supp.2d 968, 972 (D.Colo.2007); *Crane Design, Inc. v. Pac. Coast Constr., LLC,* No. C05–251, 2006 WL 692019, at *4 (W.D.Wash. Mar. 17, 2006). The courts of the Southern District of New York, on the other hand, generally found that the legislative history of § 507(b) demonstrated that "Congress intended to adopt a three-year limitations period running from the date of the infringement." *See Auscape Int'l v. Nat'l Geographic Soc'y,* 409 F.Supp.2d 235, 244–47 (S.D.N.Y.2004); *see also Harris v. Simon & Schuster, Inc.,* 646 F.Supp.2d 622, 630 (S.D.N.Y.2009); *Broadvision Inc. v. Gen. Elec. Co.,* No. 08 Civ. 1478, 2009 WL 1392059, at *6 (S.D.N .Y. May 5, 2009); *Med. Ecuc. Dev. Servs., Inc. v. Reed Elsevier Grp ., PLC,* No. 05 Civ. 8665, 2008 WL 4449412, at *10 (S.D.N.Y. Sept. 30, 2008); *Vasquez v. Torres–Negron,* No. 06 Civ. 619, 2007 WL 2244784, at *5–7 (S.D.N.Y. July 11, 2007); *Roberts v. Keith,* No. 04 Civ. 10079, 2006 WL 547252, at *2–4 (S.D.N.Y. Mar. 7, 2006). In *C.A. Inc. v. Rocket Software, Inc.,* the Eastern District of New York followed suit, holding that a copyright "claim accrues with the act of infringement." 579 F.Supp.2d 355, 360 (E.D.N.Y.2008). Thus, the district courts in the Second Circuit who have grappled with *TRW's* impact on § 507(b)

have embraced what can best be described as the minority approach. This court, however, is reluctant to do the same.

**\*7** Although the *Auscape* decision—exhaustive and well reasoned as it is—is persuasive, this court finds the Third Circuit's opinion in *William A. Graham Co. v. Haughey* convincingly so. *See* 568 F.3d 425 (3d Cir.2009). Most importantly, as to civil copyright claims, the discovery rule best comports with the text and structure of the Copyright Act. *See id.* at 434–35. Specifically, a comparison of the Act's criminal limitations period, which begins to run when the "cause of action arose" and therefore embodies the injury rule, 17 U.S.C. § 507(a), with the Act's civil limitations period, which begins to run when "the claim accrued," *id.* § 507(b), dictates that the term "accrued" carries a meaning different from "arose" and therefore embodies a different rule, namely the discovery rule. *See Haughey,* 568 F.3d at 434–35. Moreover, while the *Auscape* court points out that Congress's consideration of a statutory exception for fraudulent concealment implicitly demonstrates that Congress intended for accrual to occur at the time of the infringement, since a discovery rule would render a fraudulent concealment exception "superfluous," *Auscape,* 579 F.Supp.2d at 246–47, the *Haughey* court highlights "the important fact ... that Congress rejected inclusion of any statutory exceptions to the statute of limitations period," *Haughey,* 568 F.3d at 436. And despite the policy interest in achieving national consistency with a bright-line rule, the court shares the Third Circuit's concern that certain types of infringement may not constitute truly "public acts" that are readily subject to detection. *See id.* at 437.

In sum, notwithstanding the court's receptiveness to the discovery rule's continued viability, [4] plaintiffs are advised to reevaluate their case, the basis for their claims, and their manner of execution. And the court warns plaintiffs that any further failure to adhere to the above-outlined directives will not be tolerated.

4    The court's discussion of accrual under § 507(b) is simply that, a discussion, and should not be interpreted to cut off future argument on the issue or otherwise preclude the parties from attempting to modify the court's viewpoint. Nor should the court's observations be interpreted to relieve plaintiffs of their burden to adequately plead their causes of action.

**V. *Conclusion***

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that defendants' motions to dismiss (Dkt.Nos.76, 77, 101, 104, 106, 107, 109) are **GRANTED** to the extent that plaintiffs' complaint is **DISMISSED** for failure to meet the pleading requirements under FED. R. CIV. P. 8; and it is further

**ORDERED** that defendants' motions are otherwise **DENIED;** and it is further

**ORDERED** that plaintiffs are GRANTED leave to file a third amended complaint, in full compliance with the terms of this Order, *within thirty (30) days* from the date of the filing of this Order, after which defendants may renew or supplement their

motions, or otherwise respond to the complaint as permitted under the Federal Rules of Civil Procedure; and it is further

**ORDERED** that if plaintiffs fail to file an amended complaint *within thirty (30) days* from the date of the filing of this Order, the Clerk of the Court shall enter judgment dismissing this action without further order of the court; and it is further

**\*8 ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3328549

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.